UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

------------------------------------- X
UNITED STATES OF AMERICA,              :   Criminal No. 21-cr-40 (TNM)
                                       :
v.                                     :
                                       :
PATRICK MCCAUGHEY III,                 :
                                       :
            Defendant.                 :   April 14, 2021
------------------------------------- X

### REPLY TO GOVERNMENT OPPOSITION TO MOTION TO REOPEN DETENTION HEARING AND FOR RELEASE ON CONDITIONS

The Defendant Patrick McCaughey III respectfully submits the following in response to the government's opposition brief.

**I.    THE GOVERNMENT PROVIDED NO SUBSTANTIVE REASONS WHY THE COURT SHOULD NOT REOPEN THE HEARING BASED UPON NEW INFORMATION.**

The government's entire opposition essentially concedes that the new information provided by the defendant is sufficient to reopen the bail hearing. Its position can be summarized like this: "despite the contents of the newly discovered interview, the inequity of the bail status of the similarly situated co-defendants, and the approximately $1,000,000.00 in new real estate security being offered, the court's original detention determination should stand." The only direct opposition the government provided to this threshold question of whether the bond hearing should be reopened is the conclusory statement that "[t]here is nothing in the defendant's motion that undermines the court's previous conclusion that the defendant McCaughey is a danger to the community and that there is no combination of conditions that will protect the community if he is released." *Opposition Brief*, pp. 1 and 8. Even that statement

1

expressly goes to the merits of whether Mr. McCaughey should be released and *not* whether there is sufficient new information for the Court to reopen the hearing.

The government also suggests that "it does not concede that the primary purpose of Officer Hodges' screams… has a 'material bearing,' on detention;" *Id.* p. 8; however, even that likewise conclusory assertion ignores both (a) the other critical aspect of Officer Hodges' interview, which seemingly confirms the defense's position that it was the efforts of Mr. McCaughey that were responsible for allowing Hodges to free his arm, and (b) the aforementioned other new information about both the codefendant's current status as well as the substantial additional bail package security.

Moreover, the government also concedes that the new bail package itself was sufficient to reopen the hearing, as its position in that regard assumes that the hearing is reopened. The government merely "defers to the Court" on the *substantive* issue "as to whether the defendant's proposed bail package … alters the determination that he is a flight risk." *Id.* p. 1.[1] For those reasons, the defendant avers that he has more than met that initial threshold requirement to reopen this hearing with the three to four important pieces of new information as set forth in his motion.

## II. THE GOVERNMENT HAS NOT REFUTED THE FACT THAT THE NEW INFORMATION FROM OFFICER HODGES UNDERMINES THE GOVERNMENT'S ORIGINAL DETENTION ARGUMENT.

As set forth in the defendant's Motion to Reopen, both the government and the Court relied heavily on the perception that Mr. McCaughey's alleged assault of Officer Hodges left him screaming in pain. The government now concedes, however, that this

---

[1] By leaving it to the Court, the government has seemingly abandoned its argument that Mr. McCaughey is a flight risk.

was not, in fact, true. Instead, the government half-heartedly suggests that, while Hodges could also have been "simultaneously in pain at the moment when defendant McCaughey was pinning him with a riot shield...," pain is not an element of 18 USC s. 111(b) Opposition *Brief*, pp. 10-11. The government further pivots from its original detention argument by suggesting that "irrespective of whether he experienced physical pain at the precise moment of his screams, he most certainly experienced a terrifying and traumatic experience..." *Id*. However, this is simply not what the government – and the Court – relied upon in detaining the defendant. Accordingly, this new information alone warrants the reopening of this hearing.

The Hodges interview also provides new contextual support for the defendant's consistent assertion – essentially unrefuted by the government in its opposition papers – that not only did he not intend to injure Hodges (or anyone else), but that he actually provided important aid to him.

    III.    **THE GOVERNMENT HAS EVEN LESS OF A RESPONSE TO THE NEWLY ENHANCED FACT THAT MR. MCCAUGHEY IS LIKELY THE PERSON MOST RESPONSIBLE FOR ACTUALLY *UNPINNING* OFFICER HODGES.**

Crucially, the government essentially glossed over what may be the most important fact upon which new light has been shed by Officer Hodges' interview – that *the defendant is very likely the person responsible for Hodges' being able to extricate himself from his predicament.* The only way the government addressed this claim in its opposition papers was to (a) create a strawman by falsely suggesting the defendant is casting himself as a "hero," and (b) thereafter making a single unsupported claim that

"the evidence does not bear that out."[2] *Opposition Brief*, p. 11. Nowhere does the government provide an alternative explanation for what is clearly Mr. McCaughey yelling to the crowd behind him: "Let this guy breathe! Let me back! Let me back! Let me back! See, Note 4, *infra*. The reason for that is two-fold. First, there is no alternative explanation; the defendant is the person who got the crowd to back off in order to help Officer Hodges. In addition, the government's entire case for detention (and for conviction) collapses when this Court realizes the logical incongruity of, on the one hand, its claim that the defendant was intentionally "squishing" Officer Hodges, and on the other hand, uncontroverted evidence that it was the defendant who actually assisted Hodges to get "unsquished."

### A. Officer Hodges' interview confirms that the defendant's efforts allowed him to extract himself from the doorway.

The statements of Officer Hodges in his WUSA9 interview provide important support for what the defendant believes is already apparent from the government's proffered video; namely, that it was the force of the mass of people pushing behind McCaughey that led to Officer Hodges being pressed against the door jamb, and not Mr. McCaughey.

In viewing the tunnel videos *before* seeing Officer Hodges' WUSA9 interview, it was difficult for the viewer to understand just what it was that allowed him to simply back out of the doorway in which he was previously stuck. However, evaluating Mr.

---

[2] The government's assertion that Mr. McCaughey is "no hero" is a classic strawman. Nowhere in the defendant's filings or arguments has he suggested he is a hero. To the contrary, the defendant has conceded that he exercised extremely poor judgment in getting so close to "the action." But it is nonetheless an undisputed fact that Mr. McCaughey rendered aid, in multiple ways, to Officer Hodges.

4

McCaughey's efforts to get the crowd move back now, *after* hearing Officer Hodges explain that (a) he was yelling to alert someone that he was in distress, and (b) he was thereafter "thankful" that someone was able to give him a "way out," it is evident that it was Mr. McCaughey who heeded his call and was able to secure for Hodges his "way out." He is the person who got the massive crowd to ease up enough to allow Hodges to back out of the door frame.[3]

Thus, not only has Hodges provided new context to the nature and purpose of his screams, but he has, whether intentional or not, provided evidence that Mr. McCaughey is most responsible for him being able to free himself from that doorway. Hodges' interview makes sense of what has heretofore been, to both the government and the Court, the apparent irreconcilability of Mr. McCaughey's actions in, on the one hand, allegedly intentionally assaulting Hodges, while on the other hand rendering him aid by (a) urging the crowd to back up in order that Officer Hodges could free himself, and then (b) lowering his face shield after his gas mask was ripped from his by a 3rd party, and then (c) alerting his fellow officers that he needed their help.

Again, to be sure, Mr. McCaughey exercised poor judgment in making his way to the front of the pack in that tunnel, picking up a defensive plastic shield, and staying there for some 3-5 minutes. But that hardly makes him guilty of intentionally assaulting Hodges or anyone else, with or without a deadly weapon.

---

[3] There is no evidence that Hodges was being pinned, and therefor possibly later freed, by his fellow officers from behind or by any other protestors or group of protestors from some other angle.

## B. If The Government Is Correct, Mr. Mccaughey Would Be One Of The Most Diabolical And Prescient Criminal Minds Of Our Time.

It remains the government's position in its opposition papers that Mr. McCaughey single-handedly and with intent to injure, "squished" Officer Hodges into the doorway. The government's own video shows plainly and clearly, however, that Hodges was pinned just as the mass of humanity behind the defendant began a fresh 20-second push forward, with the crowd moving as one to chants of "Heave ... Ho..." https://www.youtube.com/watch?v=qc0U755-uiM, (from 20:48 up to the point that Hodges begins to scream at around 21:08).

The government relies heavily on its hyperbolic, and now largely debunked herein, claim that Mr. McCaughey used the plastic shield to "crush Officer Hodges in the door" and suggests that, in so doing, McCaughey was acting upon his comment prior thereto, wherein he said to Officer Hodges: "come on man, you are going to get squished..." Opp. Brief p. 11. It is apparent, however, especially in light of Mr. McCaughey's other conduct in rendering assistance and aid to Officer Hodges, that he said that to Hodges precisely because he *did not* want him to be hurt.

In the context of the moment, when the throngs of protestors behind Mr. McCaughey were already propelling him firmly against Officer Hodges, the comment was merely a recognition of Officer Hodges current position, stuck between a doorway on one side, and McCaughey and the ever-pressing crowd behind him, on the other. It might be a different story had the defendant said: "I am going to squish you," but that simply is not what happened.

Further, and as aforesaid, the actions of Mr. McCaughey from the moment Officer

Hodges was, in fact, "squished," belie any feasible possibility that Mr. McCaughey was expressing an intention to "squish" him. It is simply irreconcilable that the defendant, on the one hand, intentionally pinned Officer Hodges, and then on the other hand, immediately took steps to allow him to be unpinned and to otherwise bring him aid and comfort.

To believe the government's position, one would essentially have to accept the following utterly implausible scenario: (1) Mr. McCaughey was personally pinning Officer Hodges in the doorway with the intent to injure him; (2) upon hearing Hodges' screams for help, McCaughey immediately and instantly came up with, and implemented, a plan for his potential criminal defense should he ever be indicted, by: (a) *pretending* that he was *not* responsible for Officer Hodges being pinned; (b) *pretending* to implore the crowd to back up and release the pressure so that Hodges could free himself; (c) *pretending* to care about Hodges by reaching over and lowering his protective face shield for him; and (d) *pretending* to be concerned that Hodges may be hurt by *repeatedly* calling him to the attention of his fellow officers.

Consider that, if the defendant was the one pinning Officer Hodges (with the intent to injure him) and then he had a "change of heart," as the government suggests, he would simply have stopped pinning him. The defendant would have had no reason whatsoever to holler to the crowd behind him, imploring them repeatedly to "let me back", which he most clearly did as evidenced by the audio and video from the YouTube video originally proffered by the government.[4]

---

[4] At approximately 21:12, when Officer Hodges begins to scream as the crowd was pushing forward in unison, you can clearly hear Mr. McCaughey yelling: "Let this guy breathe! Let me back! Let me back! Let me back!" It was only then that the people

7

Moreover, if the defendant had intended to pin Officer Hodges and to cause him injury, why on earth would he spend the effort, seconds later, to (a) reach out and lower Hodge's protective face shield for him, and (b) frantically try to alert fellow police officers that Hodges may be in need of assistance? The only logical explanation is that posited by the defense and supported by the government's video and Officer Hodges himself in his WUSA9 interview – that Mr. McCaughey not only did not assault or in any way intend to injury Officer Hodges, but he came to his aid on at least three separate occasions, including getting him *unpinned*.[5]

IV. THE DIFFERENCE BETWEEN THE EVENTS AS CAPTURED ON VIDEO, AND THOSE SAME EVENTS AS DEPICTED BY THE GOVERNMENT IN ITS OPPOSITION, IS AKIN TO SOMEONE ASSIGNING SUBTITLES TO THE WRONG FILM.

The fact that Mr. McCaughey's actions, while foolish and unwise, do not fit at least the most serious charges in this Indictment, is precisely why the government has been compelled to undertake such great intellectual contortions in its filings and arguments - it is simply not possible for the government to reconcile Mr. McCaughey's clear, multiple efforts to render aid to Officer Hodges, with the crimes with which it has grossly overcharged him.[6]

---

behind the defendant stopped pushing, allowing Officer Hodges to simply back himself out of the doorway. https://www.youtube.com/watch?v=qc0U755-uiM

[5] That Mr. McCaughey was not purposely pinning, squishing, or assaulting Officer Hodges is still further confirmed by the one piece of audio in its video that the government glaringly ignores. At 20:05 of the government's cited video, the defendant is clearly heard telling Officer Hodges: "don't try to use that stick on me, *I'm not hurting you.*" Id.

[6] This is also the likely reason why the government has been prone to overcompensate by the use of hyperbole and rank exaggeration in trying to describe its version of the defendant's conduct, as set forth more fully below.

8

The government described Mr. McCaughey's conduct, which is depicted clearly on publicly available video upon which it has relied, as "[a]ttacking" multiple officers, "engaging in hand-to-hand combat with Officer Foulds," and "fanatically and repeatedly" assaulting officers. While the issue of whether he assaulted anyone at all will ultimately be the province of the jury, the context of the charges (i.e., the circumstances of the alleged crime and the weight of the evidence as to the elements thereof) are for this Court to judge for purposes of this hearing.

Mr. McCaughey never once raised the plastic shield in an offensive matter. Nor did he "strike" anyone with it – there is apparently some video of Mr. McCaughey leaning forward with the plastic shield while he was attempting to deflect baton blows from Officer Foulds and others, but that can hardly be aptly described as "hand-to-hand combat." Most importantly, there is scant information in the record that would *even remotely establish that he had any "intent to injure,"* which the government concedes is a necessary element it will have to prove in order for the defendant to be guilty of the crimes of violence alleged. In its multiple filings and arguments to date on the issue of detention and amidst all of its exaggerations, *the government has yet to explain how the plastic shield, as it was used by the defendant, is a dangerous or deadly weapon, which is another necessary element of 18 U.S.C. 111(b).* See, e.g., US v. Schoenborn, (7th Cir. 4 F.3d 1424, 1433, note 6) ("The district court properly instructed that '[t]he term 'dangerous weapon' is defined as any object used in a manner likely to endanger life or inflict great bodily harm.'")

Additionally, the government wrongly suggests that "the defendant does not contest that Hodges was audibly screaming while being assaulted by defendant

9

McCaughey…" *Opposition Brief*, p.8. To the contrary, it has been Mr. McCaughey's position from the start, as set forth in his original Motion for Bond, the February 12 argument thereon (both of which are incorporated herein by reference), and the current Motion to Reopen, that Mr. McCaughey never assaulted Officer Hodges – or any other person.

The government further claims that Mr. McCaughey "knowingly and eagerly engaged in a violent insurrection to occupy the United States Capitol and abort the certification of a lawful and fair election." *Opposition Brief*, p. 17. Though there is much to unwrap in that single sentence, the government goes on to also allege that Mr. McCaughey intended to "occupy" the Capitol and to "stop the democratic process." *Id*. How the government can make these giant inferential leaps, in suggesting all of what Mr. McCaughey's intentions were, is a mystery.

Insurrection is defined as: "an organized attempt by a group of people to defeat their government and take control of their country, usually by violence." https://dictionary.cambridge.org/us/dictionary/english/insurrection. The government has proffered no evidence that Mr. McCaughey either: (a) was affiliated with any organized groups or protests; (b) made any anti-government statements before or after January 6; (c) coordinated or communicated with any other protestors; (d) was wearing any kind of "battle" attire; (e) brought with him any weapons of any kind; (f) brought provisions for an "occupation," or (g) otherwise acted with any premeditation whatsoever. Conversely, it seems clear that Mr. McCaughey was there with the intention to simply protest, things gradually got out of hand, he got "caught up in the moment," and, in his youthful exuberance, stupidly made his way to the front of the group of protesters inside the West

tunnel.[7]

If the defendant had entered the Capitol to protest the Congressional proceedings, like others have done before him,[8] there is nothing in the evidence to suggest that he would then have sought to "occupy" the building or "stop the democratic process." Notably, the U.S. Capitol is, in fact, generally open to the public, even on days when Congress is in session. https://www.visitthecapitol.gov/plan-visit/watching-congress-session.; https://www.uscp.gov/visiting-capitol-hill/visitor-information/building-access-hours.[9]

There is simply nothing in the record to support either the government's vastly overstated description of the defendant's conduct, or its overreaching inferences about Mr. McCaughey's intentions that day.

---

[7] And the still open question of whether the election was "lawful and fair" is precisely why at least several hundred thousand other protestors descended upon Washington D.C. that day. They weren't seeking an "insurrection" or "occupation." It is also why, as one prominent survey taken after January 6 revealed, a staggering 37% of the entire national electorate believed there was widespread fraud in the 2020 Presidential election. https://poll.qu.edu/national/release-detail?ReleaseID=3686 In other words, the protesters were not just a part of some "fringe element," as the government and media have consistently tried to portray.

[8] See, e.g., https://www.bbc.com/news/magazine-29280937 ("Code Pink" protest).

[9] There is also video evidence showing that many Capitol Police Officers: (a) willingly removed barricades to let protestors approach the Capitol building (b) let dozens of protestors literally just walk into the building, and (c) even took "selfies" with protestors. https://www.lifesitenews.com/news/videos-depict-capitol-police-letting-protesters-into-us-capitol-posing-for-selfies.

V. **THE GOVERNMENT ACKNOWLEDGED THAT SIMILARLY SITUATED CODEFENDANTS SHOULD BE TREATED SIMILARLY; YET IT DID NOT IN ANY WAY DISTINGUISH THE TWO IN THIS CASE**

The government admitted that "it is axiomatic that similarly-situated defendants should be treated similarly..." Opposition Brief, p. 13. It then went on to recite (a) the procedural history of the two defendants herein, and (b) platitudes about no two defendants being alike. Most importantly, the government concedes that Mr. McCaughey and Mr. Stevenson are "similarly situated defendants," as it didn't even make an effort to differentiate the two aside from their respective post-arrest procedural histories.

The reason the government didn't distinguish the two codefendants is because the government *can't* distinguish them – except in terms of their detention status – as they are as near mirror images in terms of alleged criminal conduct and personal history. The only notable distinction is that codefendant Stevenson is not only on release, but he has been so released without so much as an unsecured cosigner. Mr. McCaughey, on the other hand, has been detained for close to three (3) months now despite the fact that he has offered two successively greater and more substantial *secured* bail packages.[10] Given that the similarly situated codefendant was released with so much as an unsecured bond, it is hardly unreasonable for this defendant to be released after

---

[10] The government seems to imply there is some significance to the fact that Stevenson was released upon his initial presentment in the Norther District of Florida. However, Mr. Stevenson was later arraigned here in the District of Colombia and, over the government's objection, he was ordered released by this Court, through a Magistrate. Any way the government slices the pie, these two similarly situated defendants, under the same Indictment, are currently not being treated similarly in this District, in contradiction to the government's own acknowledged axiom.

providing some – or all if the Court deems necessary – of the proposed secured real property liens.

Quite serendipitously for the parties and the Court, a District Judge issued an Opinion this week in a case strikingly similar to this one, wherein it engaged in substantial comparisons between similarly situated defendants involved in the January 6 Capitol protest.

### A. U.S. v. Federico Klein, 21-cr-236 (JDB)

In U.S. v. Klein, 21-cr-236 (JDB), the government cited the within matter in arguing that Klein and McCaughey are similarly situated and therefore, because this defendant is incarcerated, so should be Mr. Klein.[11] The District Court in Klein distinguished Mr. McCaughey somewhat from Mr. Klein based upon allegations contained in the government's Opposition to this defendant's current Motion to Reopen and for Release. (ECF# 30). In particular, it appears the Court in Klein took at face value the government allegation that this defendant is "allegedly depicted on video using the shield to pin an officer against a door for over ten seconds as the officer screams for help..." Id. at p.22. Of course, the defendant herein avers <u>there is strong evidence now before this court that squarely and directly refutes that allegation</u>.

Notwithstanding that one area where the Court in Klein distinguished its defendant from Mr. McCaughey, there are several aspects of the allegations against Mr. Klein that are actually worse than those against Mr. McCaughey. In particular, Klein: (a) worked for the State Department and took an oath to defendant the Constitution; (b)

---

[11] As there is no mention of Mr. McCaughey in the government's opposition papers in Klein, presumably it made the analogy orally at the April 9, 2021 hearing.

13

spent almost 40 minutes in the tunnel, while this defendant spent around 5 minutes or so in total; and (c) was heard rallying the protestors, saying: "we need fresh people, we need fresh people," while Mr. McCaughey undertook no such leadership role.[12] Nonetheless, this defendant believes that, on balance, all similarly charged defendants in that tunnel, who have similarly spotless criminal histories, ought to be treated similarly as a matter of fundamental fairness.

Importantly, the Klein Court picked up on one of this defendant's primary arguments for release; to wit, the unwarranted disparity in treatment between Mr. McCaughey and his codefendant, Mr. Stevens, when it noted that "the government decided not to appeal the release of a codefendant in that same case, who is alleged to have used a stolen riot shield in the tunnel to [assault officers] and to have tried to take an officer's baton." Id. at p.23. The Court went even further in this regard, citing a string of "Capitol" cases where defendants are charged with assaulting officers under 18 U.S.C. s.111(b), but who have been released "without objection from the government." Id. (citing at least 5 cases where defendants, who are charged similarly to this defendant for conduct on January 6, have been released with government consent).

Most shocking, however, was the revelation in Klein that this defendant, 23-year-old Patrick E. McCaughey III who has heretofore lived an upstanding life, is the **ONLY** defendant alleged to have been at the "front of the line" in the West tunnel who is currently being detained. "And the government is not aware of any other individual – besides McCaughey – who, like Klein, was on the front line of the mob in the tunnel and

---

[12] Mr. McCaughey may himself have been partially lured into the tunnel – and deeper therein – by Klein's overtures.

14

is still detained pending trial." U.S. v. Klein, 21-cr-236 (JDB) (Opinion, 4/12/2021, p.23) (ECF# 9).

Ultimately, the Klein Court held that the government failed to establish a sufficiently articulable, concrete way in which the defendant would be too much of a danger to release. Hence, while Klein didn't pose *no* continuing danger at all, the Court held that "what future risk he does present can be mitigated with supervision and other strict conditions on his release."[13] Id.

As in Klein, the defendant herein avers that, although the government has not (because it cannot) articulated a specific, concrete danger that Mr. McCaughey may present in the future, even if the Court believes he presents some vague, lingering danger, it certainly can't rise to such a degree that it couldn't be "mitigated with supervision and other strict conditions of his release." Id.

Moreover, as the government pointed out in its opposition brief, it is axiomatic that similarly situated defendants should be treated similarly. As there is nary a sliver of paper separating Mr. McCaughey from Mr. Stevenson, fundamental fairness requires that Mr. McCaughey be given the opportunity to prepare for trial likewise on home confinement.

    B.    **U.S. v. Munchel**

The government purports to rely on the recent District Court of Appeals ruling in U.S. v. Munchel, 2021 WL 620236 (D.C. App. 2021) as supportive of a finding herein that Mr. McCaughey is such a danger to the community that no combination of

---

[13] This leaves Mr. McCaughey as the sole remaining detained individual from the West tunnel.

conditions can protect the community. In particular, it relies upon a distinction that Court made regarding those who did not commit violence, and "those who actually assaulted police officers…" However, the government is misapprehending a couple of key aspects of the holding in Munchel.

First, when it drew its aforementioned guide line, the Court specifically referred to those defendants who *actually assaulted police officers,* not those who are merely (over)charged as such, like Mr. McCaughey. Id. at 18-19. That is a big distinction, particularly here, where there is such clear, countervailing evidence calling those most serious assault charges into question.

Moreover, the facets of the Munchel opinion that are most relevance herein are those that flesh out the requirements the government must meet in order to establish a particular defendant is too much of a danger, moving forward, to be released. The District Court "did not adequately demonstrate that it considered whether [defendants] posed an articulable threat to the community…" Id. at 18.

The District Court in Klein actually summarized the import of Munchel in this regard squarely, when it found that "ultimately, the D.C. Circuit's holding is that a finding of dangerousness must be predicated on concrete determination that the defendant poses a continued, 'identifiable and articulable threat to the community' or to another person." (Klein, at 24) (emphasis in original) The Court further found that "the D.C. Circuit advised the district court to consider 'the specific circumstances that made it possible, on January 6, for the defendant to threaten the peaceful transition of power.'" Id. (citing, Munchel, at 8).

Here, we have a defendant who:

(1) hasn't so much as a jaywalking ticket in his entire life;

(2) has a stellar reputation;

(3) has construction work awaiting his arrival at home in CT;

(4) is a lifelong US resident and citizen;

(5) has turned over his passports to his attorney;

(6) has 3 separate family members willing to pledge real property;

(7) will execute a non-extradition waiver;

(8) came to D.C. unaffiliated with any groups or other protestors;

(9) arrived completely unarmed;

(10) had no plans other than to protest the questionable election results;

(11) exercised no leadership role;

(12) conspired with no one;

(13) used a plastic police shield to deflect police baton strikes for a couple of minutes; and

(14) has identified real and, at least in part, <u>uncontroverted evidence that he actually rendered comfort and aid to the primary officer he is alleged to have supposedly assaulted.</u>

As in <u>Munchel</u> and <u>Klein</u>, there is nothing about the defendant or his unpremeditated actions that day that would suggest he will be, in any way, a danger to the community, or any member thereof, should he be released, on conditions, during

the pendency of this case.[14]

Dated: Stamford, CT
April 14, 2021

                        Respectfully Submitted,

By: _____
Lindy R. Urso (ct 20315)
Attorney at Law
810 Bedford Street, Suite 3
Stamford, CT 06901
Tel: 203-325-4487
Fax: 203-357-0608
lindy@lindyursolaw.com

## CERTIFICATION OF SERVICE

This certifies that a copy of the foregoing Motion was filed via ECF on this 14th day of April in the year of our Lord 2021.

_____
Lindy R. Urso

---

[14] This is especially true because of the fact that the "ship has sailed" on 2020 election protests.