# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Case No. 21-cr-040 (TNM)** |
| | : | |
| PATRICK E. McCAUGHEY, III, | : | |
| ET. AL | : | |
| Defendants | : | |

## UNITED STATES' OPPOSITION TO DEFENDANTS JUDD'S, CAPPUCCIO'S, AND KLEIN'S SEVERANCE MOTIONS

The government opposes: (a) defendant David Judd's "Motion to Sever his Trial from those of his Codefendants," ("JM," ECF 206); (b) defendant Steven Cappuccio's "Motion to Sever" ("CM," ECF 207); and (c) defendant Federico Klein's "Motion to Sever" ("KM," ECF 249). Judd and Klein contend the charges against them were misjoined with those against their codefendants, in violation of Federal Rule of Criminal Procedure 8(b). Alternatively, they seek a severance pursuant to Federal Rule of Criminal Procedure 14. Cappuccio does not challenge the joinder but also seeks a Rule 14 severance. As explained herein, Judd's and Klein's Rule 8(b) claims are meritless and this Court should deny all three defendants' Rule 14 severance requests as a matter of its discretion, in order to efficiently manage its resources.

Defendants Tristan Stevens (ECF 246) Patrick McCaughey (ECF 247) and David Mehaffie (ECF 250) have adopted Judd's severance motion. That's improper. Although the "same legal standards apply to each defendant's motion to sever," "the fact-specific nature of the inquiry renders adoption by reference inappropriate." *United States v. Straker*, 800 F.3d 570, 625 n.19 (D.C. Cir. 2015); *see id*. ("We decline to determine in the first instance, without defendant-specific briefing, how the law applies to [the] codefendants") (declining to consider a defendant's

severance claim on appeal that was based only on his adoption of a co-defendant's argument under Fed. R. App. P. 28(i)). In any event, because the "adopted" motions are meritless, their adoption provides no basis for relief.

## A.    Background

The grand jury returned the fifty-three count Fifth Superseding Indictment that was filed on December 1, 2021. ECF 179. Defendants Judd, Cappuccio, and Klein were charged in the following counts, occasionally with one or all codefendants:

| Count 9: Klein | 18 U.S.C. §§ 111(a)(1) and (2) (Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting) | No codefendant |
|---|---|---|
| Count 16: Judd | 18 U.S.C. §§ 111(a)(1) and 2 (Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting) | codefendant Stevens |
| Count 17: Klein | 18 U.S.C. §§ 111(a)(1) and 2 (Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting) | No codefendant |
| Count 19: Klein | 18 U.S.C. §§ 111(a)(1) and 2 (Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting) | No codefendant |
| Count 22: Judd | 18 U.S.C. §§ 111(a)(1) and (b) (Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon) | No codefendant |
| Count 27 Klein | 18 U.S.C. §§ 111(a)(1) and (b) (Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting) | Codefendant Morss |
| Count 28: Cappuccio: | 18 U.S.C. §§ 111 (a)(l) and 2 ((Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting) | No codefendant |
| Count 29: Cappuccio | 18 U.S.C. §§ 111 (a)(l) and (b) ((Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon) | No codefendant |
| Count 30: Cappuccio | 18 U.S.C. §§ 2111 and 2 (robbery and aiding and abetting) | No codefendant |
| Count 31 Klein | 18 U.S.C. §§ 111 (a)(l) and 2 ((Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting) | No codefendant |

| Count 32 Klein | 18 U.S.C. §§ 111 (a)(l) and 2 ((Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting) | No codefendant |
|---|---|---|
| Count 33: Judd | 18 U.S.C. §§ 111(a)(1) and 2 (Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting) | codefendant Stevens |
| Count 34: Judd, Klein, and Cappuccio | 18 U.S.C. §§ 1512(c)(2) and 2 (Obstruction of an Official Proceeding and Aiding and Abetting) | All other codefendants |
| Count 35: Judd, Klein, and Cappuccio | 18 U.S.C. § 231(a)(3) (Civil Disorder) | All other codefendants |
| Count 38: Judd | 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon) | No codefendant |
| Count 42: Cappuccio | 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Disorderly And Disruptive Conduct In A Restricted Building Or Grounds with a Deadly or Dangerous Weapon) | No codefendant |
| Count 43: Klein | 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Disorderly And Disruptive Conduct In A Restricted Building Or Grounds with a Deadly or Dangerous Weapon) | No codefendant |
| Count 46: Judd | 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A) (Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon) | No codefendant |
| Count 50: Cappuccio | 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A) (Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon) | No codefendant |
| Count 51: Klein | 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A) (Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon) | No codefendant |
| Count 52: Judd, Klein, and Cappuccio | 40 U.S.C. §§ 5104(e)(2)(D) and 18 U.S.C. § 2 (Disorderly Conduct in a Capitol Building and Aiding and Abetting) | All other codefendants |
| Count 53: Judd, Klein, and Cappuccio | 40 U.S.C. §§ 5104(e)(2)(F) and 18 U.S.C. § 2 (Act of Physical Violence in the Capitol Grounds or Buildings and Aiding and Abetting) | All other codefendants |

In a minute entry filed on December 17, 2021, this Court allocated the defendants into two groups for trial. Group One, scheduled to begin trial on August 29, 2022, is comprised of McCaughey, Stevens, Morss, and Mehaffie. Group Two, scheduled to start trial on October 3, 2022, is comprised of Judd, Cappuccio, Quaglin, Sills, and Klein. Given that allocation, Judd's, Cappuccio's, and Klein's severance claims should be assessed against only the charges against the Group Two Defendants, since their trial will not involve the charges against the Group One Defendants.

**B.**    **Discussion**

**1.**    **Judd's and Klein's Rule 8(b) Arguments Fail Because They "Participated in the Same Series of Acts" as Their Group Two Codefendants When They Jointly Attacked Police Officers at the Same Time and Location, and for the Same Reason: to Obstruct the Congressional Certification Vote.**

Judd and Klein contend they were improperly joined with other defendants, in violation of Federal Rule of Criminal Procedure 8(b). They're wrong. Rule 8(b)'s standard for the joinder of multiple defendants is easily met in this case where all nine defendants, and in particular, the five Group Two Defendants, including Judd and Klein, participated in the same "series of acts" when they all physically attacked, within a relatively small confined space and during a narrow window of time, the police officers who were guarding the doors inside the Lower West Terrace Tunnel of the Capitol Building to prevent the mob of rioters from entering the building. The evidence will also show that all Group Two Defendants were motivated by the same goal: to disrupt the Congressional certification of the 2020 Presidential Electoral College vote, based on their beliefs that the 2020 Presidential Election had been "stolen."

In cases with multiple defendants and multiple offenses, Rule 8(b) provides the "standard for determining the permissibility of joinder of offenses." *United States v. Wilson*, 26 F.3d 142, 153 n. 4 (D.C. Cir. 1994) (cleaned up). It states:

> JOINDER OF DEFENDANTS.  The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or *in the same series of acts* or transactions, *constituting an offense or offenses*.  The defendants may be charged in one or more counts together or separately.  All defendants need not be charged in each count.

Fed. R. Crim. P. 8(b) (emphasis applied).[1]  Joint trials further several interests, including "conserving state funds, diminishing inconvenience to witnesses and public authorities, and avoiding delays in bringing those accused of crime to trial.'" *United States v. Brown*, 16 F.3d 423, 428 (D.C. Cir. 1994) (cleaned up). Consequently, "[t]here is a preference in the federal system for joint trials," *United States v. Bikundi*, 926 F.3d 761, 780 (D.C. Cir. 2019), and the D.C. Circuit construes Rule 8(b) broadly in favor of joinder, *see United States v. Nicely*, 922 F.2d 850, 853 (D.C. Cir. 1991) (it is "difficult to prevail on a claim that there has been a misjoinder under Rule 8(b)").

The propriety of joinder "is determined as a legal matter by evaluating only the 'indictment [and] any *other pretrial evidence offered by the Government*.'" *United States v. Carson*, 455 F.3d 336, 372 (D.C. Cir. 2006) (emphasis added). Joinder under Rule 8(b) "is appropriate if there is a 'logical relationship between the acts or transactions' so that a joint trial produces a 'benefit to the courts.'" *United States v. Spriggs*, 102 F.3d 1245, 1255 (D.C. Cir. 1996) (quoting *United States v. Perry*, 731 F.2d 985, 990 (D.C. Cir. 1984)).

---

[1] Fed. R. Crim. P. 8(a), on the other hand, applies only to the joinder in a single charging document of multiple counts against a single defendant. *See United States v. Gooch*, 665 F.3d 1318, 1325 (D.C. Cir. 2012).

     a.     **All Group Two Defendants are Properly Joined because of the Evidentiary, Temporal, Spatial, and Logical Intersections between their Criminal Conduct, Demonstrating They Participated in a "Series of Acts Constituting an Offense."**

Judd and Klein contend there is no "logical nexus" between the charged conduct of each of the codefendants. JM at 1-3, KM at 6. That ignores the charges and the expected trial evidence, summarized below. First, all Group Two Defendants, together with many dozens of others, jointly attacked, with deeds and words, the vastly outnumbered police officers positioned at the rear of the tunnel on the second landing of the Lower West Terrace ("LWT Tunnel" or "Tunnel") of the Capitol Building between approximately 2:40 p.m. and 4:20 p.m.  That the Defendants are not charged with conspiracy, JM at 1, or a "common scheme or plan," KM at 2, 6, is of no moment. *United States v. Gbemisola*, 225 F.3d 753, 760 (D.C. Cir. 2000); *United States v. Rittweger*, 524 F.3d 171, 177-78 (2d Cir. 2008).[2] Nor is the fact that most counts charge fewer than all defendants, and in some cases, only a single defendant. JM at 4. *See* Rule 8(b) ("The defendants may be charged in one or more counts together or separately."). What matters is that the Group Two Defendants' many actions during that sustained attack within a narrow, enclosed area and during a circumscribed time period amounted to their "participat[ion] in the … same series of acts …, constituting an offense or offenses." Rule 8(b).

That substantial overlap in the charged conduct triggers "the presumption and common practice [that] favor trying together defendants who are charged with crimes arising out of a common core of facts." *United States v. De La Paz-Rentas*, 613 F.3d 18, 23 (1st Cir. 2010). The government anticipates the trial evidence will prove the following, *inter alia*:

---

[2] Notably, Judd is charged with aiding and abetting in Counts 16, 33, and 34, and Klein is charged with aiding and abetting in Counts 9, 17, 19, 27, 31, 32, 34, 52, and 53.

- At various points between 12:50 and 2:40 p.m. on January 6,[3] at least three of the Group Two Defendants, Quaglin, Sills, and Klein, were in the front row of rioters who were facing off with police on the West Plaza of the Capitol Building at the foot of the partially constructed inaugural stage.  The remaining two Group Two Defendants, Judd and Cappuccio, were members of that same crowd on the West Plaza, but not yet at the forefront of the line confronting the police.  Similarly, at least three of the Group One Defendants, particularly McCaughey, Morss, and Stevens, were also repeatedly at the forefront of this same West Plaza crowd of rioters confronting the police at various points during this same timeframe.

- Beginning around 12:55 p.m. through 1:10 p.m., Quaglin and other rioters repeatedly assaulted the initial officers defending the West Plaza along the foot of the stage.  Then, from 1:15 p.m. through 2:25 p.m., multiple Group One and Group Two Defendants, including Morss, Quaglin, McCaughey, and Stevens, repeatedly stood at the forefront of that crowd, variously threatening the police or trying to get them to abandon their defense of the Capitol. During that time period, Morss, Quaglin, and other rioters worked together to rip away fences and protective equipment the officers were using to keep the rioters at bay. For instance, around 2:15 p.m., Morss and other rioters ripped away a fence held by an officer to keep the crowd back. Around ten minutes later, at 2:25 p.m., while standing at the forefront of the same crowd, Stevens told officers: "Know what happens when [you] get surrounded by your enemy? Know what treason is? Know what happens to those who commit treason? They get tied to a post and shot. Are you ready for that?"

- Beginning around 2:25 through 2:35 p.m., as rioters broke through the police line on the West Plaza and officers began to retreat, multiple members of the Group One and Group Two Defendants, including Sills, Quaglin, Morss, and Klein, took leading roles in pushing back the police as the police left the first terrace of the West Plaza and retreated to the Lower West Terrace.

- For instance, between 2:25 and 2:32 p.m., Sills and others pushed through the line of police officers on the West Plaza. Then, after the line has completely broken, he repeatedly threw items at the officers as they retreated up onto the inaugural stage.

- Between 2:33 and 2:34 p.m., Klein pushed against an officer who tried to move him away from that same defensive line on the West Plaza and also taunted the officers.

- At 2:34 p.m., Quaglin lunged at an officer on that same police line who was trying to protect a fallen colleague. Along with other rioters, Quaglin grabbed several police riot shields.

- From 2:40 through 3:20 p.m., all Group One and Group Two Defendants worked their way up to the second landing of the Lower West Terrace and converged in the LWT Tunnel, where they and other rioters assaulted officers en masse in an attempt to push their way into the Capitol.

---

[3] These times are all approximate.

- At 2:40 p.m., Sills was among the first group of rioters to ascend the inaugural stage and reach the LWT Tunnel. There, Sills ripped away a police baton from Officer C.W., briefly left the Tunnel, then returned inside and used the baton to strike at officers, including Officer C.W. and Officer V.B.

- Group One Defendants similarly converged in the Tunnel and began assaulting the same officers as a group. Beginning around 2:40, Mehaffie entered the Tunnel and began trying to push past the police guarding the doors. Starting at 2:52 p.m., Mehaffie stood on a ledge outside the tunnel beckoning additional rioters in and helping coordinate the surge against the line of officers. Mehaffie maintained this position and continued to direct and coordinate the efforts to heave past the police line in the tunnel until around 3:20 p.m., when he was finally forced off the ledge.

- The other Group One Defendants, McCaughey, Stevens, and Morss, all entered the tunnel shortly after Mehaffie, with McCaughey and Stevens first entering around 2:49 p.m. (when they joined their first joint pushing effort to try to get past the police) and Morss entering around 2:57 p.m.

- Meanwhile, Klein entered the tunnel at 2:43 p.m. and beckoned other rioters to join him.

- At 2:43 p.m., Judd was among the initial crowd of rioters who reached the inaugural stage and swarmed towards the Capitol Building. Around the same time, Cappuccio began to work his way through the crowd to the tunnel.

- By 2:56 p.m., Judd entered the Tunnel and beckoned other rioters to join him. He then joined a group of rioters (including Klein and Stevens) who were pushing en masse against the line of officers seeking to prevent the rioters from entering the Capitol. The officers being pushed against by this group included, among others, Officers C.W., A.G., V.B., and O.F.

- At around that time, Cappuccio began moving to the front of the line of rioters confronting the police in the Tunnel, entering the Tunnel around 3:06 p.m.

- Between 2:58 and 3:00 p.m., Sills continued to use the stolen baton to strike at officers, including Officer C.W.

- Between 3:00 and 3:01 p.m., Klein used a stolen riot shield as a wedge to prevent Officer C.W. from closing a door in the Tunnel leading to the interior of the Capitol, allowing other rioters to pull the door back and assault the police. Klein yelled, "we need more people."

- One minute later, Judd was standing at the mouth of the Tunnel, speaking to Klein.

- One minute after that, at 3:03 p.m., Judd (joined by Quaglin, Stevens, and McCaughey) re-entered the Tunnel. Quaglin (assisted by Morss) ripped a riot shield away from Officer P.N.

- At 3:06 p.m., Judd (with Morss) urged the crowd to pass the stolen riot shields to the front of the group confronting the police to create a "shield wall." Morss, Judd, Stevens, McCaughey, and other rioters then all worked together to pass the stolen shields forward to the front line of rioters confronting the police. Judd then threw a lit firecracker at the line of officers, including, among others, Officers J.M., A.G., O.F., D.H., and P.N., then retreated from the Tunnel.

- Around the same time, Quaglin sprayed a chemical irritant in the face of Officer O.F. as he and the other officers attempted to fend off the group.

- From around 3:07 to 3:14 p.m., Quaglin, Cappuccio, and Klein continued to battle the police, using the stolen riot shields and assisting in the group effort to heave against the police line, including, among others, against Officers A.G., O.F., H.F., P.N., and D.H. (Morss, McCaughey, and Stevens worked with them against the line of officers at various points.)

- At 3:11 p.m., Cappuccio violently yanked a gas mask off the face of Officer D.H., stole his baton, and then used the baton as a weapon to beat Officer D.H.[4]  As this occurred,

---

[4] During his testimony on July 27, 2021 before the House Select Committee to Investigate the January 6 Attack on the United States Capitol, Officer D.H. recounted that attack as follows:

> On my left was a man with a clear riot shield stolen during the assault. He slammed it against me, and with all the weight of the bodies pushing behind him, trapped me. My arms were pinned and effectively useless, trapped against either the shield on my left or the doorframe on my right. With my posture granting me no functional strength or freedom of movement, I was effectively defenseless and gradually sustaining injury from the increasing pressure of the mob. Directly in front of me, a man seized the opportunity of my vulnerability, grabbed the front of my gas mask, and used it to beat my head against the door. He switched to pulling it off my head, the strap stretching against my skull and straining my neck. He never uttered any words I recognized but opted instead for guttural screams.
>
> I remember him foaming at the mouth. He also put his cell phone in his mouth so that he had both hands free to assault me. Eventually, he succeeded in stripping away my gas mask, and a new rush of exposure to CS and OC spray hit me. The mob of terrorists were coordinating their efforts now, shouting, "Heave, ho" as they synchronized pushing their weight forward, crushing me further against the metal doorframe. The man in front of me grabbed my baton that I still held in my hands, and in my current state, I was unable to retain my weapon. He bashed me in the head and face with it, rupturing my lip, and adding additional injury to my skull.

McCaughey pinned Officer D.H. against the door with one of the stolen riot shields. While standing next to McCaughey, Quaglin used a stolen shield to push against the officers standing directly next to Officer D.H. while he was pinned.  Morss, Klein, and other rioters simultaneous assisted by using their collective force to assist Quaglin, McCaughey and others pressing up against the line of officers guarding the doors.

- Two minutes later, at 3:13 p.m., Cappuccio, holding that stolen baton, retreated from the Tunnel.

- From 3:15 p.m. through 3:19, Klein repeatedly used yet another stolen riot shield to push against the line of officers defending the Capitol, including Officer H.F.

- At 3:20, police pushed all the rioters, including Quaglin and Klein, from the tunnel and forced Mehaffie from the perch where he had been directing the rioters into the tunnel. Klein, Mehaffie, Judd, Stevens, Quaglin, and Morss remained on the second landing of the LWT for much of the next hour. Judd stayed by the entrance to the tunnel until 4:15 p.m., encouraged other rioters to enter the Tunnel and washed chemical irritants from the faces of rioters who had been sprayed by the police. Stevens and Judd then joined rioters as part of a group effort to push against the police line in the tunnel once again around 4:15 p.m. through 4: 20 p.m. As that effort was ongoing, Morss and other rioters entered the Capitol through a broken window to the side of the Tunnel.[5]

Under the reasoning in *United States v. Slatten*, 865 F.3d 767 (D.C. Cir. 2017), the Group Two Defendants' actions in and around the LWT Tunnel on January 6 between 2:40 and 4:20 p.m. amounted to the "same series of acts constituting … offenses." Defendants in *Slatten* were members of a team of military contractors, the "Raven 23" team, employed by Blackwater, a private security company. In response to a car bombing in Baghdad on September 16, 2007, the team, traveling in four armored vehicles, went to a traffic circle near Nisur Square, the site of a previous car bombing. Upon their arrival, the Raven 23 team, together with Iraqi police, stopped

---

Transcript of July 27, 2021 Hearing at pp. 41-42.

[5] Judd contends "the only factual overlap" of his case with others "from the face of the Indictment" is the averment that "he is alleged to have encouraged (*i.e.*, waved, cheered) the assaultive conduct of Defendant Stevens." JM at 8. But in ruling on Judd's misjoinder motion, this Court is not limited to the indictment. *Carson*, 455 F.3d at  372. As the foregoing factual narrative shows, the government will present evidence of a substantial overlap between Judd's criminal conduct and that of several if not all of his Group Two codefendants.

all traffic in the square. Members of the team directed several gunshots at a white Kia sedan that had been "flagged" as the type of vehicle that might be used in a car bombing. The gunshots wounded the driver, and an Iraqi police officer waived his arms in an attempt to stop the gunfire. But the team members unleashed a heavy barrage of gunfire into the Kia, killing the passenger. Indiscriminate gunfire by the team members then struck other areas of the square.  At least 31 Iraqis were killed or wounded during the altercation. *Id*. at 777-78.

Eight defendants were initially charged in this Court with offenses arising from the deadly shootings. D.D.C. 1:08-cr-00360. Venue in this Court was invoked pursuant to 18 U.S.C. § 3238, which establishes venue for "offenses not committed in any district." Under § 3238, venue for such offenses is proper in any district where, *inter alia*, any "joint offender" is arrested. The government claimed that venue was proper in this Court because codefendant Jeremy Ridgeway voluntarily traveled to the District of Columbia, where he pleaded guilty to voluntary manslaughter. 865 F.3d at 786.

Four defendants went to trial; three were convicted of voluntary manslaughter, attempted manslaughter and using and discharging a firearm in relation to a crime of violence. A fourth, Nicholas Slatten, was convicted of first-degree murder. *Id*. at 778. On appeal, defendants claimed that venue was improperly laid in this Court under § 3238 because Ridgeway was not arrested here. *Id*. at 786. In rejecting that claim, the Court of Appeals noted that "Ridgeway was present in Nisur Square as a member of the Raven 23 convoy and … he fired at civilians to the south, to the west and finally to the north, *meaning he participated in the 'same series of acts or transactions' that gave rise to the prosecution pursuant to Rule 8(b)*." *Id*. at 788 (emphasis added). That was so even though Ridgeway was not charged with conspiracy and the shootings were a spontaneous reaction by the Raven 23 defendants to events quickly unfolding at Nisur Square, and  even though

each of the defendants did not join in all of the acts of his codefendants. *Id*. at 788. Here, as in *Slatten*, the Group Two Defendants engaged in the "same series of acts," when they reacted with coordinated violence in response to a quickly developing situation at the LWT Tunnel.

For the same reasons, Judd's and Klein's contention that the codefendants' conduct on January 6 was not "concerted," JM at 2, KM at 2, and involved "separate acts," JM5, is incorrect. Where all Group Two Defendants were acting in the same small space at the same time to achieve the same goal based on the same provocation, occasionally directly with one another, there was sufficient "commonality" in their conduct to satisfy the "same series of events" requirement of Rule 8(b), as there will be substantial overlapping evidence that applies to multiple defendants. *See United States v. Hubbard*, 474 F. Supp. 64, 87 (D.D.C. 1979) ("The predominant factor in the analysis of a joinder problem is the commonality of proof.").

Judd contends the "proximity" of the joined defendants' conduct *may not* be a sufficient nexus to justify Rule 8(b) joinder. JM at 8. But this is not a case of mere spatial and temporal proximity without other significant connections. That would occur, for instance, if two defendants simultaneously robbed banks across the street from each other with no other connection between the two crimes. Joinder under Rule 8(b) in that situation would be improper. *See United States v. Jackson*, 562 F.2d 789, 790–97 (D.C. Cir. 1977) (joinder of "dissimilar and apparently unconnected crimes" was improper; "We know only that the crimes occurred at about the same time and about the same place.").[6]

---

[6] Judd's and Klein's reliance on *Jackson*, JM at 3-4, 6-7, KM at 6, is unavailing. There, two defendants were jointly charged with assault with intent to rape two women. In the same indictment, they were jointly charged with a purse snatching robbery of a third woman. The robbery and the attempted rape occurred within a short time and in close proximity of each other. Those crimes were not otherwise related, however. The Court of Appeals held that the mere temporal and spatial proximity did not make the assault and the robbery a single series of acts or transactions, so joinder of the robbery and assault counts under Rule 8(b) were improper. 562 F.2d

But this case is more akin to two men separately entering the same bank at the same time, both intending to rob it, and then carrying off the robberies simultaneously, with one robber forcing the tellers to empty their teller drawers while the other forced the manager to open the vault so he could steal its contents. Even if the two robbers are not charged with conspiracy and the evidence failed to show they agreed in advance to jointly rob the bank, the fact that the two robberies occurred simultaneously, with the robbers engaging in mutually reinforcing actions by causing the victims to defend against both robberies at the same time, would permit joinder under Rule 8(b) because the two robberies constituted the "same series of acts constituting an offense or offense," to be proved largely with the same evidence.[7]

---

at 793-97.  But the decision in *Jackson* did not suggest that spatial and temporal proximity is entirely irrelevant for the joinder analysis.

Neither Judd nor Klein argue, as Jackson successfully did, that the charges against him did not involve a common "series of acts or transactions," and as shown above, they clearly did. Rather, each of them contends that the charges against him did not involve the same series of actions or transactions as those involved in the charges against their codefendants. As explained above, there is easily a sufficient commonality of criminal conduct, victims, motives, evidence, and concerted action to satisfy Rule 8(b). *See United States v. Perry*, 731 F.2d 985, 991 (D.C. Cir. 1984) (distinguishing *Jackson* and affirming the denial of severance where the charges involved "two cocaine transactions involving the same purchaser, the same intermediary (Perry), and conducted at the same place in the same manner").

[7] Judd and Klein repeatedly invoke *Kotteakos v. United States*, 328 U.S. 750 (1946), but it has no application here. Indeed, it does not address joinder at all. Rather, in *Kotteakos*, the Supreme Court held the evidence was insufficient to prove a single conspiracy where the central figure was the center of a "spoke and wheel" criminal enterprise, and the others (the "spokes") had contact only with the "hub," but had no knowledge of each other. The Court concluded that the evidence proved several conspiracies, each between a spoke and the hub, and not the single conspiracy charged in the indictment. *Id*. at 756. Here, no conspiracy is charged and an assessment of the sufficiency of the evidence must await trial.

  **b.**  **Contrary to Klein's Contention, Rule 8(b) does not Require a "Common Scheme or Plan Spanning Both Transactions and Defendants."**

Citing *United States v. Perry*, 731 F.2d 985 (D.C. Cir. 1984), Klein contends that to "properly join two defendants in this District, the Government must sufficiently demonstrate 'the existence of a common scheme or plan spanning both transactions and both defendants.'" KM at 6. But nothing in the text of Rule 8(b) requires a "common scheme or plan," and neither *Perry* nor any other decision from the D.C. Circuit has imposed such an atextual requirement.

In *Perry*, the D.C. Circuit *affirmed* the district court's denial of a severance motion. 731 F.2d at 932. There, defendant Lynch claimed he was improperly joined with Perry because he was not involved in both drug transactions charged in the indictment. Specifically, the evidence proved that Lynch was not clearly involved in the first transaction between Perry and an undercover police officer on September 28 but was clearly involved in the second transaction between Perry and the undercover officer on October 12. The court concluded that Lynch was properly joined in the indictment because the government "made an adequate showing of commonality between the two transactions," where both "involve[d] the same purchaser, the same intermediary (Perry), and [were] conducted at the same place in the same manner." *Id.* at 991.

Although the D.C. Circuit also stated that the government "sufficiently demonstrated the existence of a common scheme or plan spanning both transactions and both defendants," *id.*, it did not hold that Rule 8(b) required such a scheme or plan. Rather, it stated that Rule 8(b) required "'two or more acts or transactions connected together *or* constituting parts of a common scheme or plan,'" *id.* at 990 (emphasis added), meaning the rule could be satisfied by either a sufficient "connection of acts or transactions" or "a common scheme or plan."

Plainly, a "common scheme or plan" is one kind of connection or nexus, but not the only kind. An indictment need not "include a conspiracy charge or an allegation that each of the defendants aided and abetted one another in order to satisfy the joinder requirements under Rule 8(b)," even though "such allegations would likely simplify the analysis under Rule 8(b)." *United States v. Melvin*, 143 F. Supp. 3d 1354, 1364 (N.D. Ga. 2015), *aff'd*, 918 F.3d 1296 (11th Cir. 2017). *See also United States v. Butera*, 677 F.2d 1376, 1385 n. 7 (11th Cir.1982) ("The absence of a conspiracy charge in the case before us is of no significance in the Rule 8(b) analysis.").

> ### c.    Judd and Klein are Charged in Multiple Counts with all their Group Two Codefendants, Reinforcing the Propriety of the Joinder of those Defendants in a Single Indictment.

Judd contends that joinder is improper because he is jointly charged in only one count with a codefendant, Count 33, charging Judd and Stevens with violating 18 U.S.C. § 111(a)(1) and 2, assaulting, and aiding and abetting the assault of a police officer. JM at 5-10. That's wrong. Judd (and Klein) are also jointly charged with all of their codefendants in Counts 34 (18 U.S.C. § 1512(c)(2) and 2); 35 (18 U.S.C. § 231(a)(3); 52 (40 U.S.C. § 5104(e)(2)(D)); and 53 (40 U.S.C. § 5104(e)(2)(F)). Klein is also charged with aiding and abetting in numerous counts (9, 17, 19, 27, 31, and 32). In any event, joinder of multiple defendants under Rule 8(b) does not depend on all defendants being charged together in all counts. Fed. R. Crim. P. 8(b) ("The defendants may be charged in one or more counts together or separately.").

> ### d.    Joinder was Proper Regardless of the Admissibility of any Evidence against Particular Group Two Defendants.

Judd contends that joinder is improper because the government will present videos that show the criminal conduct of his codefendants in which he did not participate. JM at 2. That's both incorrect and beside the point. It's beside the point because, since Rule 8(b) does not require that each defendant be charged in every count, it follows that not all evidence must be admissible

against each defendant. *See United States v. Delpit*, 94 F.3d 1134, 1143 (8th Cir. 1996) ("Severance is not required merely because evidence which is admissible only against some defendants may be damaging to others"). Indeed, severance is not required even when "the evidence against one or more defendants is substantially more incriminating than evidence against the defendant seeking severance." *United States v. Gray*, 173 F. Supp. 2d 1, 10 (D.D.C. 2001), *aff'd sub nom. United States v. Moore*, 651 F.3d 30 (D.C. Cir. 2011), *aff'd sub nom. Smith v. United States*, 568 U.S. 106 (2013).

The claim is also incorrect because evidence can be admissible against a defendant even though it does not prove his own conduct, particularly where, as here, he is charged with aiding and abetting. To prove accomplice liability, the government must prove that the accomplice and principal had a shared criminal intent. *See United States v. Walker*, 99 F.3d 439, 443 (D.C. Cir. 1996). Consequently, anything admissible to prove the principal's intent, regardless of what it says about the accomplice, is admissible to prove aiding and abetting. *See Brown v. United States*, 142 F. 1, 3 (7th Cir. 1905) (the "criminal intent upon the part of [the principal is] … [a] fundamental issue [in proving aider and abettor liability], and [is] provable primarily without reference to connection with [the accomplice], or the line of evidence which may establish the further issue against him").

Additionally, evidence of what Judd's and Klein's codefendants were doing during the battle in the LWT Tunnel, particularly when Judd and Klein were in or near the Tunnel, is relevant to establish the specific charges against Judd and Klein, as well as the context of those charges. "The trial court may admit evidence that does not directly establish an element of the offense charged in order to provide background for the events or occurrences alleged." 2 WEINSTEIN'S FEDERAL EVIDENCE, § 401.04 (2d ed. 2021). Such evidence is relevant to prove, for instance, that

Judd intended to obstruct the Congressional certification vote, an element of 18 U.S.C. § 1512(a)(1). "Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *Id.*   For instance, with respect to the charges under 18 U.S.C. § 231(a)(3) which have been leveled against each defendant, the government must prove that a "civil disorder" occurred. That requires proof that at least three persons acted together in "a public disturbance involving acts of violence" that caused "an immediate danger of or results in damage or injury to the property." 18 U.S.C. § 232(1).  Proof of a "civil disorder" will require evidence of events beyond the actions of any single defendant.

That Judd and Klein were not acting alone or with a small group of rioters, but rather with many others when attacking the police lines, makes it more likely that they participated in a multi-person civil disorder and intended to obstruct the certification vote. It is also relevant to prove that they intended to disrupt the officers' discharge of their official duties in response to a civil disorder, in violation of 18 U.S.C. § 231(a)(3). Put another way, if the government was limited to presenting evidence only of Judd's and Klein's individual conduct at a separate trial of the charges against them, it would be unfairly hamstrung in proving the element of an intended "disruption" in the § 1512(c)(2) count and of the "civil disorder" element of the § 231(a)(3) count.

### e.  Joinder of Judd and Klein with Three Codefendants for Trial Will Result in the Conservation of Substantial Judicial Resources.

Judd contends that joinder achieves no conservation of judicial resources because the jury will not be called upon to make any findings in a joint trial that would apply to more than one defendant. *Id.* JM at 8-10 and n.3. That's incorrect.

For starters, most if not all of the government's evidence in a joint trial will be admissible against all five Group Two Defendants. Notably, evidence regarding the rally on the Ellipse before

17

the riot, the proceedings before the Joint Session of Congress to certify the Electoral Congress election, the security measures taken by U.S. Secret Service and U.S. Capitol Police, and the actions of the mass of rioters who laid siege to the Capitol Building and then breached its defenses, will consume a substantial portion of the trial and is relevant to the charges against all Group Two Defendants. *See United States v. El-Saadi*, 549 F. Supp. 3d 148, 166-69 (D.D.C. July 20, 2021) (Moss, J.) (denying severance where "several of the same witnesses are expected to testify with respect to both conspiracies").

Separate trials would result in the duplication of that evidence before multiple juries, squandering judicial resources. *See United States v. Wilson*, 216 F. Supp. 3d 566, 586 (E.D. Pa. 2016) (denying severance where the  government "would need to offer duplicative testimony if the robberies were tried separately, as the same law enforcement officers and cooperating coconspirators would need to testify in both cases."), *aff'd*, 960 F.3d 136 (3d Cir. 2020); *see generally United States v. Bridgeman*, 523 F.2d 1099, 1107 (D.C. Cir. 1975) ("the incremental burden of duplicating a complex trial or reproducing elusive evidence is a proper consideration in the decision to deny severance"). Only evidence that is inadmissible against Judd would be excluded in a separate trial of him alone, and he has identified no such evidence. "Absent a *dramatic* disparity of evidence, any prejudice caused by joinder is best dealt with by instructions to the jury to give individual consideration to each defendant." *United States v. Tucker*, 12 F.4th 804, 825 (D.C. Cir. 2021) (cleaned up); *El-Saadi*, 549 F. Supp. 3d. at 167 ("The Court agrees with the government that limiting instructions, if necessary, can address any risk of prejudice related to the first conspiracy's foreign ties.").

The jury will also be called upon to make findings that will apply to all Group Two Defendants. For instance, all Defendants are jointly charged in Count 35 with interfering with

police who were engaged in suppressing a civil disorder, in violation of 18 U.S.C. § 231(a)(3). As noted above, in resolving those charges, the jury must decide whether a "civil disorder" occurred at the Capitol on January 6 and whether police officers were engaged in the lawful discharge of their duties. *See* 18 U.S.C. § 231(a)(3). Similarly, all Group Two Defendants are jointly charged in Count 34 with obstruction of an official proceeding in violation of 18 U.S.C. § 1512(a)(2). In resolving those charges, the jurors will have to determine whether the Congressional certification of the 2020 Presidential Electoral College vote was a "proceeding before the Congress," *see* 18 U.S.C. § 1512 (a)(2), something several defendants in the Capitol Siege cases have contested in pretrial motion practice.[8] Finally, all defendants are individually charged in Counts 36 through 46 with violations of 18 U.S.C. § 1752. In resolving those charges, the jurors will have to determine whether the United States Capitol Building and its grounds were "restricted areas," another fact that some Capitol Breach defendants have challenged in pre-trial motions.[9]

With respect to those issues and many others, the government will present a host of witnesses who would have to testify repeatedly in the event of severed trials. As noted above, some of the officers were victims of multiple assaults by different defendants and so would have to testify in multiple trials in the event of severance.  Likewise, the same video evidence that captured assaults committed by multiple defendants would have to played over and over in multiple trials. The efficiency gained by avoiding the duplication of testimony is a significant benefit of joint

---

[8] *E.g. United States v. Montgomery*, No. CR 21-46 (RDM), 2021 WL 6134591, at *9 (D.D.C. Dec. 28, 2021); *United States v. Caldwell*, No. 21-CR-28 (APM), __ F. Supp. 3d. __, 2021 WL 6062718, at *7 (D.D.C. Dec. 20, 2021); *United States v. Sandlin*, No. 21-CR-88 (DLF), __ F. Supp. 3d. __, 2021 WL 5865006, at *5 (D.D.C. Dec. 10, 2021). Cappuccio, Judd, and McCaughey, and have now moved to dismiss Count 34, alleging a violation of § 1512(c)(2).  ECF 253, 255m 259.

[9] *E.g., United States v. Griffin*, 549 F. Supp. 3d 49, 54-57 (D.D.C. July 2, 2021); *United States v. Mostofsky*, No. CR 21-138 (JEB), 2021 WL 6049891, at *13 (D.D.C. Dec. 21, 2021). Judd has moved to dismiss Count 38, alleging a violation of § 1752(c)(2). ECF 256.

trials. *See Slatten*, 865 F.3d at 788 ("in order to convict Ridgeway, the government would be required to present the same evidence and to rely upon testimony from the same witnesses as they would for the other defendants.").

For all those reasons, Judd's and Klein's Rule 8(b) claim fail.[10]

> **2.  This Court Should Deny These Defendants' Rule 14 Severance Motions Because They Have Not Shown that a Joint Trial Would "Compromise a Specific Trial Right" or Prevent the Jury from Rendering a "Reliable Judgment."**

Judd, Klein, and Cappuccio seek severance—and apparently believe they each should be tried alone—under Rule 14. They have fallen far short of meeting their burden to obtain a Rule 14 severance.

Defendants who are properly joined under Rule 8 "may seek severance under Rule 14, which provides that '[i]f the joinder of offenses or defendants . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.'" *United States v. Wilson*, 605 F.3d 985, 1015 (D.C. Cir. 2010) (quoting Fed. R. Crim. P. 14(a)). But Rule 14 "does not require severance even if prejudice is shown," and district courts "should grant severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*,

---

[10] *United States v. Whitehead*, 539 F.2d 1023 (4th Cir. 1976), cited by Judd, JM at 4, 9, is inapposite. There, Whitehead was charged with a man named Jackson for jointly selling cocaine to an undercover DEA agent. Jackson was also charged with selling cocaine to an undercover agent together with Meredith. Jackson was tried separately and Whitehead and Meredith were jointly tried after the district court denied their severance motions. The Fourth Circuit reversed, holding that "[w]here the only nexus between two defendants joined for trial is their participation in similar offenses, on different dates, with a common third defendant, the 'same transaction' or 'series of transactions' test of Rule 8(b) is not satisfied and joinder is impermissible." *Id*. at 1026. Unlike this case, Whitehead and Meredith did not commit a core of factually related crimes on the same date and time and at the same location, so the abundant factual and logical nexus of the charges against Whitehead, on one hand, and Meredith, on the other, so prevalent here, were missing there.

506 U.S. 534, 539 (1993); *accord United States v. Bostick*, 791 F.3d 127, 152-53 (D.C. Cir. 2015) (cleaned up).

Once multiple defendants are properly joined under Rule 8(b), "[d]istrict courts should grant severance" under Rule 14 "sparingly because of the 'strong interests favoring joint trials, particularly the desire to conserve the time of courts, prosecutors, witnesses, and jurors.'" *United States v. Celis*, 608 F.3d 818, 844 (D.C. Cir. 2010) (quoting *United States v. Mardian*, 546 F.2d 973, 979 (D.C. Cir. 1976) (*en banc*)). District courts retain "significant flexibility to determine how to remedy a potential risk of prejudice, including ordering lesser forms of relief such as limiting jury instructions." *Bikundi*, 926 F.3d at 780 (cleaned up). *See generally United States v. Tucker*, 12 F.4th 804, 825 (D.C. Cir. 2021) (a joint trial is permissible "as long as the jury can reasonably compartmentalize the substantial and independent evidence against each defendant.") (cleaned up). Salient factors that militate against severance, all of which are present here, include whether separate trials would involve (1) the presentation of the same evidence; (2) testimony from the same witnesses; and (3) the same illegal conduct. *See United States v. Manner*, 887 F.2d 317 (D.C. Cir. 1989).

### a.    Judd's Rule 14 Claims are Meritless.

Judd contends severance is warranted because the most serious charge against him was "throwing a small firecracker into a crowd," whereas, for instance, Cappuccio viciously attacked Officer Hodges, demonstrating "significantly different degrees of culpability." JM at 10-11, 13. But as shown above, Judd's criminal conduct—particularly in joining the mob of rioters who were pushing aggressively against the police line inside the Tunnel and helping to organize their efforts to create a "shield wall"—was far more extensive than merely throwing a firecracker. All Group Two Defendants stormed the Capitol and attacked the police officers defending the Tunnel doors.

*See United States v. Williams*, 507 F. Supp. 3d 181, 196 (D.D.C. 2020) (denying Williams' motion for severance in prosecution for unlawful possession of a firearm, even though codefendant Douglas "was caught, on police body camera, wearing a backpack containing a gun and ammunition" and admitted he "had some idea about the contents of the backpack," whereas Williams "was not in possession of the backpack and "the government's Rule 404(b) evidence against Douglas is far stronger" than the 404(b) evidence against Williams;  "even with these disparities in evidence, Williams has failed to meet his 'heavy burden' under Rule 14"); *El-Saadi*, 549 F. Supp. 3d at 169 (denying severance even though "the number of allegations against Khawaja, as the alleged hub of the second conspiracy, is far greater than against anyone else," where "El-Saadi's alleged participation in the second conspiracy is similar to the alleged roles of several other defendants"); *United States v. Eiland*, 406 F. Supp. 2d 46, 53 (D.D.C. 2005) (denying severance; "Disparity as to the violence alleged is generally only dispositive when it is combined with another factor, such as drastic differences in those charges.") .

Judd also contends that a trial of multiple defendants with 53 counts will invite "mass confusion, chaos, and delay." JM at 14. *See also* KM at 9 (decrying the "dangers of a mass trial"). Not so. First, only five Group Two Defendants, at most, will stand trial together, which is an entirely manageable number in a federal criminal case. "We have found that the trial of four co-defendants presented no possibility of spillover prejudice." *Celis*, 608 F.3d at 846. Second, the Group Two trial will involve 39 counts,[11] not all 53 in the indictment. The government currently anticipates the trial will last approximately three to four weeks. Almost all the events took place within a few hours on a single day, with the focus of the trial being the time the defendants spent

---

[11] Counts in which at least one member of Group Two is charged are 1-4, 8, 9, 11, 13, 15-20, 22, 23 26-35, 38-40, 42, 43, 46-48, and 50-53.

on the Lower West Terrace, comprising several hours. Much of the evidence will come from several dozen videotapes rather than arcane expert testimony or a mass of documents regarding complex topics such securities regulation, tax violations, or unlawful technology transfers that are occasionally the subjects of a federal criminal trial. "The danger of spillover prejudice is minimal when the Government presents tape recordings of individual defendants." *Celis*, 608 F.3d at 846.

      **b**.     **Klein's Rule 14 Claims are Meritless.**

Klein contends he is entitled to severance because his conduct was less egregious than that of all his codefendants, since supposedly all he did was to jam a riot shield into a door to prevent it from closing. KM at 4-5. He points to Judge Bates' ruling, granting Klein pretrial release because the government did not show his confrontation with police was premeditated or that he brought a weapon to the Capitol on January 6, coordinated his unlawful conduct with others, or injured others. KM at 4-5.[12]

---

[12] In sharp contrast to Klein's contention that all he did on January 6 was to "possess[] a riot shield that was touching" a police officer, KM at 5, Judge Bates found that Klein engaged in far more extensive criminal conduct:

> While inside the [Lower West Terrace] tunnel, Klein repeatedly placed himself at the front of the mob and used force against several officers in an effort to breach the Capitol entrance and maintain the mob's position. He ignored several verbal commands by officers to "back up" and "let it go now." And twice he can be heard calling to the crowd behind him: "We need fresh people, we need fresh people." Around 2:55 p.m., Klein bent down to pick up a flagpole, which lay at the foot of the police line, and passed it back to other rioters.

> Sometime between 2:55 p.m. and 3:00 p.m., Klein came into the possession of a plastic riot shield, which had been taken from the police. Body-worn camera ("BWC") footage … captures Klein and another unidentified individual wedging the shield between the doors to the Capitol at approximately 3:00 p.m. in an apparent effort to prevent the officers from closing the doors. At 3:15 p.m., another BWC video shows Klein pushing the shield into an officer's body in an attempt to break the police line.

*United States v. Klein*, 533 F. Supp. 3d 1, 5–6 (D.D.C. 2021) (cleaned up).

For starters, Judge Bates' April 12, 2021 detention ruling was based on the charges against Klein in the initial indictment against him alone, 1:21-cr-236 (JDB). That indictment charged him with only eight counts, including one count of assaulting police. *United States v. Klein*, 533 F. Supp. 3d 1, 6 (D.D.C. 2021). The current Fifth Superseding Indictment charges Klein with six counts—Counts 9, 17, 19, 7, 31, 32—of assaulting police officers, and twelve counts overall—Counts 34, 35, 43 51-53. Klein is now charged with substantially more assaultive conduct than he was when Judge Bates granted him release.

More significantly, assuming that any lack of evidence of Klein's preplanning and concerted conduct was relevant to the detention decision, it is irrelevant to the Rule 14 severance decision. Rule 14, unlike detention, turns upon the relatedness of the charges and evidence that will be presented at a joint trial, and thus the efficiency of such a trial, balanced against the prejudice to a defendant's particular trial right that would be mitigated by severance. That Judge Bates declined to detain Klein says nothing about whether Klein can meet his formative burden of demonstrating a right to a Rule 14 severance. Tellingly, Klein contends that a joint trial will compromise his "substantive rights" but declines to even identify any such right. KM at 10.

Klein also complains that a joint trial against all eight defendants will result in spillover prejudice because some of his codefendants are charged with more heinous conduct than he is. KM at 9-10. But Klein does not even acknowledge that this Court has already granted a severance by dividing the case into two groups for trial. Thus, Klein's contentions that his criminal conduct was less egregious than that of the Group One Defendant Morss, *see* KM at 10, is of no moment.

That the evidence will prove that some of Klein's Group Two codefendants engaged in some criminal conduct that he did not join is a manifestly insufficient basis for Rule 14 severance. *See Straker*, 800 F.3d at 626 (affirming denial of severance even though defendant participated in

a kidnapping but was not involved in the victim's death); *Celis*, 608 F.3d at 844-45 (affirming denial of Giraldo's severance motion in prosecution for drug-trafficking, even though he, unlike co-defendant Valderama, was not a member of FARC, a violent revolutionary group that committed atrocities; even if the FARC evidence would have been excluded from a trial against Giraldo alone, "it does not follow that the jury was incapable of fairly assessing Giraldo's guilt"); *United States v. Mejia*, 448 F.3d 436, 446 (D.C. Cir. 2006) (affirming denial of Rios' severance motion, even though "the bulk of the trial evidence concerned Mejia rather than" Rios, where the government "introduced 'independent and substantial evidence' against Rios")

This is not a case where the evidence against Klein will be significantly less damning than that against his four Group Two codefendants. As Judge Lamberth explained, to "warrant severance as a remedy, there must be *a great disparity in evidence*, and the disparity must create a viable possibility that the jury, even with the aid of curative instructions and appropriate *voir dire*, will be unable to compartmentalize the evidence between defendants or will be impeded in their duty to render a fair assessment of guilt or innocence." *United States v. Gray*, 173 F. Supp. 2d 1, 15 (D.D.C. 2001), *aff'd sub nom. United States v. Moore*, 651 F.3d 30 (D.C. Cir. 2011).[13]

Nor is this a case where the jury will be unable to compartmentalize the evidence against Klein from that against his codefendants. KM at 7. Much of the evidence, and the most compelling evidence, the government will present will be the videos of each defendant's conduct in or near

---

[13] Such a great disparity occurred in *United States v. Sampol*, 636 F.2d 621, 645-47 (D.C. Cir. 1980) a prosecution for conspiracy to assassinate the former Chilean Ambassador to the United States. The charges against Sampol were limited to making false statements to a grand jury and misprision of a felony. The D.C. Circuit held that those charges should have been severed from those against a defendant directly involved in the murder because they were "grossly disparate" with the murder charges, but at trial, "[t]here was never [a] clear distinction between the different defendants and the evidence against each of them." *Id*. at 645-47. No such great disparity exists here: all Group Two Defendants are charged with the same crimes. *See Straker*, 800 F.3d at 627 (distinguishing *Sampol*).

the LWT Tunnel on January 6. No Group Two defendants were dressed substantially alike, nor do they look alike, so there is little chance the jury will be confused about which defendant engaged in which conduct. *See Straker*, 800 F.3d at 626 ("substantial and independent evidence against Sealey and Straker enabled the jury to reasonably compartmentalize the evidence of guilt against each of them from the rest of the evidence at trial"). Exhibit A, attached to this opposition, includes screen shots depicting the five Group Two defendants as they appeared on January 6, 2021, confirming that the jury will be able to readily distinguish each individual and to compartmentalize each defendant's specific actions during the riot.

### c.      **Cappuccio's Rule 14 Claims are Meritless.**

Cappuccio presents two reasons for severance. First, he claims his involvement in the riot was restricted to his brutal assault on D.H., unlike his codefendants' more protracted and variegated involvement in the riot. CM at 7. This, he claims, will impede the jury's ability to compartmentalize the evidence against him. CM at 5-8. *See also* CM at 7-8 (because Cappuccio's charged criminal conduct was more limited than that of his codefendants, he will suffer from "spillover prejudice").

That's wrong on at least two grounds. First, Cappuccio's criminal conduct on January 6 was not limited to his assault on Office D.H. In addition, at approximately 3:08 p.m., he entered the tunnel and pushed to the front of the group of rioters and joined them in pushing against the police line.

In addition, because Cappuccio was the primary assailant of Officer D.H., the jury will have little difficulty compartmentalizing that evidence. As for videos showing Cappuccio's codefendants, but not Cappuccio, engaged in criminal conduct, Cappuccio can readily point out

his absence from those videos. *See El-Saadi*, 549 F. Supp. 3d at 167 ("the defense can highlight … that there is no evidence El-Saadi knew about the agreement between Khawaja and Nader").

Cappuccio also states that his Sixth Amendment confrontation rights will be violated in a joint trial because recorded statements of some of his codefendants "may implicate" him. CM at 6.  He does not identify any such statements, much less show how they would implicate him, so his speculative claim cannot justify severance. *See United States v. Diaz-Antunuez*, 930 F. Supp. 2d 103, 115 (D.D.C. 2013) (denying severance where defendant "has made no proffer of … *Bruton* problems"); *United States v. Butler*, 102 F.3d 1191, 1197 (11th Cir. 1997) (affirming denial of severance where coconspirator's "statement as introduced to the jury poses no *Bruton* problem because it makes no reference whatsoever to Campbell or any other individual"); *United States v. Leal*, 74 F.3d 600, 606 (5th Cir. 1996) (same; codefendant's "confession did not refer to Leal by name;" because "[t]here was no direct implication, … the limiting instruction was adequate to prevent prejudice"). Were he to do so, the appropriate relief would be the surgical redaction of any such statements before they were admitted into evidence, not the blunderbuss of severance, with its attendant drain on judicial resources. *See United States v. Gio*, 7 F.3d 1279, 1287 (7th Cir. 1993) (following redaction, defendant "had no basis for requesting a severance on Bruton grounds.").

Neither Judd, Klein, nor Cappuccio has satisfied their daunting burden to obtain a Rule 14 severance.

**C.      Conclusion**

This Court should deny Judd's, Cappuccio's, and Klein's severance motions, and deny

the "me too" motions of defendants Stevens, McCaughey, and Mehaffie.

<div style="margin-left: 40%;">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      */s/Jocelyn Bond*
JOCELYN BOND
Assistant United States Attorney
D.C. Bar No. 1008904
Email: Jocelyn.Bond@usdoj.gov

KIMBERLEY C. NIELSEN
Assistant United States Attorney
N.Y. Bar No. 4034138
Email:Kimberley.Nielsen@usdoj.gov

KIMBERLY L. PASCHALL
Assistant United States Attorney
D.C. Bar No. 1015665
Email:Kimberly.Paschall@usdoj.gov

</div>

**Exhibit A:**

**Screen shots of "Group Two" defendants as they appeared on January 6, 2021**

**Steven Cappuccio:**



**David Lee Judd:**



Photograph #137 - AFO





**Federico Guillermo Klein:**





## ASSAULT ON FEDERAL OFFICERS AND VIOLENCE AT THE UNITED STATES CAPITOL

WASHINGTON, D.C.
JANUARY 6, 2021



**DETAILS**

The Federal Bureau of Investigation's (FBI) Washington Field Office is seeking the public's assistance in identifying individuals who made unlawful entry into the United States Capitol Building and assaulted federal law enforcement personnel on January 6, 2021, in Washington, D.C.

Anyone with information regarding these individuals, or anyone who witnessed any unlawful violent actions at the Capitol or near the area, is asked to contact the FBI's Toll-Free Tipline at 1-800-CALL-FBI

**Christopher Quaglin:**



Photograph #58 - AFO



**Geoffrey Sills:**

 

