# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-cr-40 (TNM)** |
| **v.** | : | |
| | : | |
| **PATRICK MCCAUGHEY, et. al.,** | : | |
| | : | |
| **Defendants.** | : | |

## <u>UNITED STATES' TRIAL BRIEF</u>

The United States, by and through its attorneys, respectfully submits this brief summarizing the government's evidence at trial and legal issues that may be brought before the Court.[1]  As described below, the government will introduce a variety of evidence including, but not limited to, video evidence, testimony from law enforcement witnesses, civilian witnesses who know the defendants, and evidence collected from the electronic devices of the defendants.  In an effort to streamline its presentation for this bench trial and focus on the matters in dispute, the parties have agreed to certain stipulations.

## I.      THE JANUARY 6 CAPITOL RIOT AND THE DEFENDANTS' ACTIONS

On January 6, 2021, thousands of people descended on the U.S. Capitol and interrupted the joint session of Congress that had convened to certify the votes of the Electoral College for the 2020 Presidential Election. The government's evidence will briefly set the stage for the joint session and the riot in which the defendants participated, and then focus on the defendants' criminal conduct and intent that day.

---

[1] This brief does not address the facts and legal arguments the government would present against defendant Robert Morss, as the government expects he will be entering a disposition on August 23, 2022. Should that resolution not occur, the government can provide a supplement to the Court regarding defendant Morss.

As the Court is aware, Vice President Michael Pence, as the President of the Senate, was present at the Capitol to preside over the joint session and Senate proceedings. On that day, Secret Service was present for the protection of the Vice President and his family members, and physical barriers and law enforcement officers surrounded the U.S. Capitol building and grounds.  At all relevant times, the United States Capitol building and its grounds—including the Lower West Terrace on the West Front, and the entire Capitol building itself—were closed to members of the public.

The defendants, Patrick McCaughey, Tristan Stevens, and David Mehaffie, were among the group of rioters who illegally entered the U.S. Capitol grounds that day. Specifically, these three defendants converged on the "tunnel," a stairway that had been converted into a narrow entryway due to construction of the temporary inaugural platform on the Lower West Terrace of the Capitol building.  Some of the most violent assaults on law enforcement officers occurred in this location, as rioters sieged the doors for hours attempting to storm the Capitol building.

Each of the defendants traveled from their respective residences to Washington, D.C. Starting at approximately 1:00 p.m. on January 6, 2021, members of the mob began to penetrate the restricted perimeter of the U.S. Capitol grounds.  Along with thousands of others, the defendants illegally entered the grounds and approached the Capitol on the West Front, where law enforcement officers were attempting to establish and maintain a new defensive barrier at the foot of the inaugural stage to protect the Capitol and the proceedings inside.

Defendant Stevens was at the police line by 2:00 p.m., joining with other rioters to push against the police line established close to the media tower on the West Front. Stevens spit in the direction of officers, called them cowards, and asked them if they knew what treason was. Defendant McCaughey was at the police line by 2:18 p.m., on the south side of the West Front,

near some scaffolding erected for building the inaugural platform. McCaughey joined with other rioters yelling at the police, telling them, "cops go home" and chanting "U-S-A!" Defendant Mehaffie also entered the grounds around this time, yelling at nearby rioters who were hesitating to illegally cross the outer perimeter and enter the grounds, screaming "if we can't fight over this wall, we can't win this battle!"

At 2:30 p.m., the police line guarding the West Front collapsed. All three defendants subsequently followed the retreating officers up to the inaugural platform on the Lower West Terrace by climbing the stairwell and scaffolding in the Southwest section of the U.S. Capitol grounds.

The evidence will show that the defendants all converged at a pivotal location – the Lower West Terrace "tunnel," a temporary corridor entryway created by the construction of the inaugural platform. At the end of the Lower West Terrace tunnel were two sets of glass double doors, emblazoned with the sign "Members Entrance Only," which opened directly into the heart of the U.S. Capitol building.

Defendant Mehaffie was the first of these defendants to enter the Lower West Terrace tunnel, at 2:41 p.m. Defendant Mehaffie went directly to the first set of glass double doors, and pounded on the glass four times, staring down the members of the Metropolitan Police Department who had retreated inside and were establishing a new police line.  Within moments another rioter subsequently broke the glass on that same door, giving rioters, including Mehaffie, access to the vestibule where officers were gathering. For the next six minutes, as the alarm to the building blared overhead and rioters screamed at the police, defendant Mehaffie remained at the front of the line, attempting to push past the officers, stepping inside the building, and ignoring commands

to leave. Police were able to establish a line within the vestibule between the doors, and temporarily forced rioters back out of the building and into the tunnel.

Video evidence will show that it was during this time, when the rioters were being pushed out of the interior of the building, that defendant McCaughey and defendant Stevens entered the tunnel. Defendant Stevens encouraged other rioters by counting down to start a unified heave-ho against the police line.[2] At approximately 2:52 p.m., defendant Mehaffie climbed up onto a wooden frame on the arch at the mouth of the tunnel, built to hold decorative curtains at this ceremonial entrance to the inaugural stage.  Hanging from this frame, defendant Mehaffie had a tactical vantage point above the rioters' heads and could direct their movements. For the next 28 minutes, defendant Mehaffie commanded the actions of rioters attempting to enter the building— including defendants Stevens and McCaughey—telling rioters when and where to push on the police line, how to enter and exit in the most efficient manner, and handing a shield into the rioters to set up a wall against the police.[3] The defendants' intent was clear: to storm the building and stop the Congress from certifying the electoral college vote.

While defendant Mehaffie hung from the archway and shouted direction from above, defendants McCaughey and Stevens were key players in the melee below. Video evidence will show that at approximately 2:56 p.m., defendant Stevens was within the mob where he was engaged in another round of coordinated pushing or "heave-ho-ing," which caused pressure on the police line, including MPD Officer Bogner and Sergeant Mastony, who were manning the front of the police line at the time.[4] At approximately 3:04 p.m., defendants Stevens and McCaughey began to push their way from within the mob at the mouth of the tunnel to the front of the police line.

---

[2] Count 14, 18 U.S.C. §§  111(a), 2.
[3] Count 12, 18 U.S.C. §§ 111(a), 2.
[4] Count 16, 18 U.S.C. §§ 111(a), 2.

Working in concert with other rioters, defendants Stevens and McCaughey grabbed riot shields to make a shield wall, to assist the rioters in their concerted effort to break into the Capitol.

At approximately 3:07 p.m., defendant Stevens took a stolen riot shield, and pushed it into the police line, effectively impeding USCP Sergeant Aquilino Gonell for several minutes. Evidence will show that defendant Stevens affirmatively used the shield to hit Sergeant Gonell in the face, and attempted reach around the shield and grab at the sergeant.[5] Immediately after this attack, defendant McCaughey made a similar assault on MPD Officer Daniel Hodges. At approximately 3:09 p.m., defendant McCaughey threw his body weight against Officer Hodges, telling him to go home, and to not hit him with Hodges' police baton. At approximately 3:11 p.m., the mob of rioters behind defendant McCaughey started another heave-ho effort, directing the weight and strength of the crowd behind the shield that defendant McCaughey was using to crush Officer Hodges. Video evidence will show Officer Hodges, screaming out in pain, crushed between the shield held by defendant McCaughey and the door frame of the Capitol.[6] Then, at approximately 3:13 p.m., defendant McCaughey stepped back from the police line, with shield in hand, and targeted MPD Officer Henry Foulds. Defendant McCaughey used the shield to affirmatively swing at Officer Foulds, as Foulds approached the rioters, attempting to push them back.[7] Officer Foulds and defendant McCaughey then traded blows, with Officer Foulds attempting to deliver straight strikes with his baton while McCaughey swatted at him with the stolen shield. Defendant McCaughey then exited the tunnel after approximately ten minutes of actively engaging with the front of the police line.

---

[5] Count 21, 18 U.S.C. § 111(b); Count Thirty-Six, 18 U.S.C. § 1752(a)(2) and (b)(1)(A); Count Forty-Four, 18 U.S.C. § 1752(a)(4) and (b)(1)(A).

[6] Count Twenty-Four, 18 U.S.C. § 111(b), Count Thirty-Seven, 18 U.S.C. § 1752(a)(2) and (b)(1)(A); Count Forty-Five, 18 U.S.C. § 1752(a)(4) and (b)(1)(A).

[7] Count Twenty-Five, 18 U.S.C. § 111(b); Count Thirty-Seven, 18 U.S.C. § 1752(a)(2) and (b)(1)(A); Count Forty-Five, 18 U.S.C. § 1752(a)(4) and (b)(1)(A).

At approximately 3:16 p.m., rioters joined together in a final heave-ho effort in the tunnel against the police line. The push by rioters failed, and the police line was able to make ground, pushing rioters out of the tunnel and onto the inaugural platform. When officers reached the archway of the tunnel, defendant Mehaffie, still above the crowd and directing the rioters, grabbed at the poles and batons of the officers attempting to clear the tunnel, resisting their efforts to restore order.

After the tunnel cleared, however, defendants McCaughey, Stevens and Mehaffie did not leave Capitol grounds. In fact, defendant Mehaffie lingered near the mouth of the tunnel, and is caught on USCP camera until approximately 3:50 p.m. At 4:15 p.m., defendant Stevens once again joined a group of rioters who pushed on the police line at the tunnel.[8] As late as 4:28 p.m., defendant McCaughey is caught on USCP camera in the southwest scaffolding.

The police line did not fail, however, and at approximately 5:25 p.m., officers who had been defending the Lower West Terrace doors for hours were relieved by members of the Virginia State Police, who helped the officers finally clear the terrace of all rioters.

## II.   THE GOVERNMENT'S PROOF

### A.  Charges Alleged Against Each Defendant

These defendants are part of a multi-co-defendant indictment, containing 53 counts total.

These defendants are charged as follows:

*1.  Patrick McCaughey*

Count Fourteen: 18 U.S.C. §§ 111(a)(1), 2, Assaulting, Resisting or Impeding Certain Officers and Aiding and Abetting at approximately 2:49 p.m. to 2:51 p.m.

---

[8] Count Thirty-Three, 18 U.S.C. § § 111(a), 2.

Count Twenty-Four: 18 U.S.C. § 111(a)(1) and (b), Assaulting, Resisting or Impeding Certain Officers, that is Officer Daniel Hodges, Using a Dangerous Weapon at approximately 3:06 p.m. to 3:15 p.m.

Count Twenty-Five: 18 U.S.C. § 111(a)(1) and (b), Assaulting, Resisting or Impeding Certain Officers, that is Officer Henry Foulds, Using a Dangerous Weapon at approximately 3:06 p.m. to 3:15 p.m.

Count Thirty-Four: 18 U.S.C. §§ 1512(c)(2), 2, Obstruction of an Official Proceeding, Aiding and Abetting

Count Thirty-Five: 18 U.S.C. § 231(a)(3), Civil Disorder

Count Thirty-Seven: 18 U.S.C. § 1752(a)(2) and (b)(1)(A), Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon

Count Forty-Five: 18 U.S.C. § 1752(a)(4) and (b)(1)(A) Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon

Count Fifty-Two: 40 U.S.C. §§ 5104(e)(2)(D), 2, Disorderly Conduct in a Capitol Building

Count Fifty-Three: 40 U.S.C. §§ 5104(e)(2)(F), 2, Act of Physical Violence in the Capitol Grounds of Buildings

2. *Tristan Stevens*

Count Fourteen: 18 U.S.C. §§ 111(a)(1), 2, Assaulting, Resisting or Impeding Certain Officers and Aiding and Abetting at approximately 2:49 p.m. to 2:51 p.m.

Count Sixteen: 18 U.S.C. §§ 111(a)(1), 2, Assaulting, Resisting or Impeding Certain Officers and Aiding and Abetting at approximately 2:56 p.m. to 2:58 p.m.

Count Twenty-One: 18 U.S.C. §§ 111(a)(1) and (b), Assaulting, Resisting or Impeding Certain Officers, that is Officer Aquilino Gonell, Using a Dangerous Weapon at approximately 3:03 p.m. to 3:11 p.m.

Count Thirty-Three: 18 U.S.C. §§ 111(a)(1), 2, Assaulting, Resisting or Impeding Certain Officers and Aiding and Abetting at approximately 4:15 p.m. to 4:19 p.m.

Count Thirty-Four: 18 U.S.C. §§ 1512(c)(2), 2, Obstruction of an Official Proceeding, Aiding and Abetting

Count Thirty-Five: 18 U.S.C. § 231(a)(3), Civil Disorder

Count Thirty-Six: 18 U.S.C. § 1752(a)(2) and (b)(1)(A), Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon

Count Forty-Four: 18 U.S.C. § 1752(a)(4) and (b)(1)(A) Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon

Count Fifty-Two: 40 U.S.C. §§ 5104(e)(2)(D), 2, Disorderly Conduct in a Capitol Building

Count Fifty-Three: 40 U.S.C. §§ 5104(e)(2)(F), 2, Act of Physical Violence in the Capitol Grounds of Buildings

### 3. David Mehaffie

Count Twelve: 18 U.S.C. §§ 111(a)(1), 2, Assaulting, Resisting or Impeding Certain Officers and Aiding and Abetting at approximately 2:40 p.m. to 3:18 p.m.

Count Thirty-Four: 18 U.S.C. §§ 1512(c)(2), 2, Obstruction of an Official Proceeding, Aiding and Abetting

Count Thirty-Five: 18 U.S.C. § 231(a)(3), Civil Disorder

Count Fifty-Two: 40 U.S.C. §§ 5104(e)(2)(D), 2, Disorderly Conduct in a Capitol Building

Count Fifty-Three: 40 U.S.C. §§ 5104(e)(2)(F), 2, Act of Physical Violence in the Capitol Grounds of Buildings

### B.  Elements of the Crimes Alleged

#### 18 U.S.C. § 111(a)(1)

Counts Twelve, Fourteen, Sixteen, and Thirty-Three of the Fifth Superseding Indictment charges the defendants with assaulting, resisting, and impeding certain law enforcement officers, in violation of 18 U.S.C. § 111(a)(1). In order to find the defendants guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1.  First, the defendants assaulted, resisted, opposed, impeded, intimidated, or interfered with officers of the Metropolitan Police Department and the U.S. Capitol Police.

2.  Second, the defendants did such acts forcibly.

3.  Third, the defendants did such acts intentionally.

4.  Fourth, the person assaulted, resisted, opposed, impeded, intimidated, or interfered with was an officer or an employee of the United States who was then engaged in the performance of his official duties, or any person assisting such an officer or employee in the performance of that officer's duties.

5.  Fifth, the defendants made physical contact with the officer or employee of the United States who was then engaged in the performance of his official duties, or any person assisting such an officer or employee in the performance of that officer's duties, or acted with the intent to commit another felony.

<u>Definitions</u>

The defendants acted "forcibly" if he used force, attempted to use force, or threatened to use force against the officer.  A threat to use force at some unspecified time in the future is not sufficient to establish that the defendant acted forcibly.[9]

The term "assault" means any intentional attempt or threat to inflict injury upon someone else, when coupled with an apparent present ability to do so.  A finding that one used force (or attempted or threatened to use it) isn't the same as a finding that he attempted or threatened to inflict injury.  In order to find that the defendants committed an "assault," the Court must find beyond a reasonable doubt that the defendant acted forcibly and that the defendant intended to inflict or intended to threaten injury.[10]

The terms "resist," "oppose," "impede," "intimidate," and "interfere with" carry their everyday, ordinary meanings.

It is not necessary to show that the defendants knew the person being forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with was, at that time, assisting federal officers in carrying out an official duty so long as it is established beyond a reasonable doubt that the victim was, in fact, assisting a federal officer acting in the course of his duty and that the defendant intentionally forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with that officer.[11]

---

[9]    Tenth Circuit Pattern Criminal Jury Instructions (2021), § 2.09.
[10]   *Id.*
[11]   *United States v. Feola*, 420 U.S. 671, 684 (1975).

The government further alleges that the defendants aided and abetted others in forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with certain officers.  To satisfy its burden of proof in proving that the defendants aided and abetted others in committing this offense, the government must prove the following beyond a reasonable doubt:

1. First, that others committed assaulting, resisting, opposing, impeding, intimidating, or interfering with law enforcement officers, by committing each of the elements of the offense charged;

2. Second, that the defendants knew that assaulting, resisting, opposing, impeding, intimidating, or interfering with law enforcement officers was going to be committed or was being committed by others;

3. Third, that the defendants performed an act or acts in furtherance of the offense;

4. Fourth, that the defendants knowingly performed that act or acts for the purpose of aiding, assisting, soliciting, facilitating, or encouraging others in committing the offense of assaulting, resisting, opposing, impeding, intimidating, or interfering with law enforcement officers; and

5. Fifth, the defendants did that act or acts with the intent that others commit the offense of assaulting, resisting, opposing, impeding, intimidating, or interfering with law enforcement officers.

### 18 U.S.C. § 111(a)(1) and (b)

Counts Twenty-One, Twenty-Four, and Twenty-Five of the Fifth Superseding Indictment charges the defendants with assaulting, resisting, and impeding certain law enforcement officers with a deadly or dangerous weapon, in violation of 18 U.S.C. §111(a)(1) and (b). In order to find the defendants guilty of this offense, the Court must find that the government proved each of the

following elements beyond a reasonable doubt, all of the above elements of § 111(a)(1), and additionally:

> Sixth, in doing such acts, the defendants used a deadly or dangerous weapon.

An object is a deadly or dangerous weapon if it is designed to be used, actually used, capable of being used, or threatened to be used in a manner likely to produce death or serious bodily harm.[12]

For such a weapon to have been "used," the government must prove that the defendants not only possessed the weapon, but that the defendants intentionally displayed it in some manner while forcibly assaulting, resisting, opposing, impeding, intimidating or interfering with the federal officer.[13]

## 18 U.S.C. § 1512(c)(2)

Count Thirty-Four of the Fifth Superseding Indictment charges the defendants with obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and (2). In order to find the defendants guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1. First, the defendants attempted to or did obstruct or impede an official proceeding;

2. Second, the defendants intended to obstruct or impede the official proceeding;

3. Third, the defendants acted knowingly, with awareness that the natural and probable effect of his conduct would be to obstruct or impede the official proceeding; and

4. Fourth, the defendants acted corruptly.

---

[12]     Assault With a Dangerous Weapon (definition of dangerous weapon), Redbook 4.101 (modified); *United States v. Arrington*, 309 F.3d 40, 45 (D.C. Cir. 2002).
[13]     Tenth Circuit Pattern Criminal Jury Instructions (2021), § 2.09; *United States v. Arrington*, 309 F.3d 40, 45 (D.C. Cir. 2002).

The government further alleges that the defendants aided and abetted others in committing obstruction of an official proceeding.  To satisfy its burden of proof in proving that the defendants aided and abetted others in committing this offense, the government must prove the following beyond a reasonable doubt:

6. First, that others committed obstruction of an official proceeding by committing each of the elements of the offense charged;

7. Second, that the defendants knew that obstruction of an official proceeding was going to be committed or was being committed by others;

8. Third, that the defendants performed an act or acts in furtherance of the offense;

9. Fourth, that the defendants knowingly performed that act or acts for the purpose of aiding, assisting, soliciting, facilitating, or encouraging others in committing the offense of obstruction of an official proceeding; and

10. Fifth, the defendants did that act or acts with the intent that others commit the offense of an obstruction of an official proceeding.

The term "official proceeding" includes a proceeding before the Congress. The official proceeding need not be pending or about to be instituted at the time of the offense. If the official proceeding was not pending or about to be instituted, the government must prove beyond a reasonable doubt that the official proceeding was reasonably foreseeable to the defendant. As used in Count One, the term "official proceeding" means Congress's Joint Session to certify the Electoral College vote.

A person acts "knowingly" if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident. In deciding whether the

defendants acted knowingly, the Court may consider all of the evidence, including what the defendants did or said.

18 U.S.C. § 231(a)(3)

Count Thirty-Five of the Fifth Superseding Indictment charges the defendants with civil disorder, in violation of 18 U.S.C. § 231(a)(3). In order to find the defendants guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

In order to find the defendants guilty of this offense, the Court must find the following three elements beyond a reasonable doubt:

1. First, the defendants knowingly committed an act or attempted to commit an act with the intended purpose of obstructing, impeding, or interfering with one or more law enforcement officers.

2. Second, at the time of the defendants' actual or attempted act, the law enforcement officer or officers were engaged in the lawful performance of their official duties incident to and during a civil disorder.

3. Third, the civil disorder in any way or degree obstructed, delayed, or adversely affected either commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function.

18 U.S.C. § 1752(a)(2) and (b)(1)(A)

Counts Thirty-Six and Thirty-Seven of the Fifth Superseding Indictment charges the defendants with disorderly or disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A). In order to find the defendants guilty of this offense, the

Court must find that the government proved each of the following elements beyond a reasonable doubt:

1. First, that the defendant engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building or grounds;

2. Second, that the defendant did so knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions;

3. Third, that the defendant's conduct occurred when, or so that, his conduct in fact impeded or disrupted the orderly conduct of Government business or official functions.

4. Fourth, in doing such acts, the defendant used or carried a deadly or dangerous weapon.

"Disorderly conduct" occurs when a person is unreasonably loud and disruptive under the circumstances, or interferes with another person by jostling against or unnecessarily crowding that person.

"Disruptive conduct" is a disturbance that interrupts an event, activity, or the normal course of a process.

The terms "restricted building or grounds" and "knowingly" have the same meanings as previously defined.

The term "deadly or dangerous weapon" has the same definition as in 18 U.S.C. § 111(a)(1) and (b).

<u>18 U.S.C. § 1752(a)(4) and (b)(1)(A)</u>

Counts Forty-Four and Forty-Five of the Superseding Indictment charges the defendants with entering and remaining in a restricted building or grounds with physical violence, in violation

of 18 U.S.C. § 1752(a)(4) and (b)(1)(A). In order to find the defendants guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1.  First, that the defendant engaged in any act of physical violence against any person or property in any restricted building or grounds; and

2.  Second, that the defendant did so knowingly.

3.  Third, in doing such acts, the defendant used or carried a deadly or dangerous weapon.

The term "knowingly" has the same meaning as previously defined.

The term "deadly or dangerous weapon" has the same meaning as previously defined.

<u>40 U.S.C. § 5104(e)(2)(D)</u>

Count Fifty-Two of the Fifth Superseding Indictment charges the defendants with disorderly or disruptive conduct in a Capitol building or grounds, aiding and abetting, in violation of 40 U.S.C. § 5104(e)(2)(D) and 18 U.S.C. § 2. In order to find the defendants guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1.  First, that the defendants engaged in disorderly or disruptive conduct in any of the United States Capitol Buildings;

2.  Second, that the defendants did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress; and

3.  Third, that the defendants acted willfully and knowingly.

The term "United States Capitol Buildings" includes the United States Capitol located at First Street, Southeast, in Washington, D.C.

The term "disorderly or disruptive conduct" has the same meaning described in the instructions for Count Three defining "disorderly conduct" and "disruptive conduct."

A person acts "willfully" if he acts with the intent to do something that the law forbids, that is, to disobey or disregard the law.  "Willfully" does not, however, require proof that the defendant be aware of the specific law or rule that his conduct may be violating.

The term "knowingly" has the same meaning as previously defined.

<u>40 U.S.C. § 5104(e)(2)(F)</u>

Count Fifty-Three of the Fifth Superseding Indictment charges the defendant, with acts of physical violence in the Capitol Grounds or Building, aiding and abetting, in violation of 40 U.S.C. § 5104(e)(2)(F), and 18 U.S.C. § 2.  In order to find the defendants guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1.   First, that the defendants engaged in an act of physical violence in the Grounds or any of the Capitol Buildings; and

2.   That the defendants did so willfully and knowingly.

The term "act of physical violence" is defined as "any act involving (A) an assault or other infliction or threat of infliction of death or bodily harm on an individual; or (B) damage to, or destruction of, real or personal property."

The terms "United States Capitol Buildings," "knowingly," and "willfully" have the same meanings as previously defined.

**C.  Stipulated Testimony**

The government has proposed submitting the following three transcripts as evidence in this case[14]:

---

[14] If all three defendants do not agree to these stipulations, we expect these witnesses to testify before the Court, except that USCP Officer Mark Gazelle will testify in place of Daniel Schwager.

In *United States v. Couy Griffin*, 21-cr-00092-TNM (March 21-22, 2022), this Court heard the testimony of United States Secret Service (USSS) Inspector Lanelle Hawa.  Inspector Hawa testified regarding the restricted perimeter surrounding the U.S. Capitol building and grounds and the presence of then Vice President Pence and his immediate family within the restricted perimeter from the afternoon of January 6, 2021 until the morning of January 7, 2021.

In *United States v. Timothy Hale-Cusanelli*, 21-cr-00037 (TNM) (May 24-26, 2022), this Court heard the testimony of Daniel Schwager, who, on January 6, 2021 was the general counsel to the Secretary of the United States Senate.  Mr. Schwager testified regarding Congress's Certification of the Electoral College vote (the "Certification proceeding"), including an explanation of the provisions governing the Certification proceeding.  Mr. Schwager also testified about the Certification proceeding, as it occurred on January 6 and 7, 2021.

In *United States v. Webster*, 21-cr-208, this Court heard the testimony of Edgar Tippett who, on January 6, 2021, was a district manager at Safeway Stores, Incorporated.  Mr. Tippett testified that on January 6, 2021, in response to the city-wide curfew imposed by Mayor Bowser, Safeway closed all of its 12 Washington, D.C. stores at 4:00 p.m., instead of the regularly scheduled time of 11:00 p.m.  Safeway's Washington, D.C. sales were between 18 and 47 percent less than they had projected on that day.  Mr. Tippett also testified that Safeway's Washington, D.C. stores receive their shipments from a warehouse in Pennsylvania, but because the stores had to close and no employees were working, the scheduled shipments for the remainder of the day on January 6, 2021, could not be delivered.

To save time, and to focus on the matters that will likely be in dispute, the government plans to offer into evidence a transcript of Inspector Hawa's testimony and the accompanying exhibits from the *Griffin* trial, Mr. Schwager's testimony and the accompanying exhibits from the

*Hale-Cusanelli* trial, and Mr. Tippett's testimony and the accompanying exhibits from the *Webster* trial.

### D.  Trial Stipulations

The government has proposed stipulations[15] to the following facts: (1) a description of the Capitol Building and Grounds; (2) the certification of the electoral college vote; (3) the "civil disorder" that took place on January 6, 2021; (4) the civil disorder affected interstate commerce; (5) the civil disorder affected a "federally protected function"; (6) U.S. Capitol Police Officers and Metropolitan Police Department Officers were engaged in their official duties as officers or employees of the United States on January 6, 2021; (7) the operation and maintenance of closed-circuit video monitoring and recording equipment utilized by the USCP on January 6, 2021; (8) authenticity of body worn camera; (9) certain stipulated testimony (as noted above); (10) the authenticity of open source videos; (11) the authenticity of videos recovered from private individuals; (12) the authenticity of photographs; (13) the proper chain of custody regarding items seized pursuant to lawfully executed search warrants; (14) the use of proper and reliable techniques to extract cell phone data from the defendants' cell phones; and (15) the defendants' identities and presence in the Capitol on January 6, 2021.

### E.  U.S. Capitol Police Officers

U.S. Capitol Police Sergeant Aquilino Gonell, United States Capitol Police, will testify that on January 6, 2021, he was on duty at the United States Capitol.  When rioters descended upon the Capitol grounds, Sgt. Gonell was one of the members of law enforcement who defended the building and its occupants from the mob.

---

[15] If all three defendants do not agree to these stipulations, we expect to present witnesses who will testify before the Court to these facts.

Sgt. Gonell is the victim named in Count Twenty-One, in which defendant Stevens is charged.  He is expected to testify that during the course of January 6th he was assaulted on numerous occasions, including on the West Plaza, the Lower West Terrace, as well as in the tunnel.  After the police line broke on the West Plaza, Sgt. Gonell will explain that he retreated to the tunnel where he spent multiple hours defending the Capitol building at the tunnel entrance.  He engaged in numerous physical altercations throughout the day and suffered several injuries, some of which later required medical intervention.

With respect to defendant Stevens and Count Twenty-One, Sgt. Gonell will authenticate and identify himself in two videos, including: (1) an open-source video taken inside of the tunnel by photo-journalist John Farina and (2) a video taken by and recovered from the phone of rioter Lewis Cantwell.  The videos cover overlapping time periods but were recorded from different perspectives.  The portions of the two videos relevant to Count Twenty-One depict Sgt. Gonell near the front of the police line confronting rioters, with defendant Stevens near the front of the opposing line of rioters.  On the videos, Steven can be seen using a stolen USCP riot shield to forcefully push against the line of officers, including Sgt. Gonell, and ultimately strikes Sgt. Gonell in the head with the shield.  Sgt. Gonell will testify as to his memory regarding this incident as well as his experience in coming into contact with Stevens and the dangerousness of the riot shield in that context.  Sgt. Gonell will further testify that he recalls other actions taken by defendant Stevens that were not captured on video, including punching officers and using a flagpole to strike at officers. Sgt. Gonell will also testify that Stevens called officers "pussy" and "pig" during one confrontation in the tunnel.

USCP Capitan Ronald Ortega will serve as the government's overview witness regarding January 6, 2021 His testimony will include, but is not limited to, the timeline of January 6, 2021;

the perimeter of the restricted grounds and the barriers, such as racks, fencing, and "Area Closed" signs; the interactions between rioters and law enforcement at relevant locations on Capitol grounds, such as the Lower West Terrace; his personal interactions with the group of rioters; and the rioters' progression toward the Capitol.

USCP Captain Mark Gazelle will testify regarding the congressional proceedings that took place on January 6, 2021, including the interruption caused by the rioters.

### F. Metropolitan Police Department Officers

*Officer Ricki Chasten*

Officer Ricki Chasten, Metropolitan Police Department, will testify and lay a foundation for the introduction of his Body Worn Camera footage. Officer Chasten will testify generally regarding his recollections of January 6, 2021, including that he reported to the U.S. Capitol, and worked with law enforcement to repel the mob on both the West Plaza and Upper West Terrace. He will testify as to the accuracy of his BWC, including a clip which appears to depict defendant Stevens near the front of the police line on the West Plaza prior to the breach of the police line at that location. In the clip, Stevens appears to be angry and exchanges words with an officer immediately in front of him, Officer Curtice. Officer Chasten is expected to testify that he recalls defendant Stevens from that date and that Stevens was very "vocal" and kept pushing his way toward the officers that day.

*Officer Chad Curtice*

Officer Chad Curtice, Metropolitan Police Department, will testify generally regarding his experiences on January 6, 2021, including his efforts to defend the Lower West Terrace and tunnel. He will additionally authenticate his BWC footage from that date and the United States expects to play several clips of that footage, including, but not limited to, an interaction with defendant

Stevens at approximately 2:21 p.m. in which defendant Stevens calls Officer Curtice a "coward" and spits in the direction of the officer's feet. Stevens then can be speaking angrily at Curtice, including asking "do you know what happens to traitors?...you get tied to a post and shot." Officer Curtice will then describe his recollections of that interaction. He may also describe his experiences in the tunnel as he worked to prevent the mob from gaining access to the Capitol through that entrance.

*Sergeant Jason Mastony*

Sergeant Jason Mastony, Metropolitan Police Department, is expected to testify regarding his observations and experiences on January 6, 2021. He will describe being on duty that day and having a platoon of MPD officers under his command. He will testify regarding the early portion of the day in which he observed crowds of individuals moving toward the United States Capitol Building. He will then discuss how he responded with his platoon to the Capitol after hearing a call for assistance and to organizing and directing his platoon as they approached the grounds. Sgt. Mastony will discuss his actions and observations while on the West Plaza, in which MPD and USCP officers had established a makeshift police line, using both their bodies and bike racks. While on the West Plaza, officers faced an increasingly angry mob, with individual members confronting officers both verbally and physically, including by spraying chemical irritants at the officers, lobbing projectiles at the police line, attempting to dismantle the bike rack line, and attempting to grab objects from the officers.

Sgt. Mastony will describe how the onslaught from the crowd continually pushed back the police line on the West Plaza until the line eventually broke. At approximately 2:30 p.m., officers became overwhelmed by the aggressive crowd and were overrun. The police line was lost and officers were forced to retreat. He will describe how it initially appeared that the group of officers

on the West Plaza were backed into a corner with no place to go. The angry mob, which was continually pushing forward, stood between the officers and any forward movement (west, in the direction of the Washington Monument).  Behind the officers was what initially appeared to be a barrier, preventing the officers from retreating any further.

Sgt. Mastony will testify of his relief when he learned that officers were not yet cornered and that there was a narrow stairwell built into the wall which connected the West Plaza to the Lower West Terrace.  Upon climbing the stairs and reaching the Lower West Terrace, Sgt. Mastony initially believed that the officers should fortify the stairwell to prevent rioters from using that as an access point, but quickly learned that rioters were accessing the Lower West Terrace via other avenues.

Sgt. Mastony then moved toward the Lower West Terrance "tunnel", where he spent the next several hours defending that entrance from the mob of rioters attempting to enter the Capitol via that entrance.  He will describe the multi-hour physical and, often, hand-to-hand combat that took place in that tunnel as waves of rioters continually attempted to breach the entrance point. During that time, Sgt. Mastony did not know that other rioters had already breached the interior of the building and believed that the line of officers defending the tunnel entrance was the only barrier keeping members of the mob from entering the Capitol.

During his testimony, he will authenticate his Body Worn Camera (BWC) footage from that day and the government expects to play numerous clips from that BWC footage, including footage which captures one or more of the defendants in this case.  Sgt. Mastony is then expected to describe the context of each clip and his recollections of what occurred during the time period in which the clip was recorded.  Sgt. Mastony may also authenticate additional videos, including the Body Worn Camera video of Officer Bronson Spooner, and Sgt. William Bogner, the open-

source video recorded by photo-journalist Jon Farina, and videos recorded by other rioters, including Gina Bisignano and Lewis Cantwell.

*Officer Daniel Hodges*

Officer Daniel Hodges, Metropolitan Police Department, will testify about his experience as an officer in Civil Disturbance Unit 54, called to the Capitol on January 6, 2021. Officer Hodges will testify, and his body worn camera video will show, that he arrived with this unit to the Capitol just before 2:00 p.m. The unit attempted to get to the West Front police line to back up the officers there, but got fractured walking through the angry mob. Officer Hodges finally made it to the police line at approximately 2:25 p.m., only to experience the mob overrun the police line a few minutes later. Officer Hodges and other officers retreated up to the inaugural platform, and inside the Capitol building at approximately 2:36 p.m.

After catching his breath and decontaminating from the chemical irritants sprayed on him while in the mob, Officer Hodges returned to the tunnel at approximately 2:50 p.m. to assist his fellow officers in guarding the door to the Capitol. Officer Hodges eventually worked his way to the front of the line, where he came face to face with defendant McCaughey at approximately 3:10 p.m.. Video will show, and officer Hodges will discuss, how defendant McCaughey, armed with a riot shield, came from Officer Hodges's left side and pressed the shield against him. Defendant McCaughey can be heard on video yelling "go home" to Officer Hodges, as he shoves the officer into the metal frame of the doorway. While Officer Hodges was pinned against the frame and defenseless, another rioter—Steven Cappuccio—grabbed at his gas mask and ripped it violently from his face. Then, at approximately 3:11 p.m., the entire mob behind defendant McCaughey starts a concerted heave-ho effort against the police line. Officer Hodges will describe how, using that shield, defendant McCaughey was able to concentrate the weight of the mob behind him on

to Officer Hodges. Video evidence captures Officer Hodges in that moment—screaming in agony for help. Eventually, the mob's heave-ho lessened, and Officer Hodges was able to cycle out of the tunnel, back into the Capitol. Officer Hodges received multiple injuries from his encounters that day, including a bloody lip and a head injury.

*Officer Henry Foulds*

Officer Foulds was on duty as a member of Civil Disturbance Unit 74 on January 6, 2021. He expected to be working traffic management a few blocks away from the U.S. Capitol, but was called to the Capitol grounds, and arrived on the West Front at approximately 1:30 p.m. Officer Foulds joined his fellow officers at the bike racks, and held the rioters back for about an hour, until the police line collapsed at approximately 2:30 p.m. Officer Foulds was forced to retreat up to the inaugural platform at approximately 2:35 p.m.  and then took quick refuge inside the Capitol building.

At approximately 2:44 p.m., Officer Foulds joined other officers in the police line that was guarding the entrance to the building through the Lower West Terrace tunnel. Officer Foulds eventually cycled up to the front of the police line, and where, at approximately 3:13 p.m., defendant McCaughey swung at him with a riot shield, telling him to go home. Officer Foulds tried to defend himself with his baton, but defendant McCaughey continued to use his riot shield to swing at Officer Foulds, until defendant McCaughey finally gave up and retreated back into the mob with his stolen riot shield.

*Other MPD Officers*

Several other MPD officers—Officers Abdulkadir Abdi, Vincent Biscoe, Damian Chapman, George Donigian, Tommie Grable, Josue Hernandez-Martinez, Brian Madison, Erica Magnunson, Bronson Spooner; Sergeants Bernard Grimsley, William Bogner; and Detective

25

Phuson Nguyen—may testify to the authenticity of their body worn camera videos, which capture the defendants at various points between 2:00 p.m. and 4:15 p.m., while illegally on the grounds, pushing forward with the mob, obstructing the official proceeding. The officers may also testify generally that they were on duty on January 6, 2021, and to the actions they witnessed of rioters, specifically the three defendants charged here.

### G.  Civilian Witnesses

The government expects to call three civilian witnesses to testify as to the identities of the defendants, and their stated purpose for coming to Washington, D.C. on January 6, 2021.

*Nikhil Paranjape*

Nikhil Paranjape will testify about defendant McCaughey. Mr. Paranjape is a friend of defendant McCaughey, who has known him for many years. He will be able to testify as to defendant McCaughey's stated thoughts about the results of the 2020 Presidential Election, how defendant McCaughey traveled to Washington, D.C. in December 2020 for a prior protest, and how defendant McCaughey sent Mr. Paranjape photographs from the Capitol on January 6, 2021, including a selfie of defendant McCaughey on top of the Southwest scaffolding.

*Sandra Stevens*

Sandra Stevens is expected to testify that she is the grandmother of Tristan Stevens and has known him since his birth.  She will also testify that she raised defendant Stevens for a portion of his childhood and has been familiar with his appearance for the entirety of his life.

Around the time of January 6, 2021, Tristan Stevens was living in a residence in Pensacola, Florida, that was owned by Sandra and her husband, George Stevens.  The Pensacola residence was approximately a 10- to 20-minute drive from where Sandra and her husband lived in Lillian,

Alabama.  Although they only occasionally saw each other in person, they stayed in contact over the phone.

Sandra Stevens was aware, prior to January 6, 2021, that her grandson, Tristan Stevens, intended to travel to Washington D.C.  Sandra did not approve of Tristan's plan to go to Washington, D.C., and voiced her disapproval to Tristan.  Sandra Stevens will identify her grandson as the individual that appears in various photos and videos taken at the United States Capitol on January 6, 2022.

*George "Victor" Stevens*

George Stevens is expected to testify that he is the grandfather of Tristan Stevens and has known him since his birth.  He will testify that defendant Stevens lived with him for a portion of his childhood and that he has been familiar with his appearance for the entirety of the defendant's life.  Similar to Sandra Stevens, he will testify that, around the time of January 6, 2021, Tristan Stevens was living in a residence in Pensacola, Florida, that was owned by George and his wife, Sandra Stevens.  The Pensacola residence was approximately a 10- to 20-minute drive from the grandparents lived in Lillian, Alabama.  Although they only occasionally saw each other in person, they stayed in contact over the phone.  George Stevens will identify his grandson as the individual that appears in various photos and videos taken at the United States Capitol on January 6, 2022.

*Travis Lovato*

Travis Lovato will testify about defendant Mehaffie. Mr. Lovato has known defendant Mehaffie for several years, as Mr. Lovato owns a business on the same street in Dayton, Ohio where defendant Mehaffie owns his business. Mr. Lovato identified defendant Mehaffie to the FBI when shown photographs taken of defendant Mehaffie on the Capitol grounds on January 6, 2021.

### H.  Video Evidence

The government will present much of its evidence through video that captured the defendants on the Capitol grounds on January 6, 2021. The government has created many exhibits that will marry the footage from the U.S. Capitol Police CCTV cameras and the Metropolitan Police Department body worn cameras to footage take by January 6 defendants—in this case and in others—as well as open source footage from the internet. These videos can be corroborated by USCP Camera footage and MPD body worn camera footage taken simultaneously, and by officers who are visible in the footage. The government has also received extensive footage of the events in the tunnel from photojournalist Jon Farina. Mr. Farina has provided a certificate of authenticity for the footage provided, and it can be additionally authenticated through the USCP Camera 0074, which captured the rioters in the tunnel directly outside the double doors that led from the inaugural platform into the Capitol building.

### I.  Physical Evidence

A crucial exhibit to the government's presentation of evidence is a Capitol Riot Shield, similar to the shield used by defendants McCaughey and Stevens in their assaults on Officer Hodges, Officer Foulds, and Sergeant Gonell. The Court will be able to feel the weight of this shield, feel its size, and understand more fully how this object—when used both to strike officers affirmatively and to crush officers behind the weight of multiple rioters—meets the legal definition of deadly and dangerous weapon. We expound further on the legal argument regarding that definition below.

Cell phones were recovered from each defendant, and from defendant Mehaffie's wife, and were subsequently downloaded by law enforcement. The cellphones for defendant McCaughey and defendant Stevens contain photographs and videos from the Capitol grounds, as well as

communications with others before, during and after January 6, 2021 about the events of the day. For example, defendant Stevens's phone contains a video from the rally of an unidentified speaker discussing the official proceeding, Vice President Pence, and the election results at 1 p.m. It also contains a video from the West Front of the Capitol, as the police line is a collapsing and a rioter nearby is screaming that they are protecting communists, in which defendant Stevens turns the camera to face himself and give a thumbs up. Finally, it contains a video from the tunnel itself, which depicts defendant Stevens and other rioters are participating in a heave-ho against the police line.

Defendant McCaughey's phone contains a selfie of him on the southwest scaffolding, after the police line has collapsed. It also contains conversation with a friend after the events of the day, which, in response to the text "yeah definitely, I'd like to hear about your time there," defendant McCaughey texted "short answer, Donald is a p*ssy." Finally, it contains conversations with government witness Nikhil Paranjape about a video which circulated on YouTube, the video taken by photojournalist Jon Farina, showing defendant McCaughey assaulting Officer Daniel Hodges.

Law enforcement also recovered items worn by each defendant on the Capitol grounds on January 6th—a brown hooded sweatshirt from defendant McCaughey, a brown sweatshirt with an animal logo from defendant Stevens, and blue earbuds from defendant Mehaffie.

### J.  Defendants' Statements

The government will not be admitting custodial statements from any of these defendants. Rather, each of the defendants made statements that are caught on video while on the Capitol grounds that day. Specifically, defendant McCaughey can be heard multiple times encouraging the cops to go home, and joining in chants of "USA!" Defendant Stevens made many statements to Officer Curtice, including calling him a coward, asking him if he knew what treason is, and telling

him the cops were surrounded by the enemy. Defendant Mehaffie can be heard and seen encouraging rioters to come over the wall into the restricted area, stating "if we can't fight over this wall, we can't win this battle." Once at the tunnel, he can be heard directing rioters, and stating things like "in this side, out that side" and "we don't hit them, we push."

## III.   ANTICIPATED DEFENSES AND LEGAL ARGUMENTS

The parties are mutually committed to trying the case expeditiously and without lengthy arguments about objections. The government may nonetheless object to particular portions of exhibits, or particular questions about exhibits.

As it relates to anticipated defenses, the government anticipates that the defendants will argue that A) they lacked the corrupt intent necessary to prove a violate of Section 1512(c)(2), B) the shields used by defendants McCaughey and Stevens in committing their assaults were not deadly or dangerous weapons sufficient to meet the elements of Section 111(b), and/or C) the defendants acted in self-defense.   The evidence will refute each of these arguments.

### A.  The defendants all had the corrupt intent necessary to meet  Section 1512(c)(2).

Each defendant came to Washington, D.C., and ultimately to the U.S. Capitol, to support former President Trump, their preferred candidate in the 2020 presidential election.  But they did more than simply show up, protest, or march in solidarity with a crowd.  They made their way past thousands of others to the front of the police line on the West Front. There, defendants McCaughey and Stevens yelled at police officers who were guarding the Capitol building, encouraging them to go home and accusing them of treason.  When the police line fell, each of the defendants followed the retreating officers, scaling the scaffolding and stairs on the southwest side of the West Front. All three entered, and remained, in the tunnel that police officers were visibly defending to keep rioters from breaching the Capitol where lawmakers were meeting in joint session to certify

the results of the 2020 presidential election. The defendants were clear in their intent—to work together with a large group of some of the most violent rioters fighting to push past the police officers and break into the U.S. Capitol Building.

This and other evidence the government intends to adduce at trial will establish the defendants intended to stop what Congress was doing that day, and that they knew their conduct was wrongful.

### B.  Riot shields, as used by the defendants on January 6th, were deadly and dangerous weapons.

The defense is likely to argue that the riot shields used by defendants McCaughey and Stevens were not deadly or dangerous weapons, as charged in 18 U.S.C. § 111(a)(1) and (b), 18 U.S.C. § 1752(a)(2) and (b)(1)(A), and 18 U.S.C. § 1752(a)(4) and (b)(1)(A). Specifically, defendant McCaughey is charged with § 111(b) against Officer Hodges and Officer Foulds, and defendant Stevens is charged with § 111(b) against Sergeant Gonell.

To violate § 111(a), a defendant must: "(1) forcibly; (2) assault, resist, oppose, impede, intimidate, or interfere with; (3) a designated federal officer; (4) while engaged in or on account of the performance of official duties. In addition, the defendant must have: (5) the intent to do the acts specified in the subsection." *United States v. Arrington*, 309 F.3d 40, 44 (D.C. Cir. 2002) (internal quotation marks omitted). To violate § 111(b), a defendant must, in addition to the aforementioned elements: "(1) use a deadly or dangerous weapon; (2) in the commission of any of the acts described in the prior subsection . . . [and] (3) the defendant must use the weapon intentionally." Id. If an object is not inherently deadly, to qualify as a "deadly or dangerous weapon," it "must be capable of causing serious bodily injury or death to another person and the defendant must use it that manner." *Arrington*, 309 F.3d at 45.

As the D.C. Circuit has explained, a defendant may violate § 111(b) by attempting to cause or purposely or knowingly causing bodily injury to a designated officer with a deadly or dangerous weapon, or by using a deadly or dangerous weapon with the purpose of causing the designated officer to fear imminent serious bodily injury. *See United States v. Duran*, 96 F.3d 1495, 1509-11 (D.C. Cir. 1996). Here, defendant McCaughey and defendant Stevens acquired stolen U.S. Capitol police riot shields, which are large, weighty objects, that when wielded against others can cause serious bodily injury, or at minimum, put the officers on the other side of that shield in fear of imminent serious bodily injury.

While § 111(b) does not include a definition for "deadly or dangerous weapon," multiple courts of appeal have defined "dangerous weapon" as an object that is either "inherently dangerous or is used in a way that is likely to endanger life or inflict great bodily harm." *United States v. Chansley*, 525 F. Supp. 3d 151, 161-162 (D.D.C. Mar. 8, 2021) (collecting cases). Courts in this district have found skateboards and police batons to be "deadly or dangerous weapons" for purposes of § 111(b). *See, e.g.*, *United States v. Owens*, Case No. 21-cr-286 (BAH), 2021 WL 2188144, at *7 n.5 (D.D.C. May 28, 2021) (skateboard); *Sabol*, 2021 WL 1405945, at *11 (police baton). Here, the riot shields were plainly capable of inflicting great bodily harm and therefore qualify as a dangerous weapon for purposes of § 111(b).

This Court in the detention hearing for defendant McCaughey (Hearing, May 4, 2021) and Judge Bates in the detention for defendant Federico Klein (*United States v. Klein*, 533 F. Supp. 3d 1, 13 (D.D.C. 2021))—a co-defendant charged in this indictment with a violation of 18 U.S.C. § 111(a)(1) and (b) for use of a riot shield in an attack on law enforcement in the tunnel—have raised concerns over the use of these weapons as being "used in a way that is likely to endanger life or inflict great bodily harm." Here, the evidence will show the riot shields were wielded in a

way that was likely to endanger life and inflict great bodily harm. Indeed, one need only look at the officers on the receiving end of the attacks by the defendants. Video of Officer Hodges shows him screaming in agony as defendant McCaughey pinned him against the door using the riot shield—an act he would likely not have accomplished without the use of the riot shield. Officer Hodges will additionally testify about how the riot shield compounded the weight of the mob, moving in rhythmic unison in a heave-ho, causing him to cry out for help because he feared for his bodily safety. Video of defendant Stevens' assault on Sergeant Gonell will demonstrate the defendant using the shield in multiple ways, including as a striking device, smacking Sergeant Gonell on his face shield as well as a tool to focus the weight of the mob on Sgt. Gonell by pushing it against him.   Finally, defendant McCaughey similarly used the riot shield, not as a shield, but as an affirmative weapon to strike at Officer Foulds.

Certainly a reasonable person would have viewed crushing an officer with a heavy riot shield, and proactively swinging the shield at the faces of officers, as video evidence will show both defendants did, as something that could have caused substantial injury and a reasonable person would have feared substantial injury and imminent and serious bodily injury by that very action.

### C.  The defendants were not acting in self-defense.

Neither the law nor the facts expected to be elicited at trial support a claim of self-defense for any of the defendants presently before the Court.  Defendants McCaughey and Stevens have each been charged with at least one count of 18 U.S.C. § 111(b) for specific conduct directed toward law enforcement officers on January 6th.  Further, defendant Mehaffie has been charged with one count of 18 U.S.C. § 111(a) under an aiding and abetting theory for his role in assisting the mob in assaulting, resisting, opposing, impeding, intimidating, and interfering with the line of

officers defending the tunnel during the time that defendant Mehaffie acted as "tunnel commander" at the entrance.

Section 111 makes it a crime to "forcibly assault[], resist[], oppose[], impede[], intimidate[], or interfere[] with" a federal officer in the performance of the officer's duties. 18 U.S.C. § 111(a)(1). A defendant charged under Section 111 may assert, as an affirmative defense, a theory of self-defense, "which justifies the use of a reasonable amount of force against an adversary when a person reasonably believes that he is in *immediate danger of unlawful bodily harm* from his adversary and that the use of such force *is necessary to avoid this danger." United States v. Middleton,* 690 F.2d 820, 826 (11th Cir. 1982).

Nevertheless, this defense is limited in several ways. First, "[a] defendant cannot claim self-defense if he was the aggressor or if he provoked the conflict upon himself." *Waters v. Lockett*, 896 F.3d 559, 569 (D.C. Cir. 2018) (internal quotation marks and citation omitted). Further, an essential purpose of § 111 is "to protect both federal officers and federal functions." *United States v. Feola*, 420 U.S. 671, 679 (1975). As a result, "[a]n individual is not justified in using force for the purpose of resisting arrest or other performance of duty by a law enforcement officer within the scope of his official duties." *United States v. Drapeau*, 644 F.3d 646, 653 (8th Cir. 2011); *see also United States v. Branch*, 91 F.3d 699, 714 (5th Cir. 1996) ("[Self-defense] principles must accommodate a citizen's duty to accede to lawful government power and the special protection due federal officials discharging official duties."). Finally, even in a circumstance where an individual might be justified in using some force to resist a federal officer, that resistance must be reasonable under the circumstances. *See Abrams v. United States*, 237 F.2d 42, 43 (D.C. Cir. 1956) (observing that "the use of 'reasonable force' only would have been open to defendants"); *see also United States v. Wallace,* 368 F.2d 537, 538 (4th Cir. 1966) (explaining

that Section 111 permits "reasonable force employed in a justifiable belief that it is exerted in self-defense"); *United States v. Perkins*, 488 F.2d 652, 655 (1st Cir. 1973) (defendant may be convicted under Section 111 where "he used more force than was necessary to protect the person or property of himself or others").

The video evidence and testimony that the United States expects to introduce at trial will demonstrate that defendants McCaughey, Stevens, and Mehaffie each entered a restricted area on the U.S. Capitol grounds and participated – each in different ways – in a prolonged and physical confrontation with officers inside the Lower West Terrance tunnel.  All defendants could have been properly arrested from the moment that they set foot in restricted areas and law enforcement had every right to attempt to remove them from the area.  Thus, none of the three defendants were justified in using force for the purpose of resisting the efforts of law enforcement to clear the tunnel or the Capitol grounds.  If any defendant proffers a justifiable use of force to resist officers in these circumstances, the United States submits that the amount of force exerted by these defendants was patently unreasonable.

Further, the evidence will demonstrate that defendants McCaughey and Stevens were each the "initial aggressors" with respect to the assaults that they committed on officers.  As the court will see from the evidence, defendants McCaughey and Stevens each initiated and physically participated in both group and individual assaults on officers while inside of the tunnel.  These defendants pursued retreating officers, entered the tunnel without any right to do so, and used physical violence against officers who were properly using a defensive line to bar their way through the entrance.  These defendants – not the officers – were the "initial aggressors" who provoked the conflict on themselves and, thus, may not seek to justify their actions by raising self-defense.

While defendant Mehaffie's conduct was somewhat different from that of his codefendants, the legal analysis is similar. Mehaffie is not charged with the physical assault of any officer *by his own hands*. He is charged with *aiding and abetting* the assaults, resistance, opposition, impediment, intimidation, and interference of officers as carried out by other members of the mob. It was Mehaffie's direction and encouragement that assisted and enabled other members of the mob to more efficiently channel their collective efforts against the line of officers at the entrance. Significantly for the purposes of raising a self-defense claim, the members of the mob whom Mehaffie aided and abetted were the initial aggressors who were trying to fight their way through the police line. Law enforcement did not initiate this hours-long battle. Members of the mob did and, with each breached barrier and retreating officer, they carried their force forward. Defendant Mehaffie thereby aided and abetted others who were the initial aggressors and should, therefore, be precluded from raising self-defense.

## IV.   CONCLUSION

The defendants were aggressive, violent, and active participants in the breach of the U.S. Capitol on January 6, 2021. Acting together and with others around them, they corruptly obstructed the joint session of Congress to Certify the Electoral College vote. At trial, the evidence will prove beyond a reasonable doubt that the defendants committed each offense charged in the Fifth Superseding Indictment.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

By:   */s/ Kimberly L. Paschall*
KIMBERLY L. PASCHALL
Assistant United States Attorney
Capitol Siege Section
D.C. Bar No. 1015665

601 D Street N.W.
Washington, DC 20530
Kimberly.Paschall@usdoj.gov