**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| | : | |
| v. | : | **Case N. 21-CR-40 (TNM)** |
| | : | |
| **PATRICK E. MCCAUGHEY III,** | : | |
| | : | |
| Defendant. | : | |

<u>**SENTENCING MEMORANDUM ON BEHALF OF PATRICK E. MCCAUGHEY**</u>

Patrick E. McCaughey III ("Mr. McCaughey") submits this sentencing memorandum in support of his request for a sentence of 12 months' incarceration. Although his conduct is indeed serious, it represents the only legal transgression this hard-working person has ever committed. It is also significant to note that his actions were not motivated by any desire for personal financial gain or any other type of benefit. Rather, his actions, which he himself admits were reprehensible, were motivated by a misunderstanding as to the facts surrounding the 2020 election. Indeed, Mr. McCaughey knew next to nothing about the 2020 election and listened to sources of information that were clearly false. Mr. McCaughey has learned valuable life lessons from this incident, and he will never repeat the actions that bring him before the Court in this case. For the reasons set forth in greater detail below, we request a 12-month sentence because we believe it to be "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

As explained in greater detail below, Mr. McCaughey was one of thousands of protestors who walked to the U.S. Capitol Building on January 6, 2021, after former U.S. President Donald J. Trump asked his supporters to march towards the U.S. Capitol Building in protest of the 2020

presidential elections and "fight" on his behalf.  This represents one of the saddest episodes in American history.  There remain many grifters[1] out there who remain free to continue propagating the "great lie" that Trump won the election, Donald Trump being among the most prominent.  Mr. McCaughey is not one of these individuals; he knows he was wrong.

Mr. McCaughey has no prior criminal record and has fully admitted his role in the riot. His sentencing guideline range, as calculated by the probation officer, is 108 months to 135 months.  However, this is a case where the guidelines themselves should be discarded since they fail to take into account Mr. McCaughey's unique personal attributes.  In fact, the defense argues that under all of the 18 U.S.C. 3553(a) factors, a sentence of 12 months' incarceration would be appropriate in this case.

## I.      FACTUAL BACKGROUND

Mr. McCaughey was a law-abiding citizen before the instant offense.  His life was characterized by hard work and dedication to his community.

Prior to his detention, Mr. McCaughey lived with his mother in Ridge Field, Connecticut.  He centered his life around his family and community.  The letters appended hereto from his family members and friends show that he has touched their lives very deeply by his caring and hard-working personality.

### A.      Patrick McCaughey's Family Background

Mr. McCaughey was born on September 4, 1997, in Walnut Creek, California.

---

[1] It is noteworthy that Steve Bannon was convicted of two counts of Contempt of Congress. After his conviction, he used his Podcast to call for 4,000 "shock troops" to "deconstruct" the Government.  Mr. Bannon is a far more dangerous individual than Mr. McCaughey; however, he was sentenced to four (4) months in prison. *See* DOJ Press Release, available at: *https://www.justice.gov/usao-dc/pr/stephen-k-bannon-sentenced-four-months-prison-two-counts-contempt-congress* (October 21, 2022).

PSR ¶ 113.  Mr. McCaughey describes his upbringing as "quiet and pleasant.". *Id.* ¶ 114.  His father is 61 years of age and is the owner of McCoy Construction, LLC, in New Canaan, Connecticut and his mother is 56 years old and is employed as an administrative assistant for Sunset Hill Property Management Group in Ridgefield, Connecticut. *Id.* ¶ 113.  Mr. McCaughey has a very close relationship with his parents, as well as his sister Maria McCaughey, who is 28 years old and works as an account manager. *Ibid.*

Mr. McCaughey grew up in a household where respect and hard work were the pillars of his upbringing.  He has always been very generous and kind in the relationships that he maintained with his friends and family members and maintains daily contact with his parents and sister.

### B.    Patrick McCaughey's Educational and Professional Background

Mr. McCaughey graduated from Ridgefield High School in Ridgefield, Connecticut, in 2015. PSR ¶ 123.  After graduating from high school, Mr. McCaughey began working for his father as a Journeyman Carpenter in New Canaan, Connecticut. *Id.* ¶ 127.

The importance of hard work was instilled in Mr. McCaughey at a young age.  From 2012—when he was fifteen years old—until 2016, Mr. McCaughey worked part-time as a stage crew member for the Richfield Orchestra in Richfield, Connecticut, where he was paid $12 an hour doing whatever the stage managers requested. PSR ¶ 126.  Mr. McCaughey also worked for the Town CHIRP Concerts in his local park in Ridgefield, Connecticut, during the summers assisting in setting up and deconstructing the stage equipment. PSR ¶ 125.

Upon receiving his high school diploma, Mr. McCaughey began full-time employment with his father at his father's company McCoy Construction. PSR ¶ 127.  Mr. McCaughey worked as a Journeyman Carpenter in this company for 5 years earning $1,000.00 a week. *Ibid.*

During the COVID pandemic, Mr. McCaughey was laid off from the company, but was later reemployed in May of 2021. *Ibid.*  Upon his release, Mr. McCaughey intends to return to his employment with McCoy Construction, LLC.

### C.    Patrick McCaughey's Arrest

In January 2021, Mr. McCaughey was arrested for the present offense.  On January 6, 2021, he travelled to the District of Columbia in order to attend a rally in support of former U.S. President Donald J. Trump.  During these demonstrations, President Trump asked his supporters to march towards the U.S. Capitol Building in protest of the 2020 presidential elections and "fight" on his behalf.  Alongside thousands of other members of the crowd, Mr. McCaughey walked to the U.S. Capitol Building and entered the building.

Mr. McCaughey had no role in the planning or organization of the protests or the rioting that ensued in and around the Capitol Building.  Mr. McCaughey's father was a fervent Trump supporter and asked his son to come to the Trump rally with him.  Mr. McCaughey agreed because he enjoyed spending time with his father and wanted to bond with him.  This was just the second time that he went to a political event.  Mr. McCaughey's desire to bond with his father resulted in Mr. McCaughey being heavily influenced by his father's political views.

Mr. McCaughey's mother and sister elaborate on Mr. McCaughey's father's influence and how this resulted in Mr. McCaughey being influenced by false information:

- His father became a fervent Trump supporter and "anti-masker". He has not spoken with his 82-year-old mother in over two years and also broke off all contact with our daughter since Christmas of 2019 – because both are not Trump fans and followed COVID protection guidelines. Letter from Ulrike Fein-McCaughey.

- When Patrick's father asked him to come to the Trump rally, Patrick agreed, of course. This was just the second time that he went to a political event. His father was quite clear about his expectations that Patrick needed to conform to his

4

wishes and Patrick also started to believe that the election was "stolen", that Trump was the solution for all woes of this country, and that all "patriots" needed to show their support. My son would have not driven alone to the rally on January 6th. Letter from Ulrike Fein-McCaughey.

- I witnessed was my radical father attempting to convert everyone around him to the glory that was Donald Trump to him. Letter from Maria McCaughey.

- I believe my father's dedication to ignoring all issues that did not interest him, and his tendency to cut out those who disagreed with him forced my brother to adapt to his interests once again and therefore, radicalize himself too. I firmly believe that my brother would not have gone so far to the extreme without his need to cultivate a positive relationship with my father, and that he would not have been anywhere near the Capitol building on January 6, 2021, without my father's fervor about a "stolen election." Letter from Maria McCaughey.

*See* Reference Letters attached hereto as Exhibit "A", pp. 4-7 & 10-13.  Mr. McCaughey now understands that the information he obtained was false and that the presidential election was not fraudulent.

### D.      Patrick McCaughey is a Pillar in his Community

Mr. McCaughey was raised by his mother in Connecticut, who instilled in him positive values and the importance of hard work.  As a dedicated and caring son, brother, student, friend, and neighbor he has always exhibited values of modesty, kindness, humanity, diligence, sincerity, honesty, reliability, nobility, and love for his family and others, as attested by his family and friends. *See* Ex. "A".

Mr. McCaughey's mother, Ulrike Fein-McCaughey, describes her son as "gentle", "compassionate", and "selfless". *Id.* at 10-13.  Ms. Fein-McCaughey explains how her son is "very ashamed and embarrassed by his actions" on January 6th.  *Id.* at 11. According to Ms. Fein-McCaughey,"[h]e is selfless and gives freely – his time, attention, and also material goods. … If he sees that someone needs help, he will offer it." *Id.* at 13.  One example Ms. Fein-McCaughey cites to support her son's selflessness nature is that while leaving the Capitol Plaza on January

6th, he observed a female journalist who was carrying a tripod and he accompanied her to make sure she felt safe and comfortable in the riotous crowd. *Ibid.*

Mr. McCaughey's sister, Maria McCaughey, states that her brother is an "even keeled, intelligent, … good kid, who did a dumb thing[.]" *Id.* at 6.  Maria McCaughey explains how her brother has goals of moving "to Montana and have a farm, and to visit Japan." *Ibid.*  Her letter depicts an immense love for her brother, and a sincere worry that he was influenced by the environment that her and Mr. McCaughey's father created during their childhood.  She states that "[Patrick] is … just a kid who wants his dad to not only love him, but to like him, and he would do anything to make that happen." *Ibid.*

Margaret 'Peggy' Jay, Mr. McCaughey's grandmother, describes Mr. McCaughey as a helpful, "trustworthy", and a "reliable hard worker". *Id.* at 9.  Ms. Jay explains how Mr. McCaughey "has repaired an aging flagstone terrace, helped to install wood flooring, and assisted in much exterior painting. All … done with a pleasant, upbeat attitude." *Ibid.*  Also, Ms. Jay relies on her grandson for chores around the house such as "trash removal, heavy lifting" and assistance with her pet cat." *Ibid.*  Ms. Jay states that Mr. McCaughey, "an honor student in high school who was never in any trouble" told her that "he was a DUMMY to have been present on January 6th in Washington", which demonstrates the remorse he has for his actions. *Ibid.*

Similarly, Mr. McCaughey's aunt, Margaret Siderwicz, remembers Mr. McCaughey as "an especially kind and thoughtful child" who "was well read, and enjoyed intellectual discussions." *Id.* at 27.  Whenever Ms. Siderwicz saw Mr. McCaughey, he "was the same sweet, kind person that [she] had known since his birth." *Ibid.*  Mr. McCaughey's former neighbor and family friend, Jane Marie Grassi, who is a teacher in the Ridgefield Public Schools and who has known Mr. McCaughey since he was 8 years old, found Mr. McCaughey to be a respectful, kind

and helpful person. *Id.* at 3.  Mr. McCaughey is close friends with Ms. Grassi's son, and she has observed Mr. McCaughey's helpful nature firsthand.  She states, "[o]ver the years, Patrick has helped us with any work around the house and property when we needed an extra had." *Ibid.* Ms. Grassi further states that she "trusted [Patrick] for many years to take care of our animals and look after our home while we were on vacation." *Ibid.*  Additionally, as Mr. McCaughey's Latin teacher, Ms. Grassi observed Mr. McCaughey to be "a very engaged, intelligent, and motivated student." *Ibid.*

Family friend and widow, Bernadette Flory, has also had the opportunity to experience Mr. McCaughey's kindness and generosity on multiple occasions, such as when he helped with various projects around her house or when he would just stop by to say Merry Christmas and Happy New Year. *Id.* at 29.  In Ms. Flory's opinion, who raised three sons herself, Mr. McCaughey "truly is one kind and caring young man." *Ibid.*  Mr. McCaughey's best friend since Middle School, Gerald Matthews, states that Mr. McCaughey "has always been a genuine individual and true to his words.  His calm and collected personality have led to many good memories and pastimes in our community." *Id.* at 2.  Another childhood friend of Mr. McCaughey, Nikhil Paranjape, who works as an Investment Data Analyst at Fidelity Investments, describes Mr. McCaughey as an "invaluable friend". *Id.* at 15.  Mr. Paranjape, states Mr. McCaughey and him share many interests such as "computers, as well as construction and housework." *Ibid.*

Mr. McCaughey's selfless nature is also reflected in the letters sent by his friends.  For example, Mr. Paranjape states, "Patrick has been very helpful to my family in many ways. To name a few, he helped, and taught me how to install a water heater. He went through the process of the plumbing work, as well as the various checks that need to be done to ensure it is a sound

installation, as well as it being up to code." *Ibid.*  Additionally, Mr. Paranjape describes Mr. McCaughey's goals of building upon his career to allow himself to work for himself and be able to provide for his mother. *Ibid.*  Similarly, Mr. McCaughey's friend, Michael Bellino, describes him as a "kind, honest, rational and hard-working man" who is "always there for his friends and his family." *Id.* at 8.

A family friend, Ernest Ventres, admires Mr. McCaughey's "generous and upbeat attitude".  *Id.* at 1.  Mr. Ventres describes how Mr. McCaughey was always extremely helpful at any group gathering he attended, stating "[Patrick] always looked for ways to help the group. *Ibid.*  He would arrange things, set the table, offer and pour drinks [and] oversee the grill."  Mr. Ventres shares a recent demonstration of Mr. McCaughey's character where Mr. Ventres, who is 90 years of age, asked for some extra help.  *Ibid.*  He writes, "[t]here was a recent incident when I needed extra help. There is only an exterior entrance to my basement, and it is steep. Patrick showed up as soon as I called upon him and installed a sturdy railing that is safe and useful." *Ibid.*  This instance is one of many and demonstrates Mr. McCaughey's value to his community.

A family friend, Veronica Tyrell, states that "[Patrick] has always shown respect towards his family, friends, and strangers" and who "is a kind young man, [and] a true gentleman." *Id.* at 14.  Further, Ms. Tyrell has observed how Mr. McCaughey has had to be the "man of the house, helping [Ms. Fein-McCaughey] with house projects and is an integral part of his family… both emotionally and financially." *Ibid.*  Similarly, Laura MacMaster Danforth, another family friend, describes Mr. McCaughey as a "kind and decent young man" and in "in no way … a threat to the community." *Id.* at 26.

Through Ms. Danforth, Mr. McCaughey became close friends with her son Hunter Danforth.  Hunter and Mr. McCaughey spent many hours together whether it be at a sleepover or

an all-night gaming session. *Id.* at 25.  Hunter describes Mr. McCaughey as someone who has "always been compassionate, cheerful, and never violent." *Ibid.*

Various references from his work colleagues demonstrate Mr. McCaughey's contribution to his community and his overall character.  Felica Clem, Mr. McCaughey's colleague from the Fox Hill Lake Association where he spent many years volunteering, describes Mr. McCaughey as a "very smart and quiet young man" who had a "passion for cultivating food for his family." *Id.* at 21.  Another colleague of Mr. McCaughey's, Joseph Haas, explains how "[Patrick] is a hard-working, respectful, considerate, and empathetic individual." *Id.* at 17.  Further, Mr. McCaughey's former employer, Mark Murray, states that while Mr. McCaughey was working part time for his theatrical sound and lighting equipment company, "he was always prompt, polite, hard-working and respectful of both his fellow workers and audience members." *Id.* at 22.  Catherine Hazlehurst, Mr. McCaughey's employer and concert manager for the Ridgefield Symphony Orchestra, states that "[Patrick] stood out amongst his peers" and that he was "very personable and gracious with a natural reserve and a sense of responsibility beyond his years." *Id.* at 19-20.  Ms. Hazlehurst explains that she could always "count on [Mr. McCaughey] to observe protocols correctly and to keep everyone else safe." *Ibid.*  Additionally, Ms. Hazlehurst wrote that Mr. McCaughey was always "very respectful, loyal, dedicated and caring" during the time she spent with him and that he always spoke highly about his passion for history in school. *Ibid.*

Others in Mr. McCaughey's community have described their interactions with Mr. McCaughey to be nothing but pleasant.  Michelle Tobey, a family friend and local business owner, states that every time Mr. McCaughey enters her shop for materials, he has "always been polite and respectful" and she can tell "he has a good moral character. *Id.* at 28.  Timothy Currie

Jr., a local small business owner and another one of Mr. McCaughey's acquaintances, states that "[Patrick] is a respectful, intelligent, and caring individual" and is a "man of morals". *Id.* at 23. Furthermore, Chris Krediet, a long-term friend and colleague of Mr. McCaughey's explains how Mr. McCaughey has always been a "courteous, considerate, thoughtful, hard-working and professional" individual. *Id.* at 24.  Mr. Krediet describes one particular occasion where Mr. McCaughey was working on a home improvement project on Mr. Krediet's house and he recalls when "[Patrick] made a minor but important error in his work" and how "[Patrick] immediately took accountability for the error and then worked as hard as he could to make it right." *Ibid.*

Mr. McCaughey's commitment to his community through his hard work is evident through the letters written by many.  Donna Simone, one of Mr. McCaughey's customers, states that his "work ethic [was] admirable and respectful" and that he would always "clean up any area where he had been working." *Id.* at 16.  Ms. Simone further writes that "[Patrick] is not a reckless man or an aggressive man." *Ibid.*  Family friends, Mary and John Griffin, reiterate this proposition, stating how much they "trusted him with repairs and construction on [their] house." *Id.* at 18.

## II.  ADVISORY GUIDELINE RANGE

The Probation Officer has calculated an advisory guideline range of 108 months to 135 months, resulting from a total offense level of 31 and Criminal History Category I.[2]  The

---

[2] On March 31, 2023, 3 months after the probation office filed its draft presentence investigation report, the government submitted its objections to the report calculating a total offense level of 33.  The government incorrectly asserts that a +5 enhancement for serious bodily injury should be applied.  While Officer Hodges may have suffered bodily injury, namely multiple large bruises, there is no evidence that these bruises were caused by Mr. McCaughey or his actions. Since there is no evidence that Mr. McCaughey caused any of the bruises on Mr. Hodges' body, the +5 increase to the base offense level should be removed.  Additionally, on April 7, 2023, sent an email advising that it is seeking a +4 enhancement instead of a +5 enhancement as well as an

guideline range offers no useful advice because it (1) is the product of a guideline that is not based on empirical evidence or national experience; (2) fails to take any account of Mr. McCaughey's culpability or low risk of recidivism; (3) would result in unwarranted disparity as compared with sentences for similarly situated Defendants; and (4) is far greater than necessary to promote the goals of sentencing in this case.

The guideline range, however, is only one of the factors the Court must consider under 18 U.S.C. 3553(a).

## III.     A SENTENCE OF 12 MONTHS' INCARCERATION WOULD BEST SATISFY THE GOALS OF §3553(a).

The Court must " impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)," which are "the need for the sentence imposed

    (A)      to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)      to afford adequate deterrence to criminal conduct;

    (C)      to protect the public from further crimes of the defendant; and

    (D)      to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2). In "determining the particular sentence to be imposed," the Court must

---

additional +2 enhancement pursuant to U.S.S.G. 3C1.1. The defense objects to the additional +2 enhancement because Mr. McCaughey has not willfully obstructed or impeded, or attempted to obstruct or impede the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense. This enhancement is not warranted under the facts of this case, and the government has not provided any evidence that any conduct by Mr. McCaughey had any impact on the investigation, prosecution, or sentencing of the instant offense.

consider these purposes, the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid unwarranted disparities, and the need to provide restitution to any victims of the offense.  *See* 18 U.S.C. § 3553(a)(1)-(7).

No workable guideline could ever "account for many of the myriad factors that are properly considered in fashioning just sentences." *See United States v. Ovid, slip op*., 2010 WL 3940724, *1 (E.D.N.Y. 2010).  A substantial variance is needed in this case because of the following mitigating factors, all of which are highly relevant to the purposes of sentencing and none of which are taken into account by the guideline range.

A.     **The Guidelines are not Based on Empirical Evidence or National Experience and Fails to Promote any Purpose of Sentencing.**

When Congress enacted the Sentencing Reform Act of 1984, it directed the Commission to promulgate guidelines that assure the meeting of the purposes of sentencing, 28 U.S.C. § 991(b)(1)(A), and to use average sentences imposed and prison time actually served in the pre-guidelines period as a "starting point". 28 U.S.C. § 994(m).  The Commission was then to continually review and revise the guidelines in light of sentencing data, criminological research, and consultation with frontline actors in the criminal justice system. *See* 28 U.S.C. § 991(b)(1)(C), § 991(b)(2), § 994(o), § 995(13), (15), (16).

The original Commissioners abandoned the effort to design the guidelines based on the purposes of sentencing because they could not agree on which purposes should predominate, and instead purportedly based the guidelines on an empirical study of time served for various offenses before the guidelines. *See* USSG, Ch. 1 Pt. A(3); Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra  L. Rev. 1, 7 (1988).

In *Rita v. United States*, 551 U.S. 338 (2007), the Supreme Court gave two reasons that it may be fair to assume that the guidelines reflect a rough approximation of sentences that "might achieve§ 3553(a)'s objectives." First, the original Commission used an "empirical approach" which began "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past." Second, the Commission can review and revise the guidelines based on judicial feedback through sentencing decisions, and consultation with other frontline actors, civil liberties groups, and experts. *Id*. at 348-50.

The Court recognized, however, that not all guidelines were developed in this manner. *See Gall v. United States*, 552 U.S. 38, 46 & n.2 (2007); *Kimbrough v. United States*, 552 U.S. 96 (2007). When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role, because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purpose, even in a mine-run case." *Id*. at 109-10.

The guideline regarding offenses involving obstruction of official proceedings is not based on empirical data of past practice or on national experience since then. Because the Commission failed to rely on empirical data or national experience in promulgating or amending § 2D1.1, and thus failed to fulfill its institutional role, this Court is free to disagree, on reasoned policy grounds, with its recommendation. *See Spears v. United States*, 129 S. Ct. 840, 843 (2009); *Kimbrough*, 552 U.S. at 101-02, 109-10; *Rita*, 551 U.S. at 351, 357.

**B.     Need for Just Punishment in Light of Seriousness of the Offense.**

The need for retribution is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of the harm

caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (*mens rea*), motives, role in the offense, and mental illness or other diminished capacity." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?,* 89 Minn. L. Rev. 571, 590 (February 2005). The guidelines include none of the factors bearing on Mr. McCaughey's degree of culpability.

### 1.   Patrick McCaughey's Conduct was Aberrant.

Mr. McCaughey lived a law-abiding life until the instant offense began. He did not engage in criminal conduct until he made a mistake which led to this offense. His offense is completely uncharacteristic when viewed in the context of his entire productive adult life. This Court must consider the aberrant nature of his conduct. *See, e.g., United States v. Howe*, 543 D.3d 128, 132 (3rd Cir. 2008) (variance based on "isolated mistake" in otherwise long and entirely upstanding life); *see also United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (Defendant was a "law abiding citizen, who [did] an incredibly dumb thing"); *United States v. Davis*, 2008 WL 232920 (S.D.N.Y. 2008) (Defendant was a first offender who had worked throughout his 15-year marriage to educate his six children and whose offense was prompted by economic pressures).

Furthermore, the events on January 6th were a unique event which will likely not be repeated. In *United States v. Munchel*, the United States Court of Appeals for the D.C. Circuit stated that "the specific circumstances that made it possible, on January 6, for [the defendants] to threaten peaceful transfer of power" no longer exist. Case No. 21-3010 (D.C. Circuit March 26, 2021). Specifically, the court stated that the "appellants had a unique opportunity to obstruct democracy on January 6 because of the electoral college vote tally taking place that day, and the

concurrently scheduled rallies and protests.  Thus, [appellants] were able to attempt to obstruct the electoral college vote by entering the Capitol together with a large group of people who had gathered at the Capitol in protest that day." *Ibid.*  It further noted that "[t]he District Court found that appellants were a danger to 'act against Congress' in the future, but there was no explanation of how the appellants would be capable of doing so now that the specific circumstances of January 6 have passed." *Ibid*.

In short, the circumstances leading up to January 6th no longer exist and Mr. McCaughey will continue to lead a law-abiding life just as he had prior to the instant offense.

### C.   Need for Deterrence.

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).  "Three National Academy of Science panels ... reached that conclusion, as has every major survey of evidence." *Id*.; *see also* Zvi D. Gabbay, Exp*loring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447048 (2007) ("certainty of punishment is empirically known to be a far better deterrent than its severity").

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch, *et al*., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999).  The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id*., at 1.  It examined the effects of changes to both the certainty and severity of punishment. *Id*. While significant correlations between sentence severity and crime rates ... were not sufficient to

achieve statistical significance." *Id.* at 2.  The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1.

According to "the best available evidence, ... prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen, *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

**D.     Need for Incapacitation.**

Mr. McCaughey has an exceptionally low risk of recidivism.  Mr. McCaughey is a first-time offender, was employed throughout his adult life, and has maintained long-term relationships with family and friends.  For all male offenders in Criminal History Category I, the recidivism rate is 15.2%.  *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*.  For those who have been employed, the rate is 12.7%.  Offenders like Mr. McCaughey with zero criminal history points have a rate of recidivism half that of offenders with one criminal history point. *See* Sent'g Comm'n, Recidivism and the "First Offender," at 13-14 (May 2004) [hereinafter First Offender].

The Commission has recognized the advisability of revising the guidelines to take first offender status into account.  *See* First Offender, at 1-2 (identifying goal of "refin[ing] a workable 'first-offender' concept within the guideline criminal history structure").

In imposing the least sentence sufficient to account for the need to protect the public from further crimes of Mr. McCaughey, this Court should consider the statistically low risk of recidivism presented by Mr. McCaughey's history and characteristics. *See*, e.g., *United States v. Darway*, 255 Fed. Appx.  68, 73 (6th Cir. 2007) (upholding downward variance on a basis of Defendant's first-offender status); *United States v. Urbina*, slip op., 2-0 WL 565485, *3 (E.D.

Wis. 2009) (considering low risk of recidivism indicated by Defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because Defendants "with zero criminal history points are less likely to recidivate than all other offenders").

Additionally, the riots that occurred on January 6th, 2021, were a rare occurrence in American History and extremely unlikely to happen again. Mr. McCaughey will not have any opportunity to participate in similar conduct because the events that took place will almost certainly not take place again.

### E. Need to Avoid Unwarranted Disparities and Unwarranted Similarities.

The Court must consider the need to avoid unwarranted disparities among defendants with similar criminal histories convicted of similar criminal conduct. 18 U.S.C. § 3553(a)(6). The court should avoid unwarranted similarities in sentencing among defendants who are different in ways not accounted for in the guideline range, see *Gall*, 552 U.S. at 55 ("need to avoid unwarranted similarities among other co-conspirators who were not similarly situated"); *United States v. Ovid*, 2010 WL 3940724 (E.D.N.Y. 2010) (sentencing two Defendants with similar guideline ranges to 60 months and 126 months respectively based on distinctions in circumstances of the offenses and characteristics of the Defendants), and unwarranted differences among defendants whose conduct and characteristics are similar. *See United States v. Parris*, 573 F. Supp. 2d 744, 753, 756-62 (E.D.N.Y. 2008).

The chart below includes a sample of cases in which Defendants received sentences substantially below the guideline ranges applicable in those cases, and substantially below the guideline range of 108 months to 135 months the probation officer calculated here. This Court should take into account the sentencing trend exemplified by this chart.

In *Parris*, Judge Block in the Eastern District of New York took a similar collection of cases into account in fashioning an appropriate sentence for two securities fraud offenders. At the court's request, each party submitted a sample group of cases to illustrate the sentences imposed in other securities fraud cases. *Id*. at 752. Based on these samples, the court concluded that "[t]hose [Defendants] who were not cooperators and were responsible for enormous losses were sentenced to double-digit terms of imprisonment (in years); [while] those whose losses were less than $100 million were generally sentenced to single-digit terms." *Id*. at 753. The court relied on this national pattern in arriving at a sentence of 60 months for the two Defendants who faced an advisory guideline range of 360 months to life, which was 16.7% of the bottom of the applicable guideline range. *Id*. at 745.

Unlike the Defendants in *Parris*, who had no particular mitigating factors, there are substantial mitigating factors here. The Court should impose a sentence of 12 months' incarceration.

It is also important to consider other sentences imposed on defendants in the January 6th cases. Below is a partial chart:

| Case | Conviction | Sentence Imposed |
|---|---|---|
| *U.S. v. Matthew Council*, 1:21-CR-00207-TNM (D.C. 2022) | 18 U.S.C. § 231(a)(3) <br> 18 U.S.C. § 111(a)(1) <br> 18 U.S.C. § 1752(a)(1) <br> 18 U.S.C. § 1752(a)(2) <br> 40 U.S.C. § 5104(e)(2)(D) <br> 40 U.S.C. § 5104(e)(2)(G) | 60 months' probation <br> 180 days' home confinement <br> 100 hours' community service <br> $2,000 restitution |

| | | |
|---|---|---|
| *U.S. v. Matthew Wood*, 1:21-CR-00223-APM (D.C. 2022) | 18 U.S.C. § 1512(c)(2), 2<br>18 U.S.C. § 1752(a)(1)<br>18 U.S.C. § 1752(a)(2)<br>40 U.S.C. § 5104(e)(2)(C)<br>40 U.S.C. § 5104(e)(2)(D)<br>40 U.S.C. § 5104(e)(2)(G) | 12 months' home confinement<br>36 months' probation<br>100 hours' community service<br>$2,000 restitution |
| *U.S. v. Mark Leffingwell*, 1:21-CR-00005-ABJ (D.C. 2021) | 18 U.S.C. § 111(a)(1) | 6 months' incarceration |
| *U.S. v. Paul Hodgkins*, 1:21-CR-00188-RDM (D.C. 2021) | 18 U.S.C. § 1512(c)(2) | 8 months' incarceration<br>24 months' supervised release<br>$2,000 restitution |
| *U.S. v. Philip Young*, 1:21-CR-00617-DLF (D.C. 2022) | 18 U.S.C. § 111(a)(1)<br>18 U.S.C. § 231(a)(3)<br>18 U.S.C. § 1752(a)(1)<br>18 U.S.C. § 1752(a)(2)<br>40 U.S.C. § 5104(e)(2)(D)<br>40 U.S.C. § 5104(e)(2)(F) | 8 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |
| *U.S. v. Richard Michetti*, 1:21-cr-00232-CRC (D.C. 2022) | 18 U.S.C. § 1512(c)(2) | 9 months' incarceration<br>24 months' supervised release<br>$2,000 restitution |
| *U.S. v. Richard Michetti*, 1:21-cr-00232-CRC (D.C. 2022) | 18 U.S.C. § 1512(c)(2) | 9 months' incarceration<br>24 months' supervised release<br>$2,000 restitution |
| *U.S. v. John Andries*, 1:21-cr-00093-RC (D.C. 2022) | 18 U.S.C. § 1512(c)(2) | 12 months' and one day incarceration<br>36 months' supervised release<br>$2,000 restitution |
| *U.S. v. James Rahm Jr.*, 1:21-cr-00150-TFH (D.C. 2022) | 18 U.S.C. § 1512(c)(2), 2<br>18 U.S.C. § 1752(a)(1), (2)<br>40 U.S.C. § 5104(e)(2)(D)<br>40 U.S.C. § 5104(e)(2)(G) | 12 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |

| | | |
|---|---|---|
| *U.S. v. Troy Sargent*, 1:21-cr-00258-TFH (D.C. 2022) | 18 U.S.C. § 231(a)(3)<br>18 U.S.C. § 111(a)(1)<br>18 U.S.C. § 1752(a)(1)<br>18 U.S.C. § 1752(a)(2)<br>18 U.S.C. § 1752(a)(4)<br>40 U.S.C. § 5104(e)(2)(F) | 14 months' incarceration<br>24 months' supervised release<br>$500 restitution |
| *U.S. v. Christine Priola*, 1:21-cr-00242-TSC (D.C. 2022) | 18 U.S.C. § 1512(c)(2)(2) | 15 months' incarceration<br>24 months' supervised release<br>$2,000 restitution |
| *U.S. v. Andrew Alan Hernandez*, 1:21-cr-00445-CKK (D.C. 2022) | 18 U.S.C. § 1512(c)(2), 2 | 18 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |
| *U.S. v. Christopher Moynihan*, 1:21-cr-00226-CRC (D.C. 2022) | 18 U.S.C. § 1512(c)(2), 2<br>18 U.S.C. § 1752(a)(1)<br>18 U.S.C. § 1752(a)(2)<br>40 U.S.C. § 5104(e)(2)(A)<br>40 U.S.C. § 5104(e)(2)(D)<br>40 U.S.C. § 5104(e)(2)(G) | 21 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |
| *U.S. v. Tommy Frederick Allan*, 1:21-cr-00064-CKK (D.C. 2022) | 18 U.S.C. § 1512(c)(2), 2 | 21 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |
| *U.S. v. Joshua Hernandez*, 1:21-CR-00042-CRC (D.C. 2022) | 18 U.S.C. § 111(a)(1)<br>18 U.S.C. § 231(a)(3) | 24 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |
| *U.S. v. Seefried Hunter*, 1:21-CR-00287-RCL | 18 U.S.C. § 1512(c)(2), 2<br>18 U.S.C. § 1752(a)(1)<br>18 U.S.C. § 1752(a)(2)<br>40 U.S.C. § 5104(e)(2)(D)<br>40 U.S.C. § 5104(e)(2)(G) | 24 months' incarceration<br>12 months' supervised release<br>$2,000 restitution |
| *U.S. v. Ricky Willden*, 1:21-CR-00423-RCL | 18 U.S.C. § 111(a)(1) | 24 months' incarceration<br>36 months' supervised release<br>$500 restitution |

| | | |
|---|---|---|
| *U.S. v. Kevin Creek*, 1:21-CR-00645-DLF (D.C. 2021) | 18 U.S.C. § 111(a)(1) | 27 months' incarceration 12 months' supervised release $2,000 restitution |
| *U.S. v. Joshua Hughes*, 1:21-cr-00106-CKK (D.C. 2022) | 18 U.S.C. § 1512(c)(2), 2 | 28 months' incarceration 36 months' supervised release $2,000 restitution |
| *U.S. v. Joshua Haynes*, 1:21-cr-00594-TSC (D.C. 2022) | 18 U.S.C. § 1512 18 U.S.C. § 1363 | 32 months' incarceration 36 months' supervised release $2,000 restitution |
| *U.S. v. Matthew Miller*, 1:21-CR-00075-RDM (D.C. 2021) | 18 U.S.C. § 1512(c)(2) 18 U.S.C. § 111(a)(1) | 33 months' incarceration 24 months' probation $2,000 restitution 100 hours community service |

On February 24, 2023, this Court sentenced Co-Defendant David Mehaffie to a total term of fourteen (14) months of incarceration, followed by a term of twenty-four (24) months of supervised release.  According to the government, Mr. Mehaffie was among the first group of people to enter the tunnel as officers retreated, and bang on the glass doors as he took command and aided the rioters in pushing against the police line, even going so far as to open the doors to the Capitol Building through the tunnel and hold it open for rioters to confront officers directly. Mr. Mehaffie then made efforts to coordinate and motivate individual rioters to attack officers for more than 26 minutes as he was standing on an elevated platform near the entrance of the tunnel.

On March 28, 2023, this Court sentenced Co-Defendant Geoffrey Sills to 52 months' imprisonment.  Unlike Mr. McCaughey, Mr. Sills purchased various tactical gear in anticipation of his travels to Washington, D.C., on January 6th, wrestled a police baton from MPD officers, which was later recovered from his home, and used it to repeatedly strike officers.  He also

proceeded to motivate the crowd of protestors to action and pointed a flashing strobe light at the police line, disorienting officers.  After the events on January 6th, Mr. Sills published photos and videos of the event on Instagram before deleting his account.

On March 13, 2023, this Court sentenced Co-Defendant Tristan Stevens to 60 months of incarceration.  Pursuant to the government, similar to Mr. Mehaffie, Mr. Stevens took on a leadership role during the events of January 6th inside the tunnel when protestors pushed against the line of officers and entered the tunnel twice to actively push a riot shield against officers' heads and helmets.

On February 27, 2023, this Court sentenced Co-Defendant David Judd to 32 months of incarceration, followed by a term of 24 months of supervised release.  The government argued that, on January 6th, Mr. Judd "spent over an hour using hand gestures to direct rioters into the tunnel, yelling commands to organize rioters, passing items into the tunnel to be used as weapons, assisting rioters exiting the tunnel by washing chemical irritant from their faces, pumping his fist in the air, and providing encouragement to rioters joining the chaos inside the tunnel." [ECF 527, at 2].  Additionally, Mr. Judd lit a firecracker inside the tunnel and threw it directly at the police line, which caused officers temporary blinding and ringing in ears, as well as tingling in legs for two officers and second degree burns and a signed uniform for officer C.W.  Mr. Judd entered the tunnel at least three times and remained on Capitol Grounds as one of the few protestors who were escorted off the grounds by police officers.

Even though Mr. McCaughey was regrettably one member of this crowd of protestors inside the tunnel, he did not engage in any planning efforts prior to the events on January 6th, he did not come to the protests armed and prepared to engage in violence, he did not motivate or lead any protestors to action, and his actions inside the tunnel were limited to pushing officers

with a riot shield—against their bodies, not their heads or helmets—and were only impactful due to the force of protestors who proceeded to push Mr. McCaughey into the line of officers.  A sentence of 12 months' incarceration is an appropriate sentence in this case.

      **F.    Kinds of Sentences Available.**

This Court must consider all of "the kinds of sentences available" by statute, § 3553(a)(3), even if the "kinds of sentence ... established [by] the guidelines" zones recommend only a lengthy prison term. *See Gall*, 552 U.S. at 59 & n.11.  According to the Supreme Court's decisions in *Gall* and *Kimbrough*, federal judges are free to consider relevant circumstances related to an offense and the history and characteristics of a defendant, and are not tied to the rigid, arithmetic framework of the Guidelines.  Indeed, *Kimbrough* and *Gall* have returned sentencing courts to the "federal judicial tradition" of considering "every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify the crime and the punishment to ensue." *Gall*, 552 U.S. at 52; *see also United States v. Tornko*, 562 F.3d 558, 560 (3d Cir. 2009) ("The sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case.").

Ultimately, the Court must "impose a sentence sufficient, but not greater than necessary" to comport with the goals of sentencing. *See United States v. Ollzovsky*, 562 F.3d 530, 552 (3d Cir. 2009).  Congress directed the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," and the "general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury." 28 U.S.C. § 9940).

Congress issued this directive in the belief that "sentencing decisions should be designed

23

to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and non-serious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." *See* Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. § 3551 note).  Mr. McCaughey is plainly not a "violent and serious offender" who "pose[s] the most dangerous threat to society".

## IV.    CONCLUSION

At the time of Mr. McCaughey's sentencing, this Court will be charged with imposing a sentence that is fair, but not "greater than necessary." 18 U.S.C. § 18553(a); *Kimbrough*, 552 U.S. at 101.  This bedrock principle of sentencing law cannot be fulfilled in Mr. McCaughey's case if he is sentenced at or near the range proposed by the Guidelines.  Rather, as reflected by the data and analogous case law above, a sentence of 12 months of incarceration is more appropriate in this case.

Mr. McCaughey is a good man who has learned from his mistake.  He has no prior criminal history and is extremely unlikely to recidivate in this manner again.

Date: April 7, 2023                    Respectfully Submitted,

*/s/ Dennis E. Boyle*
Dennis E. Boyle, Esquire
Blerina Jasari, Esquire
Boyle & Jasari LLP
1050 Connecticut Ave, NW, Suite 500
Washington, D.C., 20036
Email:  dboyle@dennisboylelegal.com
            bjasari@dennisboylelegal.com
Phone: (202) 430-1900

*Counsel for Defendant Patrick McCaughey*

24

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of April 2023, I electronically filed the foregoing

document with the Clerk of Court using the CM/ECF system, which will send an electronic

notification of such filing to all counsel of record.


*/s/ Dennis E. Boyle*
Dennis E. Boyle, Esquire