## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-40-1 (TNM)** |
| **PATRICK MCCAUGHEY,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Patrick McCaughey to 188 months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment for each count of conviction.

### I.      INTRODUCTION

The defendant, Patrick McCaughey, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]

McCaughey illegally entered the grounds of the U.S. Capitol on January 6, 2021 at approximately 2:00 p.m., and made his way to the bike rack barricade, manned with overwhelmed

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $ 2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

police officers, on the Southwest Lawn. For approximately 20 minutes, McCaughey joined other rioters in taunting officers manning the police line and then joined the mob that ultimately overwhelmed that line when it fell at approximately 2:28 p.m. McCaughey then climbed the stairs in the southwest scaffolding and took a selfie on top of the scaffolding. From there, he went to the inaugural platform, entered the Lower West Terrace tunnel at approximately 2:51 p.m., and participated in a "heave-ho" push by dozens of rioters against the police line defending the door to the U.S. Capitol building. McCaughey then left the tunnel and returned a few minutes later to rejoin the rioters still attempting to break into the building. He gained control of a police riot shield and headed to the front of the mob in the tunnel. Now face to face with the officers, McCaughey used his stolen shield to push against Officer Daniel Hodges for over two minutes, trapping him against the door frame while another rioter assaulted assault Officer Hodges. Moments later, McCaughey used his shield to swipe at Officer Henry Foulds, landing blows on the officer's arms as Officer Foulds attempted to close the tunnel door. McCaughey left the tunnel at approximately 3:15 p.m.

The government recommends that the Court sentence McCaughey to 188 months' incarceration, which is at the top of the advisory Guidelines' range of 151-188 months, which the government submits is the correct Guidelines calculation. A 188-month sentence reflects the gravity of McCaughey's conduct and serves the sentencing purposes laid out in 18 U.S.C. 3553(a).

## II.   FACTUAL BACKGROUND

### A.   The January 6, 2021 Attack on the Capitol

The government refers to the Court to the other sentencing memoranda for the co-defendants in this case for a short summary of the January 6, 2021 attack on the United States

Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. *See* ECF No. 574. This Court presided over the trial in this matter and is well aware of the protracted and violent attack on the officers on the West Front and in the Lower West Terrace tunnel. It is not an exaggeration to state the actions of these officers in thwarting the mob at the Lower West Terrace entrance potentially saved the lives of others, including members of Congress. *See* Sentencing Exhibit 001, Video from MPD Commander Kyle.

**B.      McCaughey's Role in the January 6, 2021 Attack on the Capitol**

McCaughey drove from his home in Ridgefield, Connecticut to Washington, D.C. to protest Congress' certification of the Electoral College. He attended the speeches at the Stop the Steal Rally at the Ellipse in downtown Washington, D.C. At approximately 2:00 p.m., McCaughey made his way to the grounds of the U.S. Capitol.

*Approach to the Police Line*

McCaughey first appeared at the police line guarding the southern-most portion of the West Plaza at approximately 2:05 p.m. By 2:06 p.m., McCaughey was up against the bike racks, separating the mob from the police and the U.S. Capitol building, shouting at officers to "go home" and that the mob's "issue is not with you." *See* Figure 1 (Exhibit 002, Officer Chapman's Body Worn Camera).



*Figure 1: Screenshot from Sentencing Exhibit 002, Officer Chapman Body Worn Camera, at 2:06:50 p.m.*

McCaughey stayed in the vicinity of the police line as the mob continued to gather over the next 16 minutes. Then, at 2:23 p.m., some of the rioters grabbed the bike rack barricades away from the police and the line at the southwest corner of the West Plaza collapsed. *See* Figure 2 (Exhibit 002, Officer Chapman's Body Worn Camera). Officers scrambled, attempted to deploy chemical munitions to hold the advancing crowd at bay, and re-established the bike rack barricade. McCaughey, undeterred by the chemical spray, advanced to the front of the crowd; while others covered their faces and retreated, McCaughey pointed ahead, towards the scattered officers and the Capitol building behind them. *See* Figure 3 (Exhibit 003, Officer Green's Body Worn Camera).



***Figure 2: Screenshot from Sentencing Exhibit 002, Officer Chapman Body Worn Camera, at 2:23:05 p.m.***



***Figure 3: Screenshot from Sentencing Exhibit 003, Officer Green's Body Worn Camera, at 2:26:16 p.m.***

Within minutes, by 2:28 p.m., the whole police line across the West Front had collapsed under the swell of the advancing mob. At trial, MPD Sergeant Jason Mastony recounted the

5

collapse of the police line on the West Front as follows:

> Q. In your 12 years of experience, have you ever seen a police line collapse like that?
> A. No.
> Q. Had you ever seen a police line fail at all?
> A. No. In 12 years in the Metropolitan Police Department, a police line has not failed to my knowledge through members and going through training for 12 years. We've never recounted a story in the history of the Metropolitan Police Department where a line has failed in such a manner. We've withdrawn lines: There's too many people here; we can't hold this; let's pull it back. We've never had a line fail like this.

Trial Transcript, 29 August 2022: 194: 6-17.

### *McCaughey Ascends the Scaffolding*

After the collapse of the police line, McCaughey approached the scaffolding affixed to the southwest portion of the façade of the Capitol. Within 60 seconds of the first rioters breaching the scaffolding, he scaled all the steps inside the scaffolding. *See* Figures 4 and 5 (Exhibit 004, CCV Footage Southwest Scaffolding, at 2:33 p.m.).





***Figures 4 and 5: Screenshot from Sentencing Exhibit 004, CCV Footage at the
Southwest Scaffolding, at 2:33:24 p.m. and 2:33:30 p.m.***

Once atop the scaffolding, with the mob still assaulting the police line below, McCaughey
took a selfie photograph, which he sent to friends back home in Connecticut. *See* Figure 6.



***Figure 6: Selfie recovered from McCaughey's cell phone.***

One of those friends testified at trial that McCaughey sent him other messages from
Washington, D.C. on January 6th about his interactions with police at the U.S. Capitol, to include
"[n]o rubber bullets. I think they were scared of getting lead back" and "[p]lenty of teargas and
pepper spray."

***Inaugural Platform and Lower West Terrace Tunnel Entrance***

Several minutes later, McCaughey made his way down to the inaugural platform, and into the Lower West Terrace tunnel, the site of some of the fiercest fighting between members of the mob and the wholly outnumbered police officers. At 2:51 p.m., McCaughey joined his co-defendant Tristan Stevens in a coordinated "heave-ho" group push by the rioters against the police line guarding the door to the building. *See* Figures 7 and 8 (Exhibit 005, CCV Footage Lower West Terrace Tunnel, at 2:50:54 to 2:51:16 p.m.)



***Figures 7 and 8: Screenshot from Sentencing Exhibit 005, CCV Footage at the Lower West Terrace Tunnel, at 2:50:54 p.m. and 2:51:03 p.m.***

At trial, MPD Sergeant William Bogner testified about the effect of the mob on the police line at the Lower West Terrace door:

> Q. What did we just hear you say there, Sergeant?
> A. I'm trying to get shields in the proper position so we can relieve the officers at the front of the line. Basically, what we have here is a compacted mass of officers in the hallway and a compacted mass of protesters in the -- or rioters in the entryway or in the foyer. And they're compressing against each other. And I'm -- what I'm trying to do is not keep the same officers in the front of the line the whole time taking the brunt of it. That's what I'm doing here, is trying to switch that up.
> Q. Why was that necessary?
> A. Because physically officers can't handle -- people can't handle that for a prolonged period of time, so swapping them out keeps the officers fresh, keeps them making good decisions. So that was my goal at that moment.

Trial Transcript, 30 August 2022: 143: 4-19. McCaughey left the tunnel after this heave-ho but remained nearby for the next 13 minutes.

### *Assault Against Officer Daniel Hodges*

McCaughey re-entered the tunnel at approximately 3:04 p.m. With the help of his co-defendants Tristan Stevens and Robert Morss, McCaughey pushed forward into the tunnel, acquired a police riot shield from another rioter, and created a shield wall between the mob and police line. *See* Figure 9 (Exhibit 005, CCV Footage Lower West Terrace Tunnel, at 3:07:03 p.m.); Figure 10 (Exhibit 006, Defendant Bisignano Video at 00:04 minutes); Figure 11 (Exhibit 007, Defendant Cantwell Video 1 at 5:28 minutes).



*Figure 9: Screenshot from Sentencing Exhibit 005, CCV Footage at the Lower West Terrace Tunnel, at 3:07:03 p.m.*



*Figures 10 and 11: Screenshot from Sentencing Exhibit 006, Defendant Bisignano Video at 00:04 minutes and Exhibit 007, Defendant Cantwell Video 1 at 5:28 minutes.*

McCaughey made his way to the front of the mob, where he came face to face with MPD Officer Daniel Hodges. McCaughey used his riot shieled to crush Officer Hodges into the metal doorframe, while yelling at the officer to "go home." *See* Figure 12 (Sentencing Exhibit 008, Defendant Cantwell Video 2 at 00:004 minutes) and 13 (Sentencing Exhibit 009, Jon Farina

Footage at 19:19 minutes).

 

*Figures 12 and 13: Screenshot from Sentencing Exhibit 008, Defendant Cantwell Video 2 at 00:04 minutes and Sentencing Exhibit 009, Jon Farina Video at 19:19 minutes.*

After McCaughey pinned Officer Hodges in the door frame for about 30 seconds, co-defendant Steven Cappuccio reached up and grabbed the gas mask from Officer Hodges's face, leaving him defenseless against any chemical irritants. After about 50 seconds of contact with the officer, the mob began a heave-ho, the force of which McCaughey multiplied against Officer Hodges with his shield. At trial, Officer Hodges testified about the effect the riot shield had on him during the heave-ho of the crowd:

> A. The force is much greater. As there are so many people pushing forward on that one object, a hard object, unyielding, pushing into you, doing what it's designed to do, is repel a body, but being used on the police. It's much greater. It's inflexible. There's no good way to fight back against it, really. It just -- you have to endure the pressure that it creates.

Trial Transcript, 30 August 2022: 202: 11-18.

During this heave-ho, co-defendant Cappuccio disarmed Officer Hodges of his riot baton

and struck him with it in the face. Bleeding and trapped, Officer Hodges then screamed out, hoping other officers might be able to assist him. *See* Figure 14 and 15 (Sentencing Exhibit 009, Jon Farina Footage at 21:13 and 21:21 minutes). It was only then, over two minutes after the assault began, that McCaughey relented and pulled Officer Hodges's face shield down over his eyes.



***Figure 14 and 15: Screenshot from Sentencing Exhibit 009, Jon Farina Video at 21:13 and 21:21 minutes.***

At trial, Officer Hodges testified about this moment and the feeling of being crushed in the door after being rendered defenseless by co-defendant Cappuccio:

> Q. When you were pressed up against [the door frame] in this moment, what did that feel like?
> A. It hurt a great deal. It, combined with everything else that was going on, made it difficult to breathe. Being crushed by the shield and the people behind it made me defenseless, injured, made me -- contributed to my diminishing senses after the assault, which is why I was calling for help, because I knew maintaining that position and staying upright was untenable. If I was there much longer being assaulted in such a way, I knew that it was very likely I wouldn't be able to maintain my consciousness and become a liability to the other officers.

Trial Transcript, 30 August 2022: 204: 10-21. Subsequently, Officer Hodges was able to retreat to safety inside the Capitol building when the pressure from the mob decreased. On January 7, 2021, Officer Hodges then went to the Police and Fire Clinic to be seen by a doctor for his injuries. Because of a large contusion on his head, he was sent to Washington Hospital Center to receive an MRI.

### *Assault Against Officer Henry Foulds*

When Officer Hodges retreated, McCaughey did not. Instead, he remained at the front of the mob, continuing his effort to get into the building the officers were defending. MPD Officer Henry Foulds then rotated to the front of the police line and attempted to expel the rioters standing in the doorway so he could close the double doors. McCaughey swatted at Officer Foulds with his shield several times, causing Officer Foulds to deliver strikes with his baton against McCaughey. *See* Figure 16 (Sentencing Exhibit 009, Jon Farina Footage at 22:36) and Figure 17 (Sentencing Exhibit 010, Officer Foulds Body Worn Camera at 15:13:40). While Officer Foulds grabbed and held onto the metal doorframe, McCaughey landed at least one blow on the officer's arm with his riot shield. It was not until another officer behind Officer Foulds deployed a chemical irritant at McCaughey that he retreated from the doorway.

13



*Figure 16: Screenshot from Sentencing Exhibit 009, Jon Farina Footage at 22:36*



*Figure 17: Screenshot from Sentencing Exhibit 010, Officer Foulds Body Worn Camera at 15:13:40.*

At trial, Officer Foulds testified about the importance of holding this position at the Lower

West Terrace tunnel door:

Q. Officer, did we just hear your voice there?
A. Yeah. I said that if they broke through where we were at the Capitol, a lot of people were going to get killed in the riot that follows.
Q. And what are you trying to accomplish in this moment with the people who are directly in front of you?
A. So the hope is because this is -- if people push through this big inlet, you would have hundreds of people more in that were already storming into the Capitol. And we were heavily outnumbered. And the only thing that we could do to have some

14

control and prevent all the bad actors in the crowd from hurting or killing people
was hold this choke point where a small amount of our number could hold off a
larger number of protesters.

Trial Transcript, 31 August 2022: 138: 12-25.

## III.   THE CHARGES AND TRIAL CONVICTION

On December 1, 2021, a federal grand jury returned the fifth superseding indictment

charging McCaughey with one count of Assaulting, Resisting, or Impeding Certain Officers in

violation of 18 U.S.C. § 111(a)(1); two counts of Assaulting, Resisting, or Impeding Certain

Officers with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b); one

count of Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2); one count

of Civil Disorder in violation of 18 U.S.C. § 231(a)(3); one count of Disorderly and Disruptive

Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon in violation of

18 U.S.C. § 1752(a)(2) and (b)(1)(A), Engaging in Physical Violence in a Restricted Building or

Grounds with a Deadly or Dangerous Weapon in violation of 18 U.S.C. § 1752(a)(4) and

(b)(1)(A); Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D); and

Act of Physical Violence in the Capitol Grounds or Buildings in violation of 40 U.S.C.

§ 5104(e)(2)(F).

On September 13, 2022, this Court convicted McCaughey of all nine counts, with the

exception of Count 25, for which the Court did not find the use of a deadly or dangerous weapon,

but convicted the defendant instead of a violation of 18 U.S.C. § 111(a)(1).

## IV.   STATUTORY PENALTIES

The defendant now faces sentencing on the nine above-mentioned counts.

The defendant faces up to 8 years of imprisonment, a fine up to $250,000, and a term of

supervised release of not more than three years for Count 14 and 25, Assaulting, Resisting, or

Impeding Certain Officers.

The defendant faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count 24, Assaulting, Resisting, or Impeding Certain Officers with a Deadly or Dangerous Weapon.

The defendant faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count 34, Obstruction of an Official Proceeding.

The defendant faces up to 5 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count 35, Civil Disorder in violation of 18 U.S.C. § 231(a)(3).

The defendant faces up to 10 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count 37, Disorderly and Disruptive Conduct in Restricted Building and Grounds in violation of 18 U.S.C. §1752(a)(2) and (b)(1)(A) and Count 45, Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon in violation of 18 U.S.C. §1752(a)(4) and (b)(1)(A).

The defendant faces up to 6 months of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count 52, Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D) and Count 53, Act of Physical Violence in the Capitol Grounds or Buildings in violation of 40 U.S.C. 5104(e)(2)(F).

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government has submitted its objections to the calculation of the draft PSR, and supplemented those objections. The government sets forth its calculation of the guidelines below, noting where it differs from the calculations of the United States Probation Office.

I.    <u>Guidelines Analysis for Each Count</u>

**Count Fourteen: 18 U.S.C. §§ 111(a)(1), Assaulting, Resisting or Impeding Certain Officers (Heave-Ho Police Line)**

| Base Offense Level: | 14 | U.S.S.G. §2A2.2 via § 2A2.4(c). <br><br> Applying the cross reference in § 2A2.4(c) because the offense was an aggravated assault under § 2A2.2. Application Note 1: "a felonious assault that involved … (D) an intent to commit another felony." Here, the other felony is both Obstruction of the Official Proceeding (18 U.S.C. 1512(c)(2)) and Impeding Officers during Civil Disorder (18 U.S.C. 231(a)) |
| --- | --- | --- |
| Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)." <br><br> Officer Bogner and Sergeant Mastony, who were in the group of officers defending the Lower West Terrace doors at 2:51 p.m., were clearly identified as a police officers in the group that defendant McCaughey pushed against in the heave-ho effort. Both Officer Bogner and Sergeant Mastony were wearing a full MPD uniform and helmet, with a distinctive police riot gear. The evidence at trial also showed that all the officers were dressed in full uniform—guarding the entrance to |

|  |  | the Capitol. It was clear that they were government officers, and McCaughey's attack on the law enforcement officers were motivate by the fact that these government officers were performing their official duties in defending the U.S. Capitol building. |
|---|---|---|
| Total | 20 |  |

**Count Twenty-Four: 18 U.S.C. §§ 111(a)(1) and (b), Assaulting, Resisting or Impeding Certain Officers Using a Dangerous Weapon (Officer Hodges)**

| Base Offense Level: | 14 | U.S.S.G. §2A2.2 |
|---|---|---|
| Special offense characteristic | +4 | U.S.S.G. § 2A2.2(b)(2)(B): "a dangerous weapon (including a firearm) was otherwise used."<br><br>The Court's guilty verdict on Count Twenty-Four established that McCaughey used a dangerous weapon, in this case a riot shield, when he assaulted Officer Hodges. *See* U.S.S.G. § 1B1.1 cmt. n.1(E). The Court made specific findings regarding the riot shield—noting that, just like Giles Corey in the Crucible, one could be crushed to death by a board, or in this case a shield, when wielded in a dangerous manner such as the defendant did. |
| Specific Offense Characteristic | +4 | U.S.S.G. § 2A2.2(b)(3)(D): the victim sustained degree of injury that is between specified in subdivision A (bodily injury) and B (serious bodily injury)<br><br>"Bodily injury" means "any significant injury; e.g., an injury that is painful and obvious, or is of the type for which medical attention ordinarily would be sought." *See* U.S.S.G. § 1B1.1 cmt. n.1(B).<br><br>"Serious bodily injury" means "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." *See* U.S.S.G. § 1B1.1 cmt. n.1(M).<br><br>At trial, Officer Hodges testified that he suffered pain, bruising and abrasions as a result of his assaults that day. Specific to this assault by defendant McCaughey, Officer Hodges testified that he was crushed by the shield, making it difficult to breathe. Photographs and videos of those injuries were entered into evidence. Officer Hodges also testified that he sought medical treatment and received an MRI on January 7, 2021. |

18

| | | |
|---|---|---|
| | | The Court's ruling on Count 24 included the finding that the Court "credit[ed] Officer Hodges's claim that Mr. McCaughey's use of the shield caused him significant pain, specifically in his lungs, his head and his face, that it crushed him;" that "he screamed out in part in pain because of Mr. McCaughey's actions against him," and that the officer "claim[ed] to have suffered large bruises and pain all over his body." His injuries, caused by the defendant, involved extreme physical pain that rises above the level of bodily injury, but not to the point of surgery, hospitalization, or physical rehabilitation required for serious bodily injury. |
| Specific Offense Characteristic | +2 | U.S.S.G. § 2A2.2(b)(7): "the defendant was convicted under 18 U.S.C. § 111(b)." |
| Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)."<br><br>U.S.S.G. § 3A1.2(c)(1): "in a manner creating a substantial risk of serious bodily injury, the defendant, knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense."<br><br>Officer Hodges was clearly identified as a police officer when McCaughey assaulted him. Officer Hodges was wearing a full MPD uniform and helmet, with a distinctive police riot gear. The evidence at trial also showed that Officer Hodges was part of large group of officers—all dressed in full uniform—guarding the entrance to the Capitol. It was clear that he was a government officer, and the Court noted in its ruling that, from the videos and testimony, "Officer Hodges was also clearly engaged in the performance of his duties." |
| Adjustment | +2 | U.S.S.G. § 3A1.3: "victim was physically restrained in the course of the offense."<br><br>"'Offense' means the offense of conviction and all relevant conduct under §1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context." *See* U.S.S.G. § 1B1.1 cmt. n.1(I).<br><br>Video exhibits and testimony showed that in the course of assaulting Officer Hodges, McCaughey restrained his |

19

| | | |
|---|---|---|
| | | movements such that he was unable to stop the attack of another defendant. Officer Hodges also described in testimony his inability to move because he was pinned against the doorframe of the tunnel by the defendant's shield. This restraint lasted approximately 2 minutes and 5 seconds, according to the video evidence presented in Government's Exhibit 301 (Sentencing Exhibit 009) and testimony about that exhibit from Officer Hodges (indicating defendant McCaughey was pressing the shield against the officer from timestamp 19:15 until timestamp 21:20.) |
| Adjustment | +2 | U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."<br><br>McCaughey provided materially false testimony under oath that he was helping Officer Hodges when he assaulted Officer Hodges. See U.S.S.G. §3C1.1 n.4(B). This Court held that McCaughey's claim that he "was not acting with a lot of awareness of what was going on" to be incredible, Trial Transcript 13 September 2022: 40: 16-19, and that McCaughey's testimony that did not intend to harm Officer Hodges because he eventually assisted the officer in putting down his helmet's face shield was not a credible viewing of the events. Trial Transcript 13 September 2022: 25: 15- 26:1. |
| Total | 34 | |

We now focus on several key enhancements relevant to the guidelines analysis for Count 24.

### Bodily Injury versus Serious Bodily Injury

The difference between "bodily injury" and "serious bodily injury" is largely one of degree. "Bodily injury" is one that is "painful and obvious," or "is of a type for which medical attention would ordinarily be sought." U.S.S.G. § 1B1.1, cmt. n. 1(B). "Serious bodily injury" involves "extreme physical pain." *Id*., cmt. n. 1(M). Although Officer Hodges did not suffer the "protracted

impairment of a bodily member, organ, or mental faculty," or require "surgery or hospitalization," those are alternative grounds for establishing "serious bodily injury." "Extreme physical pain" which is sufficient to trigger the five-level enhancement.

Here, not only was Officer Hodges crushed by McCaughey shoving him into the doorframe with a riot shield, causing him to almost lose consciousness; that painful episode persisted for almost two minutes, much longer than the more abbreviated pain resulting from a punch, slap, or strike with an implement that would amount to "bodily injury." The government thus believes that an adjustment of +4, consistent with U.S.S.G. § 2A2.2(b)(3)(D) is warranted as an appropriate middle ground given the pain experienced by Officer Hodges.[2]

### *Restraint*

The PSR does not apply the U.S.S.G. § 3A1.3 adjustment for physically restraining the victim. However, Judge Amy Berman Jackson has applied the enhancement in another co-defendant January 6th Lower West Terrace assault case: *United States v. Kyle Young*, D.D.C. 1:21-cr-00291-2 and *United States v. Albuquerque Head*, D.D.C. 1:21-cr-00291-3. In that case, defendant Head wrapped his arms around MPD Officer Michael Fanone and dragged him out of the Lower West Terrace tunnel and into the crowd. Once there, defendant Young then held the wrist of the officer after a third defendant applied an electroshock weapon to the neck of the officer and while a fourth defendant robbed him of his badge and radio. These interactions lasted mere seconds, but, as Judge Jackson held at the sentencing hearing for defendant Young, "the fact that

---

[2] The Final Presentence Report notes that +5 would be appropriate under § 2A2.2(b)(3)(B) given the injuries sustained by the officer. We agree. Nevertheless, we advocate for +4, understanding the spectrum of injury and the degree and type of hospitalization. Such application is sound and exercises due caution.

[the officer] was rendered unable to fend the rioters off for even that short period of time enabled another individual to reach in and strip him, not only of his badge, but his lifeline, his radio. While I agree with the defense that the brevity of this action bears on the appropriate … sentence under the statute, it doesn't render the guideline inapplicable." 27 September 2022 Sentencing Tr. 10:5-12.

The same reasoning should apply here. As explained above, in the course of assaulting Officer Hodges, McCaughey restrained his movements—for over two minutes—such that he was unable to stop the attack of another defendant. Officer Hodges also described in testimony his inability to move because he was pinned against the doorframe of the tunnel by the defendant's shield. In this case, the restraint applied to the victim was neither fleeting nor accidental. It was concerted, forceful, and intended to harm law enforcement generally for defending the tunnel and its entrance.

### *Obstruction of Justice*

The PSR does not apply the U.S.S.G. U.S.S.G. §3C1.1 adjustment for willfully obstructing or impeding the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction. Application Note 4(B) of Section 3C1.1 states that "committing . . . . perjury" is one type of conduct to which the two-level obstruction enhancement applies. *United States v. Dunnigan*, 507 U.S. 87, 92-95 (1993) (confirming that perjury merits the obstruction enhancement under Section 3C1.1); see U.S.S.G. § 1B1.1(b) ("The court shall then consider … any other policy statements or commentary in the guidelines that might warrant consideration in imposing sentence."). [3] McCaughey committed perjury if he gave "false

---

[3] Application Note 4(F) adds that "providing materially false information to a judge" is another

testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Dunnigan*, 507 U.S. at 94. A "material" statement is one that concerns "information that, if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1 n.6. The Court should make specific findings at sentencing as to each element of perjury.

As explained above, this adjustment should apply, because the Court found the McCaughey's testimony incredible in ways that materially affected the elements of the offenses for Counts 24, 25, and 34. Specifically, the Court found that McCaughey's testimony about to his reasons for fighting officers in the tunnel, his self-defense claims, and his intent to harm the officers was incredible.

Thus, with the addition of +4 levels for bodily injury, +2 for restraint, and +2 for obstruction, the Adjusted Offense Level (Subtotal) for the Count 24 offense is 34, not 31.

**Count Twenty-Five: 18 U.S.C. §§ 111(a)(1), Assaulting, Resisting or Impeding Certain Officers (Officer Foulds)**

| Base Offense Level: | 14 | U.S.S.G. §2A2.2<br><br>U.S.S.G. §2A2.4(c) provides a cross reference to §2A2.2 if the conduct constituted an aggravated assault. |
|---|---|---|
| Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)."<br><br>Defendant McCaughey struck Officer Foulds with a riot shield while Officer Foulds was trying to close the Lower West Terrace tunnel door. Officer Foulds was clearly identified as a police officer. Officer Foulds was wearing a full MPD uniform and helmet, with a distinctive police riot gear. The evidence at trial also showed that Officer Foulds |

type of conduct that merits the two-level enhancement.

| | | was part of large group of officers—all dressed in full uniform—guarding the entrance to the Capitol. It was clear that the person he was assaulting a government officer. |
|---|---|---|
| Adjustment | +2 | U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."<br><br>McCaughey provided materially false testimony under oath regarding his assault on Officer Foulds. See U.S.S.G. §3C1.1 n.4(B). This Court discredited McCaughey's claim that he never struck anyone or swung his riot shield, and found that he was not merely acting in self-defense, but offensively and actively resisting the officer. Trial Transcript, 13 September 2022: 27: 21-28:5. |
| Total | 22 | |

**Count Thirty-Four: 18 U.S.C. § 1512(c)(2) and § 2—obstruction of an official proceeding before Congress, and aiding and abetting**

| Base offense level: | 14 | U.S.S.G. §2J1.2(a) |
|---|---|---|
| Special offense characteristic | +8[4] | U.S.S.G. §2J1.2(b)(1)(B): "the offense involved causing or threatening to cause physical injury to a person, or property |

---

[4] The government acknowledges that this Court has determined that the enhancements under U.S.S.G. § 2J1.2(b)(1)(B) and (b)(2) do not apply to defendants convicted for their involvement in the January 6 riots on the ground that the offense conduct did not interfere with the "administration of justice." *See United States v. Seefried*, No. 21-CR-287 (TNM), __ F. Supp. 3d __, 2022 WL 16528415, at *11 (D.D.C. Oct. 29, 2022). For the reasons stated in the government's submissions in previous January 6 cases involving convictions for violations of 18 U.S.C. § 1512(c)(2), *see, e.g., United States v. Kevin Seefried*, 1:21-cr-00287 (TNM), ECF 135, pp. 20-24 (filed February 2, 2023), the government respectfully disagrees with the Court's ruling. It seeks the enhancements under Section 2J1.2(b)(1)(B) and (b)(2) here to preserve that position.

In the event this Court declines to assess the enhancements under those provisions, the government will nevertheless request an upward variance to reflect McCaughey's aggravating conduct that is captured by those enhancements (obstructing a Congressional proceeding and causing or threatening violence), regardless of whether that conduct interfered with the "administration of justice." This Court has granted or acknowledged the bases of such upward variances in January 6 cases in which it declined to assess those enhancements. *E.g., United States v. Hale-Cusanelli*, D.D.C. 1:21-cr-00037 (TNM); *United States v. Christian Secor*, D.D.C. 1:21-cr-00157 (TNM).

damage, in order to obstruct the administration of justice."

For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol riot cases refers to a "proceeding before the Congress, § 1515(a)(1)(B).

There are multiple theories for the application of this characteristic:

*First*, where a defendant directly caused injury, threatened injury, or damaged property, this enhancement applies based upon the defendant's own acts under § 1B1.3(a)(1)(A). Here, McCaughey's carrying and use of a police riot shield while assaulting officers, specifically Officer Hodges and Officer Foulds, in the Lower West Terrace tunnel, threatened injury. The evidence at trial established that McCaughey both possessed a dangerous weapon and threatened its use.

*Second*, U.S.S.G. § 1B1.3(a)(1)(A) encompasses both the defendant's own acts or omissions and those whom the defendant aided, abetted, counseled, commanded, induced, procured, or willfully caused. By blocking and assaulting the MPD officers who were trying to defend the Lower West Terrace door, McCaughey aided and abetted those rioters immediately around him who were threatening and assaulting these officers.

*Third*, McCaughey is responsible for "all acts … of others involved in jointly undertaken criminal activity" with McCaughey if those acts were "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). That provision does not require evidence of pre-planning or conspiracy; its plain terms apply to persons who acted in unison to achieve a common goal. McCaughey is responsible for the "jointly undertaken criminal activity" of the crowd of rioters he joined in lockstep, who charged up through the scaffolding, overcame two police lines, and then attempted to breach the Lower West Terrace doors by assaulting officers, in

| | | |
|---|---|---|
| | | furtherance of the goal to disrupt, delay, and prevent the certification vote, all of which was reasonable foreseeable in connection with that joint criminal activity. |
| Special offense characteristic | +3 | U.S.S.G. §2J1.2(b)(2): "the offense resulted in substantial interference with the administration of justice." The official proceeding of Congress's Joint Session, which was required by the Constitution and federal statute, had to be halted while legislators were physically evacuated for their own safety. |
| Special offense characteristic | +6 | U.S.S.G. § 3A1.2(c)(1): "If, in a manner creating a substantial risk of serious bodily injury, the defendant or a person for whose conduct the defendant is otherwise accountable knowing or having reasonable cause to believe that aa person was a law enforcement officer, assaulted such officer during the course of the offense or immediate flight therefrom." |
| | | While trying to break into the United States Capitol to stop the official proceeding, the defendant assaulted Officer Hodges. At trial, Officer Hodges testified that he suffered pain, bruising and abrasions as a result of his assaults that day. Specific to this assault by defendant McCaughey, Officer Hodges testified that he was crushed by the shield, making it difficult to breathe. Photographs and videos of those injuries were entered into evidence. Officer Hodges also testified that he sought medical treatment. |
| | | The Court's ruling on Count 24 included the finding that the Court "credit[ed] Officer Hodges's claim that Mr. McCaughey's use of the shield caused him significant pain, specifically in his lungs, his head and his face, that it crushed him;" that "he screamed out in part in pain because of Mr. McCaughey's actions against him," and that the officer "claime[ed] to have suffered large bruises and pain all over his body." The defendant's actions caused a substantial risk of serious bodily injury. |
| | | As noted in the Court's ruling, the defendant had reasonable cause to believe the person was a law enforcement officer. Video evidence showed that Officer Hodges was wearing his MPD uniform and full riot gear. See, Government's Exhibit 301. |
| Adjustment | +2 | U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the |

| | | |
|---|---|---|
| | | administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." |
| | | McCaughey provided materially false testimony under oath regarding his knowledge about the official proceeding and that he just wanted to protest inside the Capitol building. See U.S.S.G. §3C1.1 n.4(B). This Court held that claim incredible in its findings of fact, and found that his intent was instead to stop the official proceeding occurring inside. Trial Transcript, 13 September 2022: 40: 6-11. |
| Total | 33 | |

**Count Thirty-Five: 18 U.S.C. § 231(a)(3)—obstructing police during a civil disorder**

Since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, use "the most analogous guideline." U.S.S.G. §2X5.1. Here, that is U.S.S.G. §2A2.2 "Aggravated Assault" via 2A2.4(c)(1), "Obstructing or Impeding Officers."

| | | |
|---|---|---|
| Base Offense Level: | 14 | U.S.S.G. §2A2.2, "Aggravated Assault" |
| | | U.S.S.G. §2A2.4(c) provides a cross reference to §2A2.2 if the conduct constituted an aggravated assault. |
| | | In its ruling, the Court noted that defendant McCaughey knowingly committed multiple acts with the intended purpose of obstructing, impeding or interfering with law enforcement by "joining a mass push against the police line at 2:51 p.m." The defendant also assaulted Officer Hodges with a riot shield, crushing him in the doorframe of the Lower West Terrace tunnel, and struck and pushed against Officer Foulds with the same shield. |
| Adjustment | +2 | U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." |
| | | McCaughey provided materially false testimony under oath regarding his assault on Officer Hodges and Foulds. See |

27

| | | U.S.S.G. §3C1.1 n.4(B). This Court found that McCaughey's testimony that he did not intend to harm Officer Hodges because he eventually assisted the officer in putting down his helmet's face shield was not a credible viewing of the events. Trial Transcript 13 September 2022: 25: 15- 26:1. This Court also discredited the defendant's claim that he never struck anyone or swung his riot shield, and found that he was not merely acting in self-defense, but offensively and actively resisting the officer. Trial Transcript, 13 September 2022: 27: 21-28:5. |
|---|---|---|
| Total | 16 | |

**Count Thirty-Seven: 18 U.S.C. § 1752(a)(2) and (b)(1)(A)—disorderly and disruptive conduct in a restricted area while in possession of a dangerous weapon (Assault on Officer Hodges)**

| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
|---|---|---|
| Special offense characteristic | +3 | §2A2.4(b)(1)(A), "the offense involved physical contact" and (B), "a dangerous weapon (including a firearm) was possessed and its use was threatened." <br><br> A 3-level increase pursuant to §2A2.4(b)(1)(A) is appropriate because McCaughey made physical contact with at least one of the MPD officers that he threatened with his riot shielded. <br><br> It is also appropriate under §2A2.4(b)(1)(B). Photos and videos, as well as trial testimony, established that the defendant acquired a police riot shield the Capitol, and the Court's guilty verdict on Count Twenty-Four establishes an express finding that the shield, in this defendant's hands, constituted a dangerous weapon. Testimony and video evidence established that as the MPD officers tried to keep rioters out of the building at the Lower West Terrace Tunnel, McCaughey used his shield to crush Officer Hodges in the doorframe. Taken together, this evidence established that McCaughey both possessed a dangerous weapon and threatened its use. |
| Cross Reference | | U.S.S.G. § 2A2.4(c)(1): "If the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault)." |
| Offense Level Adjusted | 34 (from Count Twenty- | See discussion above for Count Twenty-Four |

|  | Four) |  |
|---|---|---|
| Total | 34 |  |

**Count Forty-Five: 18 U.S.C. § 1752(a)(4) and (b)(1)(A)—engaging in physical violence in a restricted building or grounds (Assault on Officer Hodges)**

| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
|---|---|---|
| Special offense characteristic | +3 | §2A2.4(b)(1)(A) "the offense involved physical contact" and (B), "a dangerous weapon (including a firearm) was possessed and its use was threatened." <br><br> A 3-level increase pursuant to §2A2.4(b)(1)(A) is appropriate because McCaughey made physical contact with at least one of the MPD officers that he threatened with his riot shielded. <br><br> It is also appropriate under §2A2.4(b)(1)(B). Photos and videos, as well as trial testimony, established that the defendant acquired a police riot shield the Capitol, and the Court's guilty verdict on Count Twenty-Four establishes an express finding that the shield, in this defendant's hands, constituted a dangerous weapon. Testimony and video evidence established that as the MPD officers tried to keep rioters out of the building at the Lower West Terrace Tunnel, McCaughey used his shield to crush Officer Hodges in the doorframe. Taken together, this evidence established that McCaughey both possessed a dangerous weapon and threatened its use. |
| Cross Reference |  | U.S.S.G. § 2A2.4(c)(1): "If the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault)." |
| Offense Level Adjusted | 34 (from Count Twenty-Four) | See discussion above for Count Twenty-Four |
| Total | 34 |  |

**Count Fifty Two: 40 U.S.C. § 5104(e)(2)(D)—disorderly or disruptive conduct in the Capitol building or grounds; and Count Fifty-Three: 40 U.S.C. § 5104(e)(2)(F )-- Act of Physical Violence in a Capitol Building or Grounds.**

| Base Offense Level: | n/a | Because these offenses are Class B misdemeanors, the Guidelines do not apply to it. *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9. |
|---|---|---|

*Grouping*

The government agrees with the multiple count adjustment and grouping generally in the PSR ¶ 98, but notes that the offense level for Group 2 should be 34 instead of 31, and Group 3 should be 22 instead of 20. The government believes the grouping analysis is as follows:

Group 1: Counts 14 and 35. The victim in both of these counts are the police officers in the Lower West Terrace tunnel. The total offense level for this group is 20.

Group 2: Counts 24, 34, 37 and 45. The victim in Count 34 is the U.S. Congress. Even though Count 24 has Officer Hodges as a separate victim, the 18 U.S.C. § 111(a)(1),(b) conviction in Count 24 "embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to" the Count 34 offense of violating 18 U.S.C. § 1512(c)(2). Therefore, Count 24 and 34 should group. Counts 37 and 45 also have Officer Hodges as the victim, as the convictions included the enhanced element of use of a deadly and dangerous weapon, which the Court found applied in Count 24. The total offense level for this group is 34.

Group 3: Count 25. The victim in Count 25 is Officer Henry Foulds, a separate victim from the other two groups. The offense level for this group is 22.

The government's adjustment to Group 2 will not change the analysis, however; since the remaining groups have adjusted offense levels of 20 and 22, and they are 9 or more levels less serious even with the adjusted Group 2 offense level, no additional units are added. The total offense level should be 34, instead of 31.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 107. Accordingly, based on the government's calculation of the defendant's total adjusted offense level at 34, McCaughey's Guidelines imprisonment range is 151 to 188

months' imprisonment. The government's allocution for 188 months' incarceration is consistent with this guidelines analysis.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the § 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted law enforcement on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air.

This Court has already sentenced many January 6 defendants, including four of defendant

McCaughey's co-defendants. This Court, in determining a fair and just sentence, should look to a number of critical factors to place this defendant near the top of those culpable for violent conduct on January 6, 2021.

McCaughey was on the Capitol grounds for at least 70 minutes. He was at the police line on the West Front by 2:05 p.m. and swarmed the overwhelmed police line at 2:28 p.m. when the line fell. He went into the Lower West Terrace tunnel and stayed in the area—the site of some of the fiercest fighting against police officers—for approximately 25 minutes between 2:50 p.m. and 3:15 p.m. He participated in a heave-ho that hampered officers at the police line. He used a stolen riot shield to crush Officer Hodges in the doorframe. He struck at Officer Foulds when he was attempting close the doors to the building. And he did all of this because he wanted to stop the proceedings happening inside the Capitol on January 6. The defendant's actions on January 6 show an absolute disregard for the rule of law coupled with a willingness to incite and engage in violence. The nature and circumstances of this defendant's crimes weigh heavily towards a significant term of incarceration.

### B. The History and Characteristics of the Defendant

McCaughey has no prior arrests or convictions.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly

administration of the democratic process."[5]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. McCaughey's criminal conduct, assaulting a police officer and corruptly obstructing of an official proceeding, is the epitome of disrespect for the law. When McCaughey entered the Capitol grounds, it was abundantly clear to him that lawmakers, and the police officers who tried to protect them, were under siege. Police officers were overwhelmed, outnumbered, and in some cases, in serious danger.

The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

Finally, the defendant not only committed the acts underlying the charges, but then took the stand, and under oath, prevaricated on his role. His lies were neither minimal nor insignificant – they were directly tied to his knowledge, intent, and purpose. This outward disrespect of the Court, not only as a judicial officer, but as a trier of fact, should weigh heavily on the sentence.

### D.    The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir.

---

[5] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available                                                                                                                  at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

Additionally, a strong sentence will deter others from not only committing the crime, but taking the stand and engaging in dishonesty. While every person is constitutionally entitled to a fair trial and defense, nothing should prevent this Court from discouraging individuals from providing candid testimony material to the trial.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. McCaughey took the stand in his own defense at trial and showed little remorse for his actions. He consistently downplayed his involvement in the violent assaults on law enforcement and his corrupt intent for doing so. It is not at all clear to the government that McCaughey grasps the seriousness of these offenses, and a

---

[6] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

strong sentence is necessary to prevent him from attempting any crimes like this in the future.

### E.   The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United

States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7]

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here—the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Thomas Webster*, 21-cr-208, Judge Mehta sentenced the defendant Thomas Webster after a jury trial to 120 months' incarceration. That case involved a vicious assault against a single officer who the defendant had picked out from the police line on the West Front. Webster was convicted of violating 18 U.S.C. §111(b), among other crimes, for using a flagpole in his assault on the officer, while he defended the Capitol. The government sought a guidelines sentence, which was significantly higher than the guidelines here here (210 to 262 months), because the defendant obtained multiple enhancements for destroying evidence and using body armor. He, like McCaughey, also did not receive a downward adjustment for acceptance for responsibility. Webster also took the stand in his own defense and lied, as McCaughey did here.

In *United States v. Robertson*, 21-cr-34, Judge Cooper sentenced defendant Thomas Robertson to 87 months of incarceration following his conviction to one count of violating 18

---

seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

U.S.C. § 1512(c)(2) and one count of violating 18 U.S.C. § 231(a)(3). Leading up to January 6, the defendant advocated on social media for the use of violence to overturn the election results. Robertson traveled to Washington, D.C. prepared; he packed a gas mask, food, and a large wooden stick. While on the West Front of the Capitol, the defendant joined a crowd of rioters blocking MPD's Civil Disturbance Unit that was struggling to move through the crowd on the West Plaza where the unit planned to reinforce the Capitol Police line. The defendant stood temporarily in front of the officers, blocking their path and raising his wooden stick in a "port arms" stance. The officers had to physically move the defendant to make their way through and, when they did, the defendant struck two officers with his stick. The defendant then joined the mob of rioters and advanced to the Upper West Terrace and into the Capitol building. The defendant made it into the Crypt but eventually left when ordered to do so by police. After January 6, the defendant bragged that he was proud of his conduct and destroyed his cell phone.

Like defendant Robertson, McCaughey joined the mob of rioters on the West Front, engaged with police, and bragged about his conduct on January 6 to his friends back in Connecticut. Unlike defendant Robertson, McCaughey was convicted of assault with a deadly weapon. McCaughey did not merely raise a stick in "port arms," and his weapon did not merely strike two officers – instead, McCaughey repeatedly struck officers with a stolen police shield and crushed one of them in a doorframe for over two minutes.

The government is aware that this Court has recently sentenced four of McCaughey's co-defendants: David Mehaffie received 14 months' incarceration, David Lee Judd received 32 months' incarceration, Geoffrey Sills received 52 months' incarceration and Tristan Stevens received 60 months' incarceration. None of these defendants, however, has the same number and

severity of convictions as McCaughey. Nor was their conduct as egregious and protracted as McCaughey's. McCaughey taunted police officers at the West Front bike racks and joined the mob that threw its weight against the beleaguered line of officers guarding the Capitol. McCaughey used a deadly and dangerous weapon against Officer Hodges, where he spent over two minutes using his body weight to crush the officer in the doorframe. McCaughey assaulted Officer Foulds when he was trying to shut the doors to the Lower West Terrace tunnel. And McCaughey downplayed all of these actions when he took the stand at trial, stating that he had no further intent then to get in the building to "probably just demonstrate." The actions taken by this defendant were heinous, and his sentence should reflect that.

**G**. **Upward Departure Pursuant to U.S.S.G. § 3A1.4, cmt. n.4**

Understanding the Court's anticipated ruling on the application of the enhancements set forth in U.S.S.G. § 2J1.2(b)(1)(B) and (b)(2), and the difference between the government's and the USPO's guidelines calculations on Count 24, the government seeks an appropriate departure under §3A1.4, cmt. n.4, for the reasons discussed herein. As the defendant was convicted of 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 111(b), along with the specific facts of this case, the defendant's conduct was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." The PSR also agrees that this enhancement can apply to McCaughey's case: at ¶ 171(a), the Probation Office notes that McCaughey's Group One offenses fit the 3A1.4, n.4 definition, and "in such cases an upward departure would be warranted[.]"

As this Court has already encountered this request in *United States v. David Judd*, 21-cr-40-TNM, ECF No. 527, the government will not summarize the law again. Here, the defendant

targeted the U.S. Capitol, undertaking a key function of government, highlighting his intent to intimidate government and its protectors. In this case, the Court noted that the defendant's battling of police officers on the doorstep of the Capitol had the natural and probable effect of obstructing the government business therein. Trial Transcript 13 September 2022: 37: 7-15. The Court also found that the defendant was concerned about election integrity and spoke repeatedly with his friends about election fraud. Trial Transcript 13 September 2022: 39: 14-17. McCaughey told the officers on the grounds of the Capitol to "go home" and "people in there make more in a month than you do in a year. Why are you risking your life for them?" This evidence demonstrated the defendant's knowledge of the proceedings inside the Capitol and his clear intent to stop them. Trial Transcript 13 September 2022: 39: 23- 40:5. And the defendant used violence to accomplish this goal. As the Court noted, "it is natural to assume that someone who is willing to battle police to get inside a building must have a great interest in what is going on inside." Trial Transcript 13 September 2022: 38: 14-20.

While the government believes that this guidelines adjustment applies and meaningfully epitomizes the crime he committed that day, we nevertheless understand and appreciate that the Court need not apply this departure to the extent it varies upward, consistent with its prior treatment of similarly situated defendants.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C.

Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. See 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*).[8]  Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[9]  *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). "In view of the purpose of the MVRA and the interpretation of the VWPA's

---

[8] While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement.  *See* 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); *see also United States v. Zerba*, 983 F.3d 983, 986 (8th Cir. 2020); *United States v. Giudice,* 2020 WL 220089, at *5 (D.N.J., Jan. 15, 2020).  The defendant in this case did not enter into a plea agreement.

[9] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

definition of 'victim,' we agree with the Government that it is 'inconceivable that ... Congress somehow meant to exclude the Government as a potential victim under the MVRA when it adopted the definition of 'victim' contained in the VWPA.'" *United States v. Ekanem*, 383 F.3d 40, 44 (2d Cir. 2004).

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[10] *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same);

---

[10] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513. Here, the Court should find that McCaughey's conduct in attacking law enforcement officers on the West Front and Lower West Terrace, who attempted to keep rioters from entering the building through the broken door at the head of the tunnel, warrants restitution.

*see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[11]

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s),

---

[11] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

*see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require McCaughey to pay $2,000 in restitution for his convictions. This amount fairly reflects McCaughey's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 188 months' incarceration, the top of his applicable guidelines range, 36 months' supervised release, $100 mandatory assessment, and $2000 restitution to the Architect of the Capitol.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY: ___/s/_____
KIMBERLY L. PASCHALL
Assistant United States Attorney
National Security Section
D.C. Bar No. 1015665
601 D Street, N.W.,
Washington, D.C. 20530
202-252-2650
Kimberly.Paschall@usdoj.gov